**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **BRIAN R. VAUGHAN and JASON DARNELL, individually and on behalf of all others similarly situated,** | ) ) ) ) | |
| *Plaintiffs,* | ) ) | **Case No.: 20-cv-04241** |
| v. | ) ) | **Honorable Marvin E. Aspen** |
| **BIOMAT USA, INC., TALECRIS PLASMA RESOURCES, INC., and INTERSTATE BLOOD BANK, INC.,** | ) ) ) ) | **Magistrate Judge Jeffrey Cole** |
| *Defendants.* | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO
DISMISS PLAINTIFFS' AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

RELEVANT FACTS AND PLAINTIFFS' CLAIMS ................................................................. 2

LEGAL STANDARD.............................................................................................................. 3

ARGUMENT ......................................................................................................................... 4

    I.      PLAINTIFFS' CLAIMS ARE PREEMPTED UNDER
           THE DOCTRINE OF CONFLICT PREEMPTION............................................... 4

    II.     VAUGHAN FAILS TO STATE A CLAIM UNDER
           SECTION 15(b) ..................................................................................................... 7

    III.    THE ALLEGED BIOMETRIC INFORMATION IS
           EXEMPT FROM THE BIPA'S REQUIREMENTS ............................................... 9

           A.      BIPA exempts information collected from a
                   patient in healthcare setting…………………………………………………9

           B.      The BIPA exempts "information collected, used or
                   stored for health care treatment"..................................................... 12

           C.      The BIPA exempts "image[s] used to . . . validate
                   scientific testing or screening"................................................... 14

    IV.    PLAINTIFFS FAIL TO SUFFICIENTLY PLEAD A
           VIOLATION BY EACH DEFENDANT ............................................................. 15

    V.     PLAINTIFFS' CLAIMS THAT DEFENDANTS
           RECKLESSLY VIOLATED THE BIPA ARE
           UNSUPPORTED AND INSUFFICIENTLY PLED ........................................... 16

CONCLUSION..................................................................................................... 17

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                      **Page(s)**

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ................................................................................................3, 4

*Bank of Am., N.A. v. Knight,*
725 F.3d 815 (7th Cir. 2013) ......................................................................................16

*Chamberlain Grp., Inc v. Techtronic Indus. N. Am.,*
No. 16 CV 06113, 2017 U.S. Dist. LEXIS 157301 (N.D. Ill. Sep. 26, 2017) .........16

*Crumpton v. Octapharma Plasma, Inc.,*
513 F. Supp. 3d 1006 (N.D. Ill. 2021) ...............................................................7, 12

*Diaz v. Silver Cross Hosp. & Med. Ctrs.,*
No. 2018 CH 001327 (Cir. Ct. Will Cnty. Aug. 29, 2019) .......................................14

*EEOC v. Concentra Health Servs., Inc.,*
496 F.3d 773 (7th Cir. 2007) ........................................................................................3

*Geier v. Am. Honda Motor Co.,*
529 U.S. 861 (2000) ................................................................................................4, 7

*Hecker v. Deere & Co.,*
556 F.3d 575 (7th Cir. 2009) ........................................................................................8

*Hoagland v. Town of Clear Lake,*
415 F.3d 693 (7th Cir. 2005) ........................................................................................4

*Landers v. School Dist.,*
66 Ill. App. 3d 78 (5th Dist. 1978) .............................................................................17

*Marsh v. CSL Plasma Inc.,*
503 F. Supp. 3d 677 (N.D. Ill. 2020) ..................................................................11, 12

*Martin v. Direct Wines, Inc.,*
2015 U.S. Dist. LEXIS 89015 (N.D. Ill. July 9, 2015) ...............................................3

*Mosby v. The Ingalls Mem'l Hosp. UCM Cmty. Health & Hosp. Div. Inc.,*
No. 2018 CH 05031 (Cir. Ct. Cook. Cty. Jan. 13, 2020) ..........................................18

*Namuwonge v. Kronos, Inc.,*
418 F. Supp. 3d 279 (N.D. Ill. 2019) .........................................................................17

*Navarette v. Josam Acquisitions,*
No. 2019 CH 14368 (Cir. Ct. Cook Cty. Mar. 29, 2021) ..........................................18

*New York SMSA Ltd. P'ship v. Town of Clarkstown*,
   612 F.3d 97 (2d Cir. 2010).................................................................................7

*Pine Top Receivables of Ill., LLC v. Banco De Seguros Del Estado*,
   No. 12 C 6357, 2013 U.S. Dist. LEXIS 28040 (N.D. Ill. Feb. 25, 2013).............8, 9

*Planned Parenthood of Ind., Inc., v. Comm'r of Ind. State Dep't of Health*,
   699 F.3d 962 (7th Cir. 2012) .............................................................................4

*Resnick v. Schwartz*,
   No. 17 C 04944, 2018 U.S. Dist. LEXIS 149767 (N.D. Ill. Sep. 3, 2018)..............8

*Rogers v. CSX Intermodal Terminals*,
   409 F. Supp. 3d 612 (N.D. Ill. 2019) ................................................................17

*Thurman v. Northshore Univ. Health Sys.*,
   No. 2018 CH 3544, 2019 WL 7249205 (Cir. Ct. Cook Cty. Dec. 12, 2019) .........18

*Venture Assocs. Corp. v. Zenith Data Sys. Corp.*,
   987 F.2d 429 (7th Cir. 1993) ............................................................................8

*Vo v. VSP Retail Dev. Holding, Inc.*,
   2020 U.S. Dist. LEXIS 53916 (N.D. Ill. March 25, 2020)...........................9, 12, 13

*Webster v. Windsor Estates Nursing and Rehab*,
   No. 2019 CH 11441 (Cir. Ct. Cook Cty. Nov. 11, 2020) ......................................18

**Statutes**

Illinois Biometric Information Privacy Act 740 ILCS 14/1, *et seq.*......................*Passim*

**Rules and Other Authorities**

Fed. R. Civ. P. 8 .................................................................................................16

Fed. R. Civ. P. 12(b)(6)..........................................................................................3

21 C.F.R. § 606.160 ..........................................................................................1, 4

21 C.F.R § 630.10 ..........................................................................................10, 15

21 C.F.R. § 630.15 .............................................................................................10

21 C.F.R. § 630.40 .............................................................................................11

21 C.F.R § 640.65 .............................................................................................15

80 Fed. Reg. 29842, 29869 (May 22, 2015) ..........................................................6

## INTRODUCTION

Defendants Biomat USA, Inc., Talecris Plasma Resources, Inc. ("TPR") and Interstate Blood Bank, Inc. ("IBBI") operate plasma donation centers across the country. Through a process called plasmapheresis,[1] Defendants obtain qualified donors' plasma which is then used to create life-saving treatments for individuals across the globe suffering from a variety of medical conditions. Plaintiffs Brian Vaughan and Jason Darnell are two donors who donated plasma at Defendants' centers in Illinois. Defendants are licensed and heavily regulated by the U.S. Food and Drug Administration ("FDA"). The FDA regulations, as set forth in the Code for Federal Regulations and extensive FDA guidance, require Defendants to undertake a thorough screening and donor-identification process for plasma donors such as Plaintiffs. As part of that process, Plaintiffs scanned their fingers to verify their identities at the start of the plasmapheresis screening process.

Plaintiffs allege that this screening and identification procedure violated the Illinois Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1, *et seq*. Specifically, Plaintiffs claim that Defendants used a finger-scanner to allegedly capture their biometric identifiers and biometric information but did not (i) make certain disclosures and obtain written releases before doing so, or (ii) make publicly available a policy with guidelines for the retention and destruction of biometric identifiers and biometric information. Amended Complaint ("Am. Compl.") ¶¶ 89-90. Plaintiffs' claims should be dismissed on multiple grounds.

*First and foremost*, Plaintiffs' BIPA claims are preempted by FDA regulations mandating a ten-year retention period for records related to the collection of donor plasma. *See* 21 C.F.R. 606.160(d). Because the BIPA's requirement that biometric information be destroyed after three

---

[1] Plasmapheresis is the process used in plasma donation whereby the plasma is separated from blood cells and the blood cells returned to the donor.

years at the *latest* is fundamentally in conflict with Defendants' obligations under federal law, Plaintiffs' claims are barred under the doctrine of conflict preemption.

*Second*, Plaintiff Vaughan's claim under Section 15(b) should be dismissed because Vaughan consented, in writing, to the collection of his biometric information.

*Third*, both Plaintiffs' claims should be dismissed in their entirety because the alleged biometric data at issue, collected as part of the plasmapheresis screening process and for the purpose of facilitating plasma donations and health care treatment, is expressly exempted from the BIPA's scope.

*Fourth*, Plaintiffs' claims should be dismissed because Plaintiffs fail to allege facts to sufficiently plead claims against each Defendant.

*Finally*, to the extent Plaintiffs seek to recover for reckless violations of the BIPA, Plaintiffs' complaint is insufficiently pled and devoid of any factual allegations to suggest that Defendants acted recklessly.

## **RELEVANT FACTS AND PLAINTIFFS' CLAIMS** [2]

Plaintiffs are two individuals who donated their plasma at federally licensed Plasma Donation Centers in Illinois. As part of that process, they allege that they "were required to scan at least one fingerprint so Defendants could create, collect, capture, construct, store, use, and/or obtain a biometric template for them."  Am. Compl. ¶ 26. Plaintiffs claim that Defendants then stored their alleged biometric data in Defendants' databases and created a template based on Plaintiffs' biometrics that could be used for future identification and authentication of donors. *Id*. ¶¶ 26-27. Plaintiffs do not allege which plasma donation center(s) they visited, which Defendant operated the center(s) where they donated, or the dates of any of their donations. In fact, Plaintiffs

---

[2]     Defendants accept Plaintiffs' well-pleaded allegations as true for purposes of this motion, as they must.

allege no facts specific to either of their experiences and make no distinction between any of the three Defendant entities.

Instead, Plaintiffs generically claim that Defendants' practices violated BIPA Sections 15(a) and (b) because Defendants allegedly (i) never informed donors in writing that their biometric identifiers or information ("biometrics") were being captured, obtained, collected or stored or the purpose and length of time for which their biometrics were being kept, (ii) never obtained donors' written consent to capture, collect, obtain or store their biometrics, and (iii) failed to publicly disclose their retention schedule and guidelines for permanently destroying donor biometrics. *Id.* ¶¶ 54-57. Plaintiffs seek liquidated damages of $1,000 for each negligent violation, $5,000 for each willful or reckless violation, and other remedies. *Id*. ¶¶ 93, 105.

Plaintiffs bring this suit on behalf of themselves and a putative class including "[a]ll persons who were enrolled in the biometric system used by Defendants in Illinois for plasma donors while donating plasma to Defendants from five years preceding the filing of this action to the date a class notice is mailed[.]" *Id.* ¶ 66.

## **LEGAL STANDARD**

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must "contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). A claim should be dismissed where, accepting all well-pleaded factual allegations in the light most favorable to the plaintiff, the complaint nevertheless fails to "plausibly suggest that the plaintiff has a right to relief." *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007). Courts "need not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Martin v. Direct Wines, Inc.*, 2015 U.S. Dist. LEXIS 89015, at *2 (N.D.

Ill. July 9, 2015). Conclusions of fact and law "are . . . not entitled to the assumption of truth" and may be disregarded. *Iqbal*, 556 U.S. at 679.

## ARGUMENT

### I.      PLAINTIFFS'   CLAIMS   ARE   PREEMPTED   UNDER   THE DOCTRINE OF CONFLICT PREEMPTION

Plaintiffs' claims that Defendants violated BIPA sections 15(a) and (b) must be dismissed, first and foremost, pursuant to the doctrine of conflict preemption. BIPA's requirements are in fundamental conflict with federal regulations on the retention and preservation of donor records and frustrate the purpose of the FDA's intent with respect to donor screening.

The preemption doctrine, which is rooted in the Supremacy Clause of the U.S. Constitution, holds that federal law can preempt state laws in three ways: expressly (express preemption), impliedly (conflict preemption), and where federal legislation thoroughly occupies the legislative field (field preemption). *Hoagland v. Town of Clear Lake*, 415 F.3d 693, 696 (7th Cir. 2005). Federal regulations promulgated by an agency acting non-arbitrarily and within its congressionally delegated authority may also have pre-emptive force. *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 899 (2000). Conflict preemption arises in two scenarios: (1) when "it is impossible for a private party to comply with both state and federal requirements," or (2) when "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Planned Parenthood of Ind., Inc., v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 984 (7th Cir. 2012). Plaintiffs' claims are implicitly preempted for both reasons.

First, BIPA's requirements are in inherent conflict with Defendants' obligations under federal law. The collection of source plasma is subject to numerous and extensive federal regulations, including regarding the retention of donor records. *See* 21 C.F.R. § 606.160(b)(1).  21 C.F.R. § 606.160 sets forth the retention period for manufacturing records and states as follows:

(d) Records shall be retained for such interval beyond the expiration date for the blood or blood component as necessary to facilitate the reporting of any unfavorable clinical reactions. ***You must retain individual product records no less than 10 years after the records of processing are completed or 6 months after the latest expiration date for the individual product, whichever is the later date.*** When there is no expiration date, records shall be retained indefinitely. (Emphasis added.)

The regulations provide additional clarity, requiring the retention of records "for each donor," "including a separate and complete record of initial and periodic examinations, tests, laboratory data, and interviews, etc." as well as "record[s] which may be electronic of the donor's consent for participation in the plasmapheresis program or for immunization." § 640.72 (a)(2)-(3). Under these regulations, any data collected from donors as part of the plasmapheresis screening process is a part of the manufacturing record and subject to at least a ten-year retention period.[3]

The BIPA's requirements are fundamentally incompatible with these federal regulations. Under the BIPA, biometric identifiers and biometric information must be destroyed "when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever *occurs first*." 740 ILCS 14/15(a) (emphasis added). In other words, the alleged biometric data that federal law requires Defendants to maintain for a minimum of ten years would need to be destroyed within three years *at the latest* to comply with the BIPA. These two sets of requirements make compliance with both federal regulations and the BIPA impossible. Under the Supremacy Clause, this conflict

---

[3]      The records at issue are subject to even longer retention requirements under regulations promulgated by the European Medicines Agency ("EMA"). In compliance with the requirements set forth in directives 2002/98/EC and 2005/61/EC, "facilities to which blood and blood components are delivered, including manufacturers, should retain traceability records for at least 30 years after the time of the donation." Guideline on Plasma-Derived Medicinal Products,      EMA/CHMP/BWP/706271/2010      (21      July      2011),      *available      at*: https://www.ema.europa.eu/en/documents/scientific-guideline/guideline-plasma-derived-medicinal-products_en.pdf (last accessed Dec. 17, 2021). The Guidelines further clarify that "a link from donation/donor to finished product should be maintained by the manufacturer of the plasma derived product for at least 30 years after the time of the donation." *Id.*

between federal regulations and state legislation is resolved in favor of federal law, which preempts the BIPA's requirements. Plaintiffs' claims must be dismissed as a result.

In addition, the BIPA's requirements frustrate the purpose of federal regulations that *specifically* contemplate the use of "biometric[s]" in the donor screening process and promote "flexibility to accommodate advancing technology." 80 Fed. Reg. 29842, 29869 (May 22, 2015). At present, finger-scan technology provides Defendants with an efficient and reliable method of verifying the identities of donors to ensure donor eligibility, as contemplated by federal law. As a result, biometrics provide an important safeguard against abuse in a system where donors have a financial incentive to donate more frequently than the law permits or in circumstances where they would be prohibited from doing so. Biometrics are thus a critical method of verifying the identity of the donor, the viability of the plasma and ultimately, the safety of the recipients of plasma-derived medicines.

Subjecting the donor-identification and screening process to the BIPA's requirements and its draconian damages provisions would discourage the use of this more efficient and reliable technology, despite the FDA contemplating the use of biometrics during the donor screening process and express commitment to "flexibility to accommodate advancing technology." 80 Fed. Reg. 29869. The practical result is the reversion to a less reliable system that provides fewer safeguards and frustrates the purpose of the FDA's extensive regulations aimed at ensuring the integrity, safety, and traceability of each plasma collection and the agency's express intent of "mak[ing] the donor eligibility and testing requirements more consistent with current practices," "better assur[ing] the safety of the nation's blood supply" and providing "flexibility to accommodate advancing technology." 80 Fed. Reg. 29842.

Indeed, at least one court which has considered this issue has proposed the adoption of an "alternative method of providing donor identity" as a solution to the conflict between the federal regulations' endorsement of "biometric means" as a valid screening procedure and the BIPA's requirements. *See Crumpton v. Octapharma Plasma, Inc.*, 513 F. Supp. 3d 1006, 1014 (N.D. Ill. 2021). Implicit in that court's suggestion, however, is a recognition that the BIPA impedes the FDA's intent of permitting biometrics in the donor screening process. The doctrine of conflict preemption bars Plaintiffs' claims on this basis as well. *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 886 (2000) (finding preemption where a state law regarding airbag installation "would have stood as an obstacle to the gradual passive restraint phase-in that the federal regulation deliberately imposed"); *New York SMSA Ltd. P'ship v. Town of Clarkstown,* 612 F.3d 97, 106 (2d Cir. 2010) (holding that federal law preempted a local statute which explicitly establishes a 'preference' for certain wireless technology that interfered with Congress's goal of facilitating the spread of new technologies and the growth of wireless telephone service.).

Because the BIPA is both fundamentally incompatible with federal regulations and in conflict with the federal intent of promoting effective donor screening and safe, traceable plasma donations, Plaintiffs' claims under the BIPA are preempted and must be dismissed.

## II.    VAUGHAN FAILS TO STATE A CLAIM UNDER SECTION 15(b)

Plaintiff Vaughan's claim under Section 15(b) of the BIPA should be dismissed because, contrary to his allegations, Vaughan in fact received a written information regarding the collection of his fingerprints, and he consented to the collection in writing, consistent with the BIPA's requirements.

Though matters outside the pleadings generally may not be considered on a motion to dismiss, the Seventh Circuit has held that "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiffs['] complaint and

are central to [their] claim." *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) (admitting letters referred to in the complaint that established the parties' contractual relationship); *see also Hecker v. Deere & Co.*, 556 F.3d 575, 583 (7th Cir. 2009) (upholding district court's consideration of documents attached to a motion to dismiss which were "central to plaintiffs' case"). Though a "plaintiff is under no obligation to attach to her complaint documents upon which her action is based . . . a defendant may introduce certain pertinent documents if the plaintiff failed to do so." *Venture Assocs.*, 987 F.2d at 431. A document that goes to "the heart of the case" and the underlying basis for a plaintiff's claim is appropriate to consider. *Resnick v. Schwartz*, No. 17 C 04944, 2018 U.S. Dist. LEXIS 149767, at *9 n.8 (N.D. Ill. Sep. 3, 2018) (Chang, J.) (permitting consideration of a defined benefit pension plan attached to defendant's motion to dismiss that was "at the heart of [Plaintiff's] case"); *Pine Top Receivables of Ill., LLC v. Banco De Seguros Del Estado*, No. 12 C 6357, 2013 U.S. Dist. LEXIS 28040, at *6 (N.D. Ill. Feb. 25, 2013) (Aspen, J.) (permitting consideration of treaties and an assignment agreement that provided "the basis for plaintiff's claim").

Here, Plaintiffs' 15(b) claim is premised on the allegations that Defendants (1) failed to inform them in writing that their biometric information was being collected and the purpose of that collection; and (2) failed to obtain their written consent. In fact, Vaughan was provided a Consent Agreement for Automated Plasmapheresis ("Consent Agreement"), which specifically informed him that his fingerprints would be collected "as biometric authentication of [his] identity as part of the automatic screening process." *See* Consent Agreement, ¶ 16, attached hereto as Exhibit A. Vaughan executed the Consent Agreement in the presence of a medical staff member serving as a witness on June 14, 2017, prior to using the finger-scanner; in so doing, he acknowledged that he "underst[ood] and [agreed]" to "provide [his] fingerprint as biometric authentication." *Id*. The

Consent Agreement is unambiguous and affirmatively establishes that Vaughan knew he was providing potential biometric information during the donation screening process, understood the reason for it, and consented. His written, informed consent affirmatively defeats any alleged violation of Section 15(b) of the BIPA and his claim must be dismissed with prejudice as a result.

## III.   THE ALLEGED BIOMETRIC INFORMATION IS EXEMPT FROM THE BIPA'S REQUIREMENTS

Plaintiffs' claims also fail because the alleged biometric information at issue is explicitly excluded from the BIPA's requirements. The BIPA states that the "biometric identifiers" subject to the statute "do *not* include information captured from a patient in a health care setting or information collected, used, or stored for health care treatment, payment, or operations under [HIPAA]." 740 ILCS 14/10 (emphasis added). In other words, alleged biometric identifiers fall outside the BIPA's scope if they are "(1) . . . obtained from a patient in a health care setting; or (2) . . . collected, used, or stored in connection with healthcare treatment[.]"[4] *Vo v. VSP Retail Dev. Holding, Inc.*, 2020 U.S. Dist. LEXIS 53916, *4 (N.D. Ill. March 25, 2020) (dismissing plaintiff's BIPA claims pursuant to this statutory exemption). Here, the alleged biometric identifiers at issue are exempt under both prongs, as well as under a separate exemption excluding from the BIPA's scope all "image[s]….used to…validate scientific testing or screening."  740 ILCS 14/10.

A.  BIPA exempts information collected from a patient in a health care setting

First, the alleged biometric identifiers at issue are excluded from the BIPA's scope under the exception for information obtained from patients in a health care setting.

---

[4]     Defendants do not contend that they are covered entities under HIPAA or that the alleged biometric identifiers at issue were "collected, used or stored" for "operations under HIPAA."  Rather, Defendants contend that the alleged biometric identifiers at issue here are excluded from the BIPA's scope based on the two exceptions cited above for information obtained from a patient in a health care setting or collected, used, or stored in connection with healthcare treatment.

The BIPA does not define "patient" or "healthcare setting," but the plain language of those terms suggests a clear intent to make an exception for individuals undergoing medical procedures. Plaintiffs donating at Defendants' locations and undergoing plasmapheresis fall within this exception for purposes of the BIPA. For instance, to donate their plasma, donors must be screened and examined by trained personnel who review their medical history, assess their total plasma protein levels, and conduct a "physical examination" for "medical conditions that would place the *donor* at risk from plasmapheresis." *See* 21 CFR § 630.15(b) (emphasis added). If a determination is made that plasmapheresis poses a risk to the donor, the donor is deferred from donating. § 630.15(b)(1); *see also* § 630.10 ("A donor is not eligible if the donor is not in good health or if you identify any factor(s) that may cause the donation to adversely affect . . . (1) The health of the donor"). In addition, trained medical specialists "explain the risks and hazards of the procedure to the donor, includ[ing] the risks of a hemolytic transfusion reaction if the donor is given the cells of another donor and the risks involved if the donor is immunized." § 630.15(b)(2)(iii). In short, though other parties are the ultimate beneficiaries of plasmapheresis, conducting a physical evaluation and evaluating donors' health is an integral part of that process and intended for the *donors' benefit* to ensure their continued health.

Plaintiffs will undoubtedly respond by pointing to *Marsh v. CSL Plasma*, in which the court held that "a person who sells plasma to CSL is not a 'patient' in a 'healthcare setting.'" *Marsh v. CSL Plasma Inc.*, 503 F. Supp. 3d 677, 683 (N.D. Ill. 2020). In so holding, the court concluded that "the only thing that CSL is providing to the seller is money." *Id*. That is not the case here. As outlined above, per federal regulations, donors at Defendants' facilities receive a medical screening and health evaluation performed for their benefit to ensure their continued health. Through that screening process, donors receive critical information about their own health

10

that they might not have otherwise. For instance, a donor who is deferred from donating based on reactive test results is notified of those results and "[w]here appropriate," provided "information concerning medical follow-up and counseling." 21 C.F.R. § 630.40. Donors may very well have not received that health information without visiting Defendants' facilities and undergoing the plasmapheresis screening process.

That donors receive compensation for their time does not negate that they receive a medical evaluation during the plasmapheresis process and information about their health in order to ensure their continued well-being. This is not, as the Marsh court suggested, a bare financial transaction, as if the donor arrives at the center with a bag of his or her plasma in hand and exchanges it for money. Rather, the donor undergoes a sensitive, and highly regulated, medical procedure that accounts for the health and safety of both the donor and the ultimate recipient of plasma-derived treatment.[5]

*Vo v. VSP Retail Dev. Holding, Inc.* is also instructive. There, an eyewear company used Virtual Try-On software that collected information about customers' facial geometry to help fit them for eyewear. *Id*. at *2. The plaintiff used the Virtual Try-On software while visiting the Company's website but never requested or received an eye exam and never provided or received a prescription. *Id*. at *5-6. The court nevertheless held that because the company sells prescription eyewear, which are Class I medical devices under federal regulations, the company "provides health care"; further, because the Virtual Try-On software "facilitates this health care service," the biometric information allegedly collected from customers was "collected from a patient in a health

---

[5]     *Marsh* is also distinguishable in that the court there found that the "plaintiffs had the better of the argument" after the defendant took the dubious position that a "patient" is secondarily defined as "one that is acted upon." 503 F. Supp. 3d at 684. The court unequivocally rejected the argument, remarking that the secondary definition was attributed to a philosopher in a 1950 book on metaphysics and is a "far, far cry from the plain meaning of the word." *Id*.

care setting" and exempted by the statute. *Id*. That the plaintiff "never requested an eye exam, never received an eye exam, never provided Defendant with a prescription for corrective lenses, never received any such prescription, and never requested or received any sort of medical treatment or advice" did not change the court's analysis. *Id*. at *5-6. The court held that "even if [plaintiff] did not proceed past the Virtual Try-On software to the eye exam and prescription stage, *the initial evaluation of a prospective patient* still constitutes a health care service." *Id*. at *6 (emphasis added). This case is even clearer. Unlike the plaintiff in *Vo*, Plaintiffs here *did* undergo a medical evaluation, and did so at a federally regulated donation facility in connection with a medical procedure to collect and subsequently separate and extract plasma from other of their blood components. To the extent prospective customers browsing an eyeglass company website, who provide no medical information and received no medical evaluation constitute "patients in a health care setting," donors who are examined and evaluated by health care professionals at Defendants' facilities in preparation for plasmapheresis donation undoubtedly do too.

B. The BIPA exempts "information collected, used or stored for health care treatment"

Second, the alleged biometric data at issue is also excluded from BIPA's scope under the exception for "information collected, used or stored for health care treatment." *See* 740 ILCS 14/10. Though "health care treatment," like "health care setting," is not defined by the BIPA, there can be no dispute that the supposed biometric identifiers collected here which Plaintiffs allege were used to "identif[y] and authenticat[e]" donors and their donations (*see* Am. Compl. ¶ 26) were collected in order to ensure the integrity of the plasma and for the purpose of providing healthcare treatment to those in need.[6] Indeed, Defendants' mission, and the very purpose of

---

[6] *See generally*, Plasma: A source of life, available at: https://www.grifolsplasma.com/en/about-plasma-donation/plasma-a-source-of-life (last accessed Dec. 9, 2021) (explaining the benefits of plasma and its applications for various healthcare treatments).

plasma donation and collection in the first place, is to provide health treatment for individuals suffering from illnesses caused by the lack of essential proteins and antibodies found in blood plasma.[7] Because these proteins cannot be synthetically created or replicated in a lab, plasma donations provide an invaluable source of treatment for patients who depend on plasma-based medications for lifelong treatment of their illnesses.[8]  Any biometric identifiers that Defendants allegedly collected were in furtherance of providing those treatments by ensuring the safe and effective collection of plasma and thus fit squarely in the BIPA's exception.

*Diaz v. Silver Cross Hosp. & Med. Ctrs*., No. 2018 CH 001327 (Cir. Ct. Will Cnty. Aug. 29, 2019) (attached hereto as Exhibit B) offers support for this conclusion. In *Diaz*, a registered nurse scanned her finger at a medical-supply station to access prescription drugs for her patient. The court held that the alleged biometric data generated from her finger scan fell within the "health care" exception of the BIPA and dismissed plaintiff's claims. That the plaintiff was not the beneficiary of the treatment had no impact on the court's analysis. Nor should it here. Like the nurse in *Diaz*, Plaintiffs' alleged biometric information was collected for the purpose of providing healthcare treatment and is similarly exempted under the plain language of the statute.

Taken together, these two exemptions of not only patient information, but also information collected in connection with healthcare treatment more generally, evidence a clear legislative intent not to infringe on the provision of important healthcare treatments or otherwise compromise the ability to verify individuals' identities in that setting. Consistent with both the plain language of the statute, and the drafters' clear intent to exclude data collected in the healthcare context, Plaintiffs' claims fail.

---

[7]     *Id.*

[8]     *Id.*

C. The BIPA exempts "image[s] used to . . . validate scientific testing or screening"

In addition to exempting information related to healthcare, the BIPA also excludes from its definition of biometric identifiers "image[s] used to . . . validate scientific testing or screening." 740 ILCS 14/10. The alleged finger scans at issue fall within this exemption as well.

Donors' finger scans, which Defendants allegedly used to create a donor "template[s]" for identification and authentication purposes and to track their donations going forward, constitute an integral first step in the screening and testing process used to evaluate donor eligibility and ensure safe and viable plasma collection. *See* Am. Compl. ¶¶ 25, 26, 28. Specifically, by using finger-scan technology, Defendants are able to quickly and accurately screen donors to confirm that they meet the requirements to donate, including, for instance, that they are in good health pursuant to the FDA's regulations and that they have not donated an impermissible number of times.[9] Indeed, federal regulations *require* this initial screening and testing process to confirm that donors are in "good health and free from transfusion-transmitted infections" prior to the collection of blood or blood components, including plasma. 21 C.F.R § 630.10; *see also* 21 C.F.R § 640.65 ("A donor identification system shall be established that positively identifies each donor and relates such donor directly to his blood and its components as well as to his accumulated records and laboratory data.").

Defendants' alleged use of the finger-scanner technology served that purpose by validating the donors' identity and donor history and ensuring the completion of the requisite testing and health screen. Any alleged biometric identifiers collected as part of that screening process are therefore excluded from the definition of biometric identifiers under the statute. As such, Plaintiffs' claims necessarily must fail.

---

[9]     21 CFR § 630.10 outlines the limitations on the frequency of plasma donation.

## IV.    PLAINTIFFS FAIL TO SUFFICIENTLY PLEAD A VIOLATION BY EACH DEFENDANT

Plaintiffs' Amended Complaint also fails to sufficiently allege claims against each Defendant.  Under Fed. R. Civ. P. 8, "[a] complaint must set forth what each person (or corporation) is accused of doing." *Chamberlain Grp., Inc v. Techtronic Indus. N. Am.*, No. 16 CV 06113, 2017 U.S. Dist. LEXIS 157301, at *7 (N.D. Ill. Sep. 26, 2017) (citing *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013)).  "Details about who did what are not merely nice-to-have features of an otherwise-valid complaint; to pass muster under Rule 8 of the Federal Rules of Civil Procedure, a claim to relief must include such particulars. . . ." *Id*. at *7-8.

Here, Plaintiffs fail to allege *any* facts specific to any of the three Defendants.  They do not allege which plasma donation center(s) they visited, which Defendant operated the facilit(ies) where they donated, or the dates of any of their donations.  To the contrary, Plaintiffs allege only that they "donated plasma at ***one of the Defendants'*** Illinois-based plasma donation centers." Am. Compl. ¶¶ 2, 24.

Indeed, Plaintiffs make no attempt to distinguish among the Defendants, referring to them only generically as "Defendants" throughout the Complaint.  The only reference to Defendants individually is in allegations regarding their places of business.  *Id*. ¶¶ 3, 4.  As the case law makes clear, details regarding where and when Plaintiffs allegedly donated are not simply "nice-to-have," but required under the Federal Rules to give Defendants sufficient notice of the claims against them.  *See Chamberlain Grp.*, 2017 U.S. Dist. LEXIS 157301, at *11 (dismissing claims where the "complaint tells us nothing about the individual actions of, or the relationships between, the various TTI defendants").  Plaintiffs' allegations against each Defendant are woefully deficient in this regard and should be dismissed on that basis as well.

## V. PLAINTIFFS' CLAIMS THAT DEFENDANTS RECKLESSLY VIOLATED THE BIPA ARE UNSUPPORTED AND INSUFFICIENTLY PLED

Finally, Plaintiffs' claims should be dismissed to the extent they seek to recover damages for reckless violations of the BIPA. Although not defined by the BIPA, recklessness under Illinois common law is akin to willful and wanton conduct or "a course of action . . . which, if not intentional, shows an utter indifference to or conscious disregard for . . . the safety of others." *Landers v. School Dist.,* 66 Ill. App. 3d 78, 82 (5th Dist. 1978) (citations omitted). Here, Plaintiffs' complaint contains no allegations that Defendants acted recklessly. To the contrary, Plaintiffs allege a bare statutory violation that makes no mention or allegations of reckless conduct, but then pray for $5,000 in relief for each reckless violation. Absent any "substantive details regarding whether the allegations were reckless," Plaintiffs' claims for recklessness must be dismissed. *See Namuwonge v. Kronos, Inc.*, 418 F. Supp. 3d 279, 286 (N.D. Ill. 2019).

Federal and state courts across Illinois have repeatedly dismissed allegations of reckless or intentional conduct under the BIPA in cases where plaintiffs have similarly sought enhanced damages based on reckless conduct but failed to allege any facts in support. *E.g.*, *Namuwonge,* 418 F. Supp. 3d at 286 (finding plaintiff's "abstract statements regarding damages . . . insufficient for the Court to infer that Kronos acted recklessly or intentionally" and dismissing those claims on that basis); *Rogers v. CSX Intermodal Terminals*, 409 F. Supp. 3d 612, 619 (N.D. Ill. 2019) (general allegations that defendant's violations were "knowing and willful," were "insufficient to allow us to infer that [defendant] acted intentionally or recklessly and does nothing to distinguish this case from every possible BIPA case where the defendant is alleged to have failed to meet the strictures of Section 15."); *Mosby v. The Ingalls Mem'l Hosp. UCM Cmty. Health & Hosp. Div. Inc.,* No. 2018 CH 05031, Tr. of Hr'g at 69, 72 (Cir. Ct. Cook. Cty. Jan. 13, 2020) (dismissing a BIPA claim for reckless/intentional damages that was unsupported by facts); *Thurman v.*

16

*Northshore Univ. Health Sys.,* No. 2018 CH 3544, 2019 WL 7249205, at *12 (Cir. Ct. Cook Cty. Dec. 12, 2019) (striking conclusory allegation that BIPA defendant's actions were "willful and/or reckless"); *Navarette v. Josam Acquisitions,* No. 2019 CH 14368, Tr. of Hr'g at 3:11–22 (Cir. Ct. Cook Cty. Mar. 29, 2021) (allegations of recklessness and intentionality were "insufficient" to allow plaintiff to "proceed with request for enhanced damages"); *Webster v. Windsor Estates Nursing and Rehab,* No. 2019 CH 11441, Tr. of Hr'g at 33-34 (Cir. Ct. Cook Cty. Nov. 11, 2020) (dismissing allegations regarding reckless and intentional conduct that lacked factual support) (excerpts of transcripts attached hereto as composite Exhibit C). The outcome should be no different here, where Plaintiffs' allegations of recklessness amount to a single unsupported sentence in their prayer for relief.

## **CONCLUSION**

For all the reasons stated above, Defendants respectfully request that the Court grant this Motion and dismiss Plaintiffs' Amended Class Action Complaint with prejudice.


Dated: December 17, 2021                    Respectfully submitted,

                                            **BIOMAT USA, INC., TALECRIS PLASMA RESOURCES, INC., and INTERSTATE BLOOD BANK, INC.,**

                                   By:      /s/ Neil H. Dishman
                                            One of Their Attorneys

Jason A. Selvey
Neil H. Dishman
Julia S. Wolf
Jackson Lewis P.C.
150 North Michigan Avenue, Suite 2500
Chicago, Illlinois  60601
Tel.: 312.787.4949
Neil.Dishman@jacksonlewis.com
Jason.Selvey@jacksonlewis.com
Julia.Wolf@jacksonlewis.com

<u>**CERTIFICATE OF SERVICE**</u>

I, Neil H. Dishman, an attorney, certify that on December 17, 2021, I caused a true and correct copy of the attached *Defendants' Memorandum of Law in Support of Their Motion to Dismiss Plaintiffs' Class Action Complaint* to be served on the following counsel of record by filing with the Court's CM/ECF filing system:

David A. Fish
Mara Baltabols
The FISH LAW FIRM PC
200 East Fifth Avenue, Suite 123
Naperville, Illinois 60563
(630) 355-7590
dfish@fishlawfirm.com
mara@fishlawfirm.com

<u>/s/ Neil H. Dishman</u>

# EXHIBIT A

CONFIDENTIAL

| GRIFOLS | Form | | Page: 1 of 7 |
|---|---|---|---|
| Grifols Plasma Operations | Document #: 10-01A_NG | Revision: 2.0 | Effective Date: 15-Feb-2017 |
| | Title: Consent Agreement for Automated Plasmapheresis | | |



PROPRIETARY AND CONFIDENTIAL; SOLELY FOR THE AUTHORIZED USE OF THE GRIFOLS PLASMA COMPANIES AND THEIR AFFILIATES. PUBLICATION, REPUBLICATION, DISSEMINATION, OR DISCLOSURE OF THIS DOCUMENT REQUIRES GRIFOLS' SPECIFIC WRITTEN CONSENT. DESTROY IF YOU ARE IN UNAUTHORIZED POSSESSION OF THIS DOCUMENT.

CONFIDENTIAL

| GRIFOLS | Form | | Page: 2 of 7 |
|---|---|---|---|
| | Document #: 10-01A_NG | Revision: 2.0 | Effective Date: 15-Feb-2017 |
| Grifols Plasma Operations | Title: Consent Agreement for Automated Plasmapheresis | | |

PROPRIETARY AND CONFIDENTIAL; SOLELY FOR THE AUTHORIZED USE OF THE GRIFOLS PLASMA COMPANIES AND THEIR AFFILIATES. PUBLICATION, REPUBLICATION, DISSEMINATION, OR DISCLOSURE OF THIS DOCUMENT REQUIRES GRIFOLS' SPECIFIC WRITTEN CONSENT. DESTROY IF YOU ARE IN UNAUTHORIZED POSSESSION OF THIS DOCUMENT.

CONFIDENTIAL

| GRIFOLS | Form | | Page: 3 of 7 |
|---|---|---|---|
| Grifols Plasma Operations | Document #: 10-01A_NG | Revision: 2.0 | Effective Date: 15-Feb-2017 |
| | Title: Consent Agreement for Automated Plasmapheresis | | |



PROPRIETARY AND CONFIDENTIAL; SOLELY FOR THE AUTHORIZED USE OF THE GRIFOLS PLASMA COMPANIES AND THEIR AFFILIATES. PUBLICATION, REPUBLICATION, DISSEMINATION, OR DISCLOSURE OF THIS DOCUMENT REQUIRES GRIFOLS' SPECIFIC WRITTEN CONSENT. DESTROY IF YOU ARE IN UNAUTHORIZED POSSESSION OF THIS DOCUMENT.

CONFIDENTIAL

| GRIFOLS | Form | | Page: 4 of 7 |
|---|---|---|---|
| | Document #: 10-01A_NG | Revision: 2.0 | Effective Date: |
| Grifols Plasma Operations | Title: Consent Agreement for Automated Plasmapheresis | | 15-Feb-2017 |

PROPRIETARY AND CONFIDENTIAL; SOLELY FOR THE AUTHORIZED USE OF THE GRIFOLS PLASMA COMPANIES AND THEIR AFFILIATES. PUBLICATION, REPUBLICATION, DISSEMINATION, OR DISCLOSURE OF THIS DOCUMENT REQUIRES GRIFOLS' SPECIFIC WRITTEN CONSENT. DESTROY IF YOU ARE IN

CONFIDENTIAL

| GRIFOLS | Form | | Page: 5 of 7 |
|---|---|---|---|
| | Document #: 10-01A_NG | Revision: 2.0 | Effective Date: |
| Grifols Plasma Operations | Title: Consent Agreement for Automated Plasmapheresis | | 15-Feb-2017 |

PROPRIETARY AND CONFIDENTIAL; SOLELY FOR THE AUTHORIZED USE OF THE GRIFOLS PLASMA COMPANIES AND THEIR AFFILIATES. PUBLICATION, REPUBLICATION, DISSEMINATION, OR DISCLOSURE OF THIS DOCUMENT REQUIRES GRIFOLS' SPECIFIC WRITTEN CONSENT. DESTROY IF YOU ARE IN UNAUTHORIZED POSSESSION OF THIS DOCUMENT.

CONFIDENTIAL

| GRIFOLS | Form | | Page: 6 of 7 |
|---|---|---|---|
| | Document #: 10-01A_NG | Revision: 2.0 | Effective Date: |
| Grifols Plasma Operations | Title: Consent Agreement for Automated Plasmapheresis | | 15-Feb-2017 |

16. I understand and agree that I will provide my fingerprint as biometric authentication of my identify as part of the automated screening process (one time at the beginning of the screening process and one time at the completion of the screening process). I further understand and agree that by and through the provision of my fingerprint following the completion of the health, medical, and lifestyle history questions and acknowledgment and verification statements contained in the automated screening process, I have acknowledged, verified, and agreed to, and will acknowledge, verify, and agree to, all of the information, answers, statements, and representations provided and made in response to such questions and statements and have represented, and will represent, that all such information, answers, statements, and representations are true, accurate, and complete.

PROPRIETARY AND CONFIDENTIAL; SOLELY FOR THE AUTHORIZED USE OF THE GRIFOLS PLASMA COMPANIES AND THEIR AFFILIATES. PUBLICATION, REPUBLICATION, DISSEMINATION, OR DISCLOSURE OF THIS DOCUMENT REQUIRES GRIFOLS' SPECIFIC WRITTEN CONSENT. DESTROY IF YOU ARE IN

CONFIDENTIAL

| GRIFOLS | Document #: 10-01A_NG | Revision: 2.0 | Effective Date: |
|---|---|---|---|
| Grifols Plasma Operations | Title: Consent Agreement for Automated Plasmapheresis | | 15-Feb-2017 |



23. I have read (or have had its contents read to me) and understand this Consent Agreement, had explained to me the information provided regarding, and have had a chance to discuss and ask questions about, this Consent Agreement, the plasmapheresis procedure, the risks involved, the necessary testing, the evaluation process, and the spread of HIV by blood or plasma, and I agree to participate in Grifols' automated plasmapheresis program under and pursuant to the terms and conditions contained herein.

_____     06/14/17
Donor Signature                                      Date

Brian Vaughan
Donor Name                                               Donor Number

_____     06/14/2017
Witnessing Medical Staff Member Signature    Date

Rhonda Hagen
Witnessing Medical Staff Member Name

GRIFOLS PLASMA DONATION FACILITY (stamp or write Center name, address, and telephone number here):

Biomat USA, Inc.
3280 West 87th Street
Chicago, IL 60652
(708) 459-9888

PROPRIETARY AND CONFIDENTIAL; SOLELY FOR THE AUTHORIZED USE OF THE GRIFOLS PLASMA COMPANIES AND THEIR AFFILIATES. PUBLICATION, REPUBLICATION, DISSEMINATION, OR DISCLOSURE OF THIS DOCUMENT REQUIRES GRIFOLS' SPECIFIC WRITTEN CONSENT. DESTROY IF YOU ARE IN UNAUTHORIZED POSSESSION OF THIS DOCUMENT.

# **EXHIBIT B**

1              IN THE CIRCUIT COURT

2          OF THE TWELFTH JUDICIAL CIRCUIT

3              WILL COUNTY, ILLINOIS

4

5   YESENIA DIAZ,                    )

6                    Plaintiff,  )

7        -vs-                       )      Case No.

8   SILVER CROSS HOSPITAL AND       )  2018 CH 001327

9   MEDICAL CENTERS,                )

10                   Defendant.  )

11

12

13          TRANSCRIPT OF PROCEEDINGS had in the

14   above-entitled cause in Room A201 of the Will

15   County Court Annex, 57 North Ottawa Street,

16   Joliet, Illinois, on Thursday, August 29, 2019,

17   commencing at 10:14 a.m.

18

19

20

21   BEFORE:  HONORABLE JUDGE RAYMOND E. ROSSI.

22

23

24

Case: 1:20-cv-04233 Document #: 25 Filed: 12/17/21 Page 3 of 56 PageID #:543
Hearing - 8/29/2019
Yesenia Diaz vs. Silver Cross Hospital and Medical Centers

```
 1    APPEARANCES:

 2

             STEPHAN ZOURAS, LLP
 3           BY:  JAMES B. ZOURAS, ESQUIRE
                  jzouras@stephanzouras.com
 4           BY:  HALEY R. JENKINS, ESQUIRE
                  hjenkins@stephanzouras.com
 5           100 North Riverside Plaza, Suite 2150
             Chicago, Illinois  60606
 6           312-233-1550

 7                appeared on behalf of the Plaintiff
                  Yesenia Diaz
 8

 9
             SHOOK, HARDY & BACON L.L.P.
10           BY:  MELISSA A. SIEBERT, ESQUIRE
                  masiebert@shb.com
11           BY:  ERIN BOLAN HINES, ESQUIRE
                  ehines@shb.com
12           111 South Wacker Drive, Suite 4700
             Chicago, Illinois  60606
13           312-704-7700

14                appeared on behalf of the Defendant
                  Silver Cross Hospital and Medical
15                Centers

16

17

18

19

20

21
      STENOGRAPHICALLY REPORTED BY:
22           ROSANNE M. NUZZO, CSR, RMR, CRR
                  CSR License No. 84-1388
23

24
```

Case: 1:19-cv-04233 Document #: 29 Filed: 11/07/19 Page 34 of 56 PageID #:555
Hearing - 8/29/2019
Yesenia Diaz vs. Silver Cross Hospital and Medical Centers

**Page 3**

1    THE COURT:  Anybody on the 9:00 call that
2  hasn't been heard?
3       (No audible response).
4    THE COURT:  All right.  Then 37, 18 CH 1327.
5       Good morning.
6    MS. SIEBERT:  Good morning, your Honor.
7    THE COURT:  Hi.
8    MS. HINES:  Hi.
9    MR. ZOURAS:  Good morning, your Honor.
10      Jim Zouras for the Plaintiff.
11    MS. JENKINS:  Good morning, your Honor.
12      Haley Jenkins on behalf of the
13  Plaintiff.
14    MS. SIEBERT:  Good morning, your Honor.
15      Melissa Siebert and Erin Hines on
16  behalf of Silver Cross Hospital.
17    THE COURT:  Okay.  I've read through it, but
18  if you want to summarize or supplement briefly,
19  have at it.
20      Movant?
21    MS. SIEBERT:  That's us, your Honor.
22      Your Honor, we're here today, as you
23  know, on our motions, the combined 2-615 and 2-619
24  motion.

**Page 4**

1       Plaintiff, a registered nurse who
2  worked at the hospital, has filed a lawsuit
3  contending that the hospital's use of her finger
4  scan violated Illinois' Biometric Information
5  Privacy Act, also known as BIPA.  BIPA provides
6  protections for certain biometric information.
7       Although BIPA's legislative history is
8  sparse, the Illinois legislature clearly indicated
9  that it intended to provide exemptions for
10  hospitals such as Silver Cross.  That legislative
11  history is Exhibit 1 to our motion to dismiss.
12      Consistent with the legislative
13  history, BIPA contains exemptions related to
14  hospitals.  Specifically, BIPA excludes from the
15  definition of "biometric information"
16  "information collected, used, or stored for health
17  care treatment, payment, or operations."  That's
18  in BIPA Section 10.
19      The health -- that information -- that
20  definition is important because the definition of
21  "health care treatment, payment, or operations" is
22  as defined in HIPAA.  So this is the second HIPAA
23  motion involving Silver Cross today that's before
24  your Honor, but it's a different type of motion.

**Page 5**

1  This is about whether BIPA's HIPAA exemption
2  excludes the information collected here.  And as
3  you can -- as you read in our motion, we contend
4  that it clearly falls within BIPA's HIPAA
5  exemption because Plaintiff's finger scan is being
6  collected, stored, and used for health care
7  treatment, payment, and operations.
8       The parties have filed several
9  pleadings, including yesterday's notice of a
10  supplemental authority that are directed to the
11  2 -- primarily to the hospital's 2-615 motion;
12  actually, only to the hospital's 2-615 motion.
13      With the Court's permission, we want to
14  address the 2-619 portion of our motion first, the
15  HIPAA BIPA exemption, because if this Court
16  decides that the hospital and the finger scans
17  fall within BIPA's HIPAA exemption, we do not need
18  to proceed any further, and this case should be
19  dismissed outright.
20      To our knowledge, this case is a matter
21  of first impression as to the HIPAA BIPA -- the
22  BIPA HIPAA exemption applicability to hospitals.
23  This is an important distinction because of the
24  Illinois Assembly's expressed acknowledgment that

**Page 6**

1  hospitals were one of the few entities where
2  exemptions would be placed within BIPA, and they
3  were.
4       So Ms. Hines is going to address any
5  questions that the Court may have about our 2-619
6  portion of our motion with respect to the HIPAA
7  BIPA exemption.  And we're happy to take your
8  Honor through why treatment, payment, and
9  operations under HIPAA is applicable here with the
10  BIPA exemption.
11    THE COURT:  All right.  Thank you.
12    MS. HINES:  Would you like to hear about the
13  treatment, payment, and operations?  We're
14  primarily referring to the affidavit that is
15  attached.
16    THE COURT:  For dismissal under 2-619?
17    MS. SIEBERT:  Yes.
18    THE COURT:  All right.  Briefly.
19    MS. HINES:  Okay, your Honor.
20      As Ms. Siebert just stated, BIPA
21  excludes "information collected, used," and
22  "stored for health care treatment, payment, or
23  operations" under HIPAA.  Those are specifically
24  defined terms under HIPAA.  "Treatment" is

Case: 1:19-cv-04233 Document #: 29 Filed 12/17/21 Page 35 of 56 PageID #:546
Hearing - 8/29/2019
Yesenia Diaz vs. Silver Cross Hospital and Medical Centers

1 treatment or management of healthcare; "payments"
2 are payments for healthcare; and "health care
3 operations" includes several things, but what's
4 relevant here is conducting or arranging for
5 auditing.  These are definitions found under HIPAA
6 45 CFR 164.501.
7          Silver Cross is a healthcare provider
8 and falls under HIPAA.  Plaintiff is a registered
9 nurse.  She has scanned her finger in medical
10 supply stations at Silver Cross Hospital in order
11 to access prescription drug medication.
12 Plaintiff's finger scan data is the information
13 that was collected, used, and stored for
14 treatment, payment, and operations under HIPAA.
15          And you asked why does her finger scan
16 fall under operations?  We'll start there.  Silver
17 Cross is required, as laid out in Mr. Butler's
18 affidavit which is Exhibit 2 to the motion to
19 dismiss to have an audit trail of the prescription
20 drugs it dispenses to its patients.
21          When a registered nurse puts her finger
22 scan on the med station to access that, those
23 prescription drugs, it's because she's a
24 registered nurse, but it's also because it's

Page 7

1 tracking that she's the registered nurse she
2 claims to be.  And that is what falls under
3 HIPAA's -- the auditing that is required under
4 "operations."  And this information alone under
5 this definition is enough to qualify as exempting
6 her finger scan data from BIPA, and this case can
7 be dismissed based on that.
8          But we have two more definitions.  We
9 have payment.  When a registered nurse puts her
10 finger scan on the medical supply station, it
11 tracks the prescription drugs that she is taking
12 for that patient to the billing module, and that
13 is "payment" under the HIPAA definition which is
14 excluded under BIPA.  Again, the information under
15 this term alone is a basis for dismissal.
16          We also have "treatment."  When the
17 registered nurse scans her finger on a medical
18 supply station, it records who she is giving --
19 the patient that is getting the prescription
20 medication, the dosage, and when they're getting
21 that medication.  And, again, it's information --
22 the information under this definition is enough to
23 exclude the information from BIPA.
24          For these reasons, your Honor, we ask

Page 8

1 that the Court dismiss the Complaint outright
2 pursuant to 2-619, which is supported by the
3 affidavit of Mr. Butler that is undisputed that's
4 attached to the motion to dismiss, that this
5 information collected from the Plaintiff's finger
6 scans falls under BIPA's HIPAA exemption.
7          THE COURT:  Okay.  In your brief, you had
8 cited five independent reasons for dismissal.  Do
9 you still support -- do you still stand by that?
10          MS. SIEBERT:  We do.  We do.  But we feel it's
11 appropriate under 619, given that this is an
12 affirmative matter, that this is an exemption --
13          THE COURT:  Yes.
14          MS. SIEBERT:  -- an exemption where we have
15 submitted an affidavit that is uncontroverted,
16 that it can be decided on that basis alone.
17          We are -- we've all filed extensive
18 pleadings here which I know your Honor has read.
19 We are happy to address any questions you have
20 about our 615 basis or our supplemental authority,
21 but that all goes to the 615 portion of our motion
22 which we stand on here.
23          THE COURT:  Okay.  Hi.
24          MR. ZOURAS:  Good morning, your Honor.

Page 9

1          THE COURT:  Good morning.
2          Response?
3          MR. ZOURAS:  With respect to the motion to
4 supplement, very quickly, your Honor, that was
5 just submitted late last night.  We're obviously
6 prepared to fully argue the motion.  We would just
7 like an opportunity to address that supplemental
8 filing in writing if the Court is going to
9 entertain it.
10          THE COURT:  Wait a minute.
11          MR. ZOURAS:  We can do that.
12          THE COURT:  Right.  By the way, this is up for
13 hearing today.
14          MR. ZOURAS:  Correct, and we're prepared to
15 argue.
16          THE COURT:  All right.  Well, what -- no
17 offense, but what good is a supplemental brief
18 going to have after argument today and a ruling
19 today?
20          MR. ZOURAS:  Fair enough, your Honor.
21          They filed a supplemental pleading to
22 brief it last night.  That wasn't our decision.
23          THE COURT:  Okay.  Well, if it's any
24 consolation, I haven't seen their supplemental

Page 10

Case: 1:20-cv-04233 Document #: 29 Filed: 12/07/21 Page 36 of 56 PageID #:567
Hearing - 8/29/2019
Yesenia Diaz vs. Silver Cross Hospital and Medical Centers

1 brief.
2    MR. ZOURAS: Okay. Fair enough. Fair enough,
3 Judge.
4       With respect to the fully-briefed
5 matter before the Court --
6       (Laughter.)
7    MR. ZOURAS: -- what the Defendants want the
8 Court to do is to take a limited exemption, your
9 Honor, which has to do with patients' biometrics,
10 not employees' biometrics, and expand it to
11 include biometric collection for any caregiver
12 touching patient care, so they're talking about
13 not just nurses but anybody in a hospital
14 environment or a healthcare environment for whom
15 they collect biometrics.
16       This argument is essentially identical
17 to the one that Judge Loftus just a few weeks ago
18 rejected in a comprehensive oral ruling. We
19 recognize that's not binding, but it is directly
20 on point. And after fully vetting these
21 arguments, she not only rejected the arguments,
22 but she decided that the argument was actually, in
23 her words, nonsensical. There's no reason to
24 deviate from that ruling here, your Honor.

Page 11

1       The essential facts are that we have an
2 employee of Silver Cross here. As a condition of
3 employment, she has to disclose and produce for
4 collection her biometric identifiers in order to
5 access certain machines, essentially, certain
6 devices. Now, the efficiencies and the cost
7 savings are the reasons for that to be done.
8       The Biometric Information Privacy Act
9 has been on the books for eleven years now. And
10 as the legislature addressed and as the Supreme
11 Court has now addressed, this was done to address
12 a very serious need for protections of biometric
13 information.
14       The requirements are very easy to
15 follow. They're very easy to learn. Before you
16 collect biometric information in any context, you
17 need a written consent. You need a written
18 consent before disseminating to third parties.
19 You need a written release. You need to establish
20 a public retention and destruction schedule.
21       Here, we have the Defendant that did
22 none of that.
23       The default rule under BIPA, your
24 Honor, is that everybody is entitled to this

Page 12

1 protection. There are a couple of exemptions, and
2 they are all-encompassing. For example, the
3 financial institution exemption, all financial
4 institutions are basically shielded from having to
5 comply; the same thing for the government.
6       Hospitals are not one of them, though.
7 There are -- there is no all-encompassing
8 exemption for hospitals, as the Defendant is
9 apparently suggesting. And that is why the
10 language they are citing, your Honor, is not from
11 the exemptions. It's not in the part of the
12 statute where they list these exemptions.
13       It's from the part of the statute where
14 they define what biometrics is at all, and they
15 define biometric identifiers in a very specific
16 way. They exclude from the definition of
17 biometric identifiers, essentially, information
18 collected under HIPAA.
19       HIPAA is a statute designed to protect
20 patient information, your Honor, and that is why
21 they excluded BIPA from anything that was covered
22 by HIPAA patient-protected data. Why? It's
23 already protected by HIPAA. There are already
24 stern penalties, stern procedures in place to

Page 13

1 protect patient biometrics, not to mention the
2 practical effect of perhaps having to get a
3 consent from a patient before treating them.
4 I think the legislature was clearly concerned with
5 that.
6       So what BIPA does under the definition,
7 not an exemption, is exclude information captured
8 from a patient. And there are specific examples;
9 diagnostic testing, they refer to different types
10 of tests, x-rays, erosion process, and so forth.
11 So the entire focus of this, this definition, what
12 is excluded has to do with patients, and that is
13 something that hasn't been addressed.
14       And there isn't also any mention of
15 what possible -- and this is a glaring
16 exclusion -- what possible policy could there be
17 that the legislature had in mind to say that
18 employees of a hospital like the plaintiff
19 shouldn't have the protections under this very
20 important statute, as Judge Loftus found.
21       And so if we look at this in its proper
22 context on what a biometric identifier is,
23 clearly, this is not the situation contemplated by
24 the HIPAA -- what we're calling the exclusion for

Page 14



**Page 15**

1  HIPAA information which, again, has to do with
2  patients' information, not employee information,
3  your Honor.
4      We're happy to just address any
5  additional questions.
6      THE COURT: Yeah. A HIPAA -- a typical HIPAA
7  order would allow for production/reproduction of
8  medical records. There's really nothing
9  earth-shattering there.
10     MR. ZOURAS: Right.
11     THE COURT: But those medical records are
12  sometimes, you know, not just generated but are
13  created and interpreted by medical personnel.
14     MR. ZOURAS: Um-hum, about a patient.
15     THE COURT: About a patient, yes.
16     MR. ZOURAS: Right.
17     THE COURT: But, nevertheless, it's not like
18  the medical personnel are strangers to the
19  process.
20     MR. ZOURAS: Um-hum. Um-hum. But the
21  information is the patient's information, and that
22  is exactly the point. It's the patient's data.
23  It's the patient's records, the patient's
24  information, the patient's testing --

**Page 16**

1      THE COURT: Well --
2      MR. ZOURAS: -- the patient's everything.
3      THE COURT: All right. Let me give one other
4  example.
5      MR. ZOURAS: Um-hum.
6      THE COURT: Counsel, I'm sure -- I can tell
7  you know --
8      MR. ZOURAS: Well, let's not be sure.
9      THE COURT: That's all right. We're on the
10  record.
11     Well, in typical medical litigation --
12     MR. ZOURAS: Right.
13     THE COURT: -- there is (f)(3)s that come into
14  play.
15     MR. ZOURAS: Um-hum.
16     THE WITNESS: And for, let's say, a medical
17  expert who is identified as a 213(f)(3) witness,
18  if he has created publications, books, articles,
19  whatnot --
20     MR. ZOURAS: Um-hum.
21     THE COURT: -- those are produced, and I
22  believe they are subject to a HIPAA that may be in
23  place; and yet, yes, those relate to patients, but
24  they are created and produced by a third-party --

**Page 17**

1  in fact, not even an employee; a third-party,
2  well, consultant.
3      MR. ZOURAS: Um-hum.
4      MS. SIEBERT: Your Honor, that is why it's so
5  important to read that exemption for Section 10 in
6  its entirety. And what we're saying is, this is
7  an exemption because it's excluding an entire
8  class of information from the definition of what's
9  protected under BIPA.
10     What that definition actually says is:
11  "...information captured from a patient in a
12  health care setting or information collected,
13  used, or stored for health care treatment, payment
14  or operations..."
15     We are not asserting that this is
16  information captured from a patient in a
17  healthcare setting. That's the PHI that Plaintiff
18  is referencing and relying on.
19     What we are saying is what your Honor
20  is saying. This is information collected, used,
21  and stored for our operations; for example, the
22  required audit, which is an abuse audit as well as
23  a prescription trail audit that Silver Cross is
24  required to keep as a matter of licensing and law,

**Page 18**

1  as stated in the affidavit that we provided to
2  you.
3      So taking your analogy to its
4  conclusion, we are contending that this is
5  information collected, used, or stored under that
6  portion of BIPA which is not direct patient
7  information or any of the types of x-rays or other
8  things that are excluded from a BIPA definition of
9  "biometric information" on the grounds that
10  Plaintiff's counsel envisions.
11     MR. ZOURAS: We have to look -- and I have a
12  copy of the definition they're referring to, your
13  Honor, right here, and it's not in the exemptions.
14  The exemptions is in 740 ILCS 14/25. This is the
15  definition of what a biometric identifier is under
16  740 ILCS 14/10.
17     We're not stopping the Defendant -- we
18  have no issue with the Defendant conducting
19  audits, your Honor. That's perfectly appropriate.
20  But if they are going to use biometric information
21  for any reason, they have to comply with BIPA
22  unless it involves patient information. That is
23  the all-encompassing definition of "biometric
24  identifiers" as found in this definition. By



Case: 1:19-cv-04231 Document #: 29 Filed: 12/04/19 Page 38 of 56 PageID #:349

Hearing - 8/29/2019
Yesenia Diaz vs. Silver Cross Hospital and Medical Centers

1 default, everyone is entitled to protection unless
2 there is a specific exemption.
3     And with respect to this definition, it
4 has to do with information captured from a patient
5 in a healthcare setting or information collected,
6 used, or stored for healthcare treatment, payment
7 or operations under -- and this is very
8 important -- under HIPAA.
9     And then they go on to talk about other
10 information which only is collected by -- or from
11 patients. So by looking at the definition here in
12 its entirety in its context, clearly as found by
13 another court, your Honor, this is something
14 speaking purely to patient information, not
15 employee information, not employee biometrics.
16     THE COURT: Well, BIPA exempts, quote,
17 "information collected, used, or stored for health
18 care treatment," unquote, under HIPAA.
19     MR. ZOURAS: Under HIPAA.
20     What they're describing is a situation
21 where it is not under HIPAA; that that's the
22 point, that is what they are excluding. It's not
23 under HIPAA. HIPAA governs --
24     THE COURT: Is that true?

Page 19

1 uses -- who they have used biometrics -- a
2 biometric device will be left with no protection
3 under HIPAA or BIPA.
4     So HIPAA is already protecting the
5 patient information, and that's why this exclusion
6 from the definition exists. Nothing in HIPAA
7 protects the employee data. There is simply no
8 logical purpose or policy reason or legislative
9 history or anything else to back that up. There's
10 nothing.
11     THE COURT: Thank you.
12     MR. ZOURAS: Thank you, your Honor.
13     THE COURT: I'm sorry, though. I feel that a
14 practical application of HIPAA that exists in
15 nearly any HIPAA order is such that, yes, it
16 relates to the patient, but it need not be only
17 patient-driven, that there are -- as I indicated
18 in my examples, there are other publications and
19 treatises and other data that are captured by
20 HIPAA that don't relate to the patient in a
21 primary sense but, rather, secondary.
22     I'm going to grant the 2-619 motion for
23 the reasons stated on the record, for the reasons
24 stated in the briefs in the motion.

Page 21

1     MS. SIEBERT: No. The definition that we read
2 to you is "treatment, payment, and operations,"
3 commonly known as TPO. Those are from HIPAA.
4     "Operations" has no reference to
5 patients -- to patient information. That clause
6 as read -- as stated in our brief and as read by
7 Ms. Hines relates to a hospital's auditing trail,
8 including for abuse and control.
9     And as Mr. Barley's affidavit
10 attests --
11     MR. ZOURAS: Butler.
12     MS. SIEBERT: -- Butler -- that's exactly what
13 was -- what the information was used for here,
14 which we're required to do under other laws.
15     MR. ZOURAS: The purpose of HIPAA, which is
16 what we're talking about, is to protect patient
17 data. That is why this is referenced here. It is
18 a patient-focused statute. If --
19     THE COURT: All right. I'm sorry. I don't
20 mean to cut you off.
21     MR. ZOURAS: No. I -- if we have it their
22 way, Judge, the evil that we are attempting to
23 protect here is -- it's going to continue to
24 exist; and that is, any employee at a hospital who

Page 20

1     MS. SIEBERT: Thank you, your Honor.
2     MS. HINES: Thank you, your Honor.
3     MR. ZOURAS: Thank you, your Honor.
4     MS. JENKINS: Thanks, Judge.
5     (WHEREUPON, discussion was had off
6     the record.)
7     MS. SIEBERT: Your Honor, apologies, we're
8 not -- what's your Honor's preference? Would you
9 like a written order? Or would you like us to
10 type up an order, or would you like a handwritten
11 order for today?
12     THE COURT: We will leave it to counsel for
13 the Plaintiff.
14     MR. ZOURAS: Ah.
15     MS. JENKINS: We will write an order today --
16     MR. ZOURAS: Sure.
17     MS. JENKINS: -- for the reasons stated on the
18 record.
19     MR. ZOURAS: We're dismissing the prejudice --
20     MS. JENKINS: Is this a dismissal with or
21 without prejudice?
22     MR. ZOURAS: -- I presume, without -- without
23 leave to amend. We would ask for leave to
24 amend --

Page 22

Case: 1:20-cv-04243 Document #: 29 Filed: 11/04/19 Page 39 of 56 PageID #:569
Hearing - 8/29/2019
Yesenia Diaz vs. Silver Cross Hospital and Medical Centers

1  MS. JENKINS:  Sure.
2  MR. ZOURAS:  -- for the record.
3  THE COURT:  Oh.
4  MS. SIEBERT:  Your Honor, this would be a
5  dismissal -- this should be a dismissal with
6  prejudice.  If you are ruling that the exemption
7  applies or the definition for this information --
8  THE COURT:  No, no, no.  Well, I am ruling
9  that way.  But I always -- I always give at least
10  one additional bite of the apple.
11  MR. ZOURAS:  Okay.  Fair enough.
12  THE COURT:  28 days?
13  MR. ZOURAS:  Sure.
14  MS. JENKINS:  Sure.
15  THE COURT:  You will agree to --
16  MR. ZOURAS:  Sure.  We will be happy to
17  type -- or, sorry -- write up the order today,
18  your Honor.
19  THE COURT:  All right.  Okay.  Pick a date
20  shortly thereafter.
21  MR. ZOURAS:  To come back?
22  MS. JENKINS:  Sure.
23  THE COURT:  Yeah.
24  MS. SIEBERT:  So it's a dismissal without

Page 23

1  reporting system that is the official court
2  reporter.  By agreement, the parties can certainly
3  agree to a live court reporter, as we have here
4  today, but it's up to you.
5  MS. HINES:  Yes, yes.  We will do that, then.
6  MR. ZOURAS:  In the future, we will
7  coordinate, your Honor.
8  MS. HINES:  Yes.
9  MS. SIEBERT:  We agree that this can be --
10  MR. ZOURAS:  I mean, we -- we --
11  MS. SIEBERT:  -- the transcript, then?
12  MS. JENKINS:  We both had court reporters.
13  MS. HINES:  Yes, for sure.
14  MS. SIEBERT:  We agree that this can be the
15  transcript.
16  MS. JENKINS:  Right, from our live reporter.
17  THE COURT:  From our live reporter?
18  MS. HINES:  Yes.
19  MS. SIEBERT:  From our live reporter here.
20  THE COURT:  Right.  Okay.
21  MR. ZOURAS:  We agree, Judge.
22  THE COURT:  All right.  Thanks.
23  MR. ZOURAS:  Sure.
24  (Short pause.)

Page 25

1  prejudice?
2  MS. HINES:  With leave to replead?
3  THE COURT:  Yes.
4  MS. SIEBERT:  Thank you.
5  Your Honor, we would just question
6  whether a repleading is possible if we have
7  determined that this information is not --
8  THE COURT:  Well, I would agree.  But if it is
9  possible, I'd like to leave the door open for that
10  to change our minds.
11  MS. SIEBERT:  Understood.
12  THE COURT:  All right.
13  MR. ZOURAS:  Thank you, your Honor.
14  MS. JENKINS:  Thanks, Judge.
15  MS. SIEBERT:  Thank you.
16  MS. HINES:  Thank you.
17  (WHEREUPON, a recess was had from
18  10:40 a.m. until 10:43 a.m.)
19  THE COURT REPORTER:  Do you want this on the
20  record, Judge?
21  THE COURT:  Well, I guess you know.  I need to
22  ask a question that I should have asked at the
23  beginning.
24  Counsel, we have an electronic court

Page 24

1  THE COURT:  Thank you.
2  MS. JENKINS:  Thanks, Judge.
3  MS. SIEBERT:  Thank you, Judge.  Have a
4  wonderful holiday weekend.
5  THE COURT:  You, too.
6  MR. ZOURAS:  Thank you, Judge.
7  MS. SIEBERT:  Thank you.
8  MS. HINES:  Thank you, your Honor.
9  (Which were all the proceedings
10  had at the hearing of the
11  above-entitled cause on this date,
12  Thursday, August 29, 2019.)
13
14  (Time noted:  10:46 a.m.)
15
16
17
18
19
20
21
22
23
24

Page 26

Case 1:19-cv-04341 Document #: 24 Filed: 12/10/19 Page 40 of 56 PageID #:561

Hearing · 8/29/2019
Yesenia Diaz vs. Silver Cross Hospital and Medical Centers

 1    STATE OF ILLINOIS )

 2                      ) SS:

 3    COUNTY OF W I L L )

 4              I, ROSANNE M. NUZZO, a Certified

 5    Shorthand Reporter of the State of Illinois,

 6    CSR No. 84-1388, do hereby certify that I reported

 7    in shorthand the proceedings had at the hearing

 8    aforesaid, and that the foregoing is a true,

 9    complete, and correct transcript of the

10    proceedings of said hearing as appears from my

11    stenographic notes so taken and transcribed under

12    my personal direction.

13              IN WITNESS WHEREOF, I do hereunto set my

14    hand at Chicago, Illinois this 2nd day of

15    September, 2019.

16

17              /s/ Rosanne M. Nuzzo
                _____
18              ROSANNE M. NUZZO, CSR, RMR, CRR, CRC

19              C.S.R. Certificate No. 84-1388.

20

21

22

23

24

# **EXHIBIT C**

FILED DATE: 1/17/2020 5:17 PM  2019CH14368

Page 1

1   STATE OF ILLINOIS   )
                        ) SS:
2   COUNTY OF C O O K   )

3           IN THE CIRCUIT COURT OF COOK COUNTY
            COUNTY DEPARTMENT - CHANCERY DIVISION

4

5   LUCILLE MOSBY, individually     )
    and on behalf of all others     )
6   similarly situated,             )
                                    )
7           Plaintiffs,             )
                                    )
8       -vs-                        ) No. 18 CH 05031
                                    )
9   THE INGALLS MEMORIAL HOSPITAL   )
    UCM COMMUNITY HEALTH &          )
10  HOSPITAL DIVISION, INC., and    )
    BECTON DICKINSON and COMPANY,   )
11                                  )
            Defendants.             )

12

13

14          REPORT OF PROCEEDINGS before the HONORABLE
15  PAMELA McLEAN MEYERSON, Judge of the Circuit Court of
16  Cook County, Illinois, commencing at 2 p.m. on the
17  13th day of January, 2020, upon the hearing of the
18  above entitled case.

19

20

21

22

23

24

FILED DATE: 11/17/2020 5:17 PM   2019CH14368

Page 68

1   that impact HIPAA protected patients and I don't

2   think that that's warranted.  So the motions to

3   dismiss that were based on this argument are denied.

4           As for the standing argument, you've made

5   your arguments for the record.  I'm going to deny

6   them for the reasons that were set forth in my

7   decisions in Roach vs. Wal-Mart which was 19 CH 1107

8   and Hughes vs. Mayfield, 18 CH 13122.  Moving on to

9   the Workers' Compensation preemption argument, I'm

10  going to deny that for the reasons set forth in the

11  Hughes case.

12          The next argument, that the prayer for

13  liquidated damages should be stricken for failure to

14  adequately plead negligence, I think there's a reason

15  that the cases that defendant was able to find that

16  found a failure to adequately plead damages were all

17  cases dealing with the higher measure of damages,

18  that is to say, the $5,000 for violation for

19  intentional or reckless violation.  And that is, to

20  state the cause of action in BIPA, you just have to

21  plead a violation of the statute.  And if you pled

22  that violation and you stated a cause of action, the

23  next question is, well, was it negligent, in which

24  case you get a thousand per violation, or is it

FILED DATE: 11/17/2020 5:17 PM   2019CH14368

Page 69

1    subject to a higher award of $5,000 in the case of

2    intentional or reckless.  It's either one or the

3    other.  And essentially either you meant to do it or

4    didn't mean to do it.  But nothing further is

5    required to state a cause of action for the

6    negligence.  If you've stated the cause of action for

7    violation of statute, you don't have to plead

8    additional amounts.  It's only if you want the

9    enhanced damages that you have to plead more.  So I'm

10   going to deny the motion to dismiss on those grounds.

11         Regarding the motions to dismiss Count III

12   for failure to adequately plead the disclosure and

13   dissemination, I want to address this together with

14   the argument that was made just by BD, which was that

15   the complaint doesn't state a claim against BD at

16   all.  As to BD, the argument is well taken.  The key

17   allegation of fact as to what it did is contained in

18   paragraph 35, which says Ingalls and Ingalls Health

19   System use and have used software supplied by BD that

20   requires employees to use their fingerprints as a

21   means of authentication.  And then it does go on to

22   allege in paragraph 36 upon information and belief,

23   Ingalls and Ingalls Health System failed and continue

24   to fail to inform employees that they disclose or

FILED DATE: 11/17/2020 5:17 PM   2019CH14368

Page 70

1   disclosed their fingerprints to at least one out of

2   state third party vendor, BD, and likely others,

3   failed to inform employees that they disclose their

4   fingerprints to other currently unknown third parties

5   that post the biometric data in their data centers,

6   failed to inform employees of the purposes and

7   duration for which they collect their sensitive

8   biometric data and failed to obtain written releases

9   from employees before collecting their fingerprints.

10       So the allegations in paragraph 36 don't

11  actually state that those things happened, only that

12  there is a failure to inform the employees that those

13  things happened.  And I think that's an important

14  distinction.  If you're going to rely upon the theory

15  that in fact there was a violation, you need to say

16  it in a straightforward way rather than just saying

17  that there was a failure to inform that this

18  happened.

19       So I am going to grant defendant BD's 2-615

20  motion to dismiss and it will be without prejudice.

21  We need more allegations about specifically what was

22  BD's role.  In saying that Ingalls and Ingalls Health

23  System have used software supplied by BD, that does

24  not indicate any ongoing relationship.  It doesn't

Transcript of Proceedings  -  3/29/2021
Case: 1:20-cv-04241 Document #: 54 Filed: 12/7/21 Page 46 of 56 PageID #:556
Xiomara Navarrete, et al. vs. Josam Acquisitions, d/b/a Good 2 Go Food

```
 1   STATE OF ILLINOIS   )
                         )  SS:
 2   COUNTY OF C O O K   )

 3       IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
             COUNTY DEPARTMENT - CHANCERY DIVISION
 4

 5   XIOMARA NAVARETTE, on         )
     behalf of herself and other  )
 6   similarly situated           )
     employees, known and         )
 7   unknown,                     )
                                  )
 8                   Plaintiff,   )
                                  )
 9       vs.                      )  No. 2019 CH 14368
                                  )
10   JOSAM ACQUISITIONS,  d/b/a   )
     Good 2 Go Food,              )
11                                )
                     Defendant.   )
12                                )

13          REPORT OF PROCEEDINGS had via Zoom at the

14   hearing of the above-entitled cause, before the Honorable

15   MICHAEL T. MULLEN, Judge of said court, on Monday, the

16   29th day of March, 2021, at the hour of approximately

17   11:00 o'clock a.m.

18       PRESENT VIA ZOOM:

19          RAISE THE FLOOR ALLIANCE,
            BY:  MS. MIRANDA HUBER,
20          BY:  MS. ADA SANDOVAL, and
            NATIONAL LEGAL ADVOCACY NETWORK,
21          BY: MR. CHRIS WILLIAMS,
                On behalf of the Plaintiff;
22
            SHOOK, HARDY, & BACON, LLP.,
23          BY:  MS. KATHARINE R. PAINE,
                On behalf of the Defendant.
24
     Laurel E. Laudien, RMR, RPR, CSR #084-001871
```

Transcript of Proceedings – 3/29/2021
Xiomara Navarrete, et al. vs. Josam Acquisitions, d/b/a Good 2 Go Food
Case: 1:20-cv-04241 Document #: 54 Filed: 12/17/21 Page 47 of 56 PageID #:557

1      THE COURT:  So this is Navarrete versus Josam

2  Acquisitions.

3            If everyone would identify themselves as well

4  as who they represent starting with Plaintiff's Counsel,

5  and, Counsel, just you so know, you are on mute.

6      MS. HUBER:  Good morning, your Honor.

7            Miranda Huber on behalf of the Plaintiff.

8            I'm joined today by Ada Sandoval, a new

9  attorney in our office, and my Co-Counsel, Chris

10  Williams, from the National Legal Advocacy Network has

11  also joined this morning.

12      THE COURT:  Very good.

13            Good morning.

14      MS. HUBER:  Good morning.

15      MS. PAINE:  Morning, your Honor.

16            This is Kate Paine from Shook, Hardy, and Bacon

17  on behalf of the Defendant, Josam Acquisitions, who I'll

18  probably mostly be referring to today as Good 2 Go or

19  Good 2 Go Food.

20            And it's just me today, your Honor.

21      THE COURT:  Okay.  Well, that's enough, right?

22            Good morning to you.

23      MS. PAINE:  Good morning.

24      THE COURT:  So the motion that I have in front of me

Transcript of Proceedings  -  3/29/2021

Case: 1:20-cv-04241 Document #: 54 Filed: 12/17/21 Page 48 of 56 PageID #:558
Xiomara Navarrete, et al. vs. Josam Acquisitions, a/b/a Good 2 Go Food

1    is fully briefed, and it's brought pursuant to Section

2    619.1.  It's directed at the Complaint, and it

3    incorporates -- it's actually a first amended complaint.

4    It incorporates two parts.  One is a 615 motion directed

5    at the legal sufficiency of the Complaint itself, as well

6    as a 619 motion.

7         I have reviewed the submissions, and I do want

8    argument, but I'm going to structure this so that the

9    parties can focus their arguments on issues that I think

10   the parties should highlight.

11        So I'm just going through some rulings right

12   now, and there is a 615 motion directed at Count 1, and

13   in the initial motion, which I do not need argument on,

14   the motion seeks to strike the enhanced damages, if you

15   will, being sought in terms of $5,000 per violation which

16   is for intentional or reckless conduct as opposed to

17   $1,000 in damages for essentially what would be referred

18   to as negligent conduct, and this is a tort that goes

19   into a separate issue; but in terms of the way I view it,

20   the factual allegations are insufficient to allow the

21   Plaintiff to proceed with a request for enhanced damages.

22   The motion to strike is granted as to that.

23        I do want argument as to the state contractor

24   exclusion, but not until I am done with my further



# Angela Webster
## vs.
# Windsor Estates Nursing and Rehab

## No. 2019 CH 11441

_____

## Report of Proceedings

## 11/16/2020

_____

**TRANSCRIPT AND WORD INDEX**

**CASALE REPORTING SERVICE, INC.**
161 North Clark Street
Suite 1600
Chicago, Illinois  60601

tel:312.332.7900
fax: 312.332.6555

e-mail: crs@casalereporting.com
www.casalereporting.com

Case: 1:20-cv-04241 Document #: 54 Filed: 12/17/21 Page 50 of 56 PageID #:560

1    at this point of the litigation that

2    indicates that she clearly intended to waive

3    any expectation of privacy by the submission

4    of those fingerprints as set forth within the

5    complaint.

6            The motion pursuant to Section 619

7    as to that argument also, that theory, is

8    denied.

9            As we discussed, the McDonald

10   decision was decided somewhat recently, and

11   it is controlling.  Even if I disagreed with

12   it, I would be obligated to follow it.  I

13   agree with it, and I am going to follow it.

14   So the motion pursuant to Section 619

15   relative to the exclusivity of the Workers'

16   Compensation Act is also denied.

17           There's a further argument relative

18   to 615.  I agree with this argument.  The

19   Code of Civil Procedure and specifically

20   Section 603, clearly obligates the plaintiff

21   to assert in a factual manner all -- assert

22   in a factual manner any allegation that is

23   made against the defendant.  No conclusory

24   allegations are acceptable.  It's right in

1     the code.  It's a fact-pleading state.

2               One cannot jump to the conclusion

3     that the defendant in this case, based upon

4     the conduct that is set forth in the

5     complaint, intentionally or recklessly

6     violated Ms. Webster's protected rights.

7     There is a subset of this argument, and that

8     argument is that plaintiff did not even

9     assert in a factual manner any negligent

10    violations of the identified statute.

11              In terms of any scienter

12    requirements, I don't think we need to

13    address that at this point.  Is mens rea now

14    a part of every of BIPA complaint?  I don't

15    think we need to address that.  But what we

16    do need to address is whether or not the

17    conduct that is identified in the complaint

18    establishes in a factual way that the

19    defendant violated the BIPA protections that

20    Ms. Webster had.  And I do not believe it is

21    anywhere close.  Any references to remedies

22    beyond the $1,000 statutory violations based

23    upon any intentional and/or reckless conduct

24    are stricken.  That motion is granted in

1    part, and it's also denied in part, as the

2    motion went further than seeking the striking

3    and/or dismiss of intentional and/or reckless

4    references to the defendant's conduct as

5    being characterized as intentional or

6    reckless.  It went and asserted that the

7    conduct did not rise to the level of

8    negligence.

9           The key here is that there are

10   factual allegations that would allow one to

11   conclude, such as myself, that there was a

12   properly pled complaint that identified

13   specific statutory protections that were

14   violated by the defendant.  Do we have to

15   characterize that as intentional conduct or

16   negligent conduct?  I don't know that you do

17   have to characterize it as negligent, and

18   that motion is denied.

19          So it is abundantly clear, though,

20   if there is going to be a request for

21   enhanced damages beyond the identified

22   statutory minimum, then you're going to have

23   to support that in a factual way.  That

24   motion has been granted in part, denied in

1    part.

2              So where does that take us?  We need

3    an answer to the remaining portion of the

4    complaint.

5              Mr. Wolfe, how much time?

6         MR. WOLFE:  Your Honor, could I have

7    28 days?

8         THE COURT:  Absolutely.  28 days is

9    December 14th.

10             I didn't finish my thought, which

11   one might consider -- could characterize as a

12   rant, but in terms of the striking of the

13   intentional and/or reckless conduct, Counsel,

14   it is without prejudice, but you're going to

15   need my permission, of course, to amend the

16   complaint, if that's what you intend to do at

17   a future date and time.

18             28 days to file an answer.  That's

19   December 14th.

20             Has anyone talked about a discovery

21   schedule?

22        MR. ZOURAS:  We have not, your Honor.

23        THE COURT:  So here's what I want to

24   do.

FILED DATE: 11/17/2020 5:17 PM    2019CH14368

1    indicate in fact that after it was sold, then that

2    was the end of it and they had nothing more to do

3    with it.  It doesn't indicate anything about what

4    happened after that and whether there's an ongoing

5    relationship and whether in fact they did host the

6    data and whether in fact they now possess it or

7    obtain it or if it's just possessed or obtained and

8    kept by Ingalls on some software that they got from

9    BD.  So I am going to grant the 2-615 portion of BD's

10    motion to dismiss without prejudice.

11           I'm also going to grant Ingalls' motion to

12    dismiss Count III without prejudice.  I do need more

13    facts as opposed to conclusions about how each

14    defendant disclosed, re-disclosed or otherwise

15    disseminated the information.  What we have is too

16    conclusory.

17           So 28 days to re-plead, okay?  That puts you

18    on February 10th.  And then the defendants will have

19    28 thereafter to answer or otherwise plead and that

20    puts you on March 9th.  And let's have you come back

21    for a status sometime in the next week.  The week of

22    the 16th is wide open, so the parties can take a look

23    at your schedules and see what works out for you, any

24    day of the week of March 16th.  If the defendants

FILED DATE: 11/17/2020 5:17 PM   2019CH14368

Page 72

1   choose to file another motion, you can notice it up

2   for presentment at that time, okay?  Question?

3       MR. STRUBBE:  Your Honor, I have a question with

4   respect to the liquidated damages.

5       THE COURT:  Yes.

6       MR. STRUBBE:  You were pretty clear that with

7   respect to negligence, the motion to strike was

8   denied.

9       THE COURT:  Mm hmm.

10      MR. STRUBBE:  I'm a little unclear as to the

11  higher pleading standard.

12      THE COURT:  Well, I don't think, you didn't pray

13  for $5,000, did you?  Or did you?

14      MR. FICZKO:  It is in our prayer for relief, your

15  Honor.

16      THE COURT:  Okay.  Well, then I'm going to strike

17  that portion.  And if you want to plead that you're

18  entitled to it, you need more facts to support it,

19  okay?

20      MR. ZOURAS:  In terms for today's order, your

21  Honor, can we say for the reasons set forth?

22      THE COURT:  Yes, please.  And then I would like

23  you folks to file a copy of the transcript just

24  sometime before the next status, okay?  Good, thank

FILED DATE: 11/17/2020 5:17 PM   2019CH14368

Page 73

1   you.

2        MR. FICZKO:  Thank you, your Honor.

3        MR. STRUBBE:  Thank you, your Honor.

4            (Which were all the proceedings had or

5        offered at hearing of said cause.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24