# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

BRIAN R. VAUGHAN and JASON
DARNELL, individually and on behalf of all
others similarly situated,

          *Plaintiffs*,

    v.

BIOMAT USA, INC., TALECRIS PLASMA
RESOURCES, INC., and INTERSTATE
BLOOD BANK, INC.,

          *Defendants*.

Case No.: 20-cv-04241

Hon. Marvin E. Aspen

Mag. Judge Jeffrey Cole

# PLAINTIFFS' RESPONSE TO DEFENDANTS'
# MOTION TO DISMISS THE AMENDED COMPLAINT

**Table of Contents**

**Page**

INTRODUCTION ...........................................................................................................1

ARGUMENT ................................................................................................................1

   I.   PLAINTIFFS' CLAIMS ARE NOT PREEMPTED BY FEDERAL LAW ..................1

   II.   PLAINTIFF VAUGHAN STATES A CLAIM UNDER SECTION 15(b) ..................6

   III. BIOMETRIC INFORMATION USED TO IDENTIFY A PLASMA SELLER
       IS NOT EXEMPT UNDER BIPA. ...................................................................10

       A.  Plasma Sellers are not "Patients" In a "Health Care Setting" ..........................10

       B.  The Defendants' Reliance Upon "information collected, used or stored
           for health care treatment" Under HIPAA Is Misplaced. ...............................13

       C.  Finger Scans Do Not "Validate Scientific Testing or Screening" ..................17

   IV. PLAINTIFFS SUFFICIENTLY PLEAD A VIOLATION BY EACH
       DEFENDANT ................................................................................................20

   V.  CONCLUSION ..............................................................................................22

## Table of Authorities

**Page**

**Cases**

*Aux Sable Liquid Products v. Murphy*, 526 F.3d 1028 (7th Cir. 2008) ........................................ 2

*BBL, Inc. v. City of Angola*, 809 F.3d 317 (7th Cir. 2015) .................................................. 6, 7, 21

*Bradenberg v. Meridian Senior Living, LLC*, 2021 WL 4494275 (N.D. Ill. Sept. 30, 2021) ....... 22

*Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687 (7th Cir. 2012) ................................ 7

*Bruhn v. New Albertson's Inc.*, No. 18-CH-01737 (Cir. Ct. Cook Cty. July 2, 2019) ................ 15

*Christmas v. Landmark of Richton Park*, 20CH5439 (Oct. 22, 2021, Cir. Ct. Cook Cty., Ill.) ...................................................................................................................................... 9

*Costello v. BeavEx, Inc.*, 810 F.3d 1045 (7th Cir. 2016) .................................................... 1

*Cothron v. White Castle Sys., Inc.*, 467 F. Supp. 3d 604 (N.D. Ill. 2020) .................................... 7

*County Of Cook v. Illinois Labor Relations Bd. Local Panel*, 347 Ill. App. 3d 538, 807 N.E.2d 613 (2004) ................................................................................................................ 18

*Crumpton v. Octapharma Plasma, Inc.*, 513 F. Supp. 3d 1006 (N.D. Ill. 2021) .......... 3, 12, 15, 17

*Ctr. Video Indus. Co. v. Roadway Package Sys., Inc.*, 90 F.3d 185 (7th Cir. 1996) ................... 18

*Cunningham v. Foresters Fin. Services, Inc.*, 300 F. Supp. 3d 1004 (N.D. Ind. 2018) ............... 20

*Diaz v. Silver Cross Hosp. & Med. Ctrs.*, No. 2018 CH 001327 (Cir. Ct. Will Cnty. Aug. 29, 2019) ............................................................................................................................ 17

*Figueroa v. Kronos Inc.*, 2020 WL 1848206, (N.D. Ill. Apr. 13, 2020) .................................... 22

*Fuesting v. Uline, Inc.*, 30 F. Supp. 3d 739 (N.D. Ill. 2014) .................................................. 18

*Heard v. Becton, Dickinson & Co.*, 524 F. Supp. 3d 831 (N.D. Ill. 2021) ...................... 13, 16, 17

*In re Jaffe*, 932 F.3d 602 (7th Cir. 2019) .......................................................................... 17, 19

*Kaufmann v. Schroeder*, 241 Ill. 2d 194 (2011) ...................................................................... 12

*Marsh v. CSL Plasma Inc.*, 503 F. Supp. 3d 677 (N.D. Ill. 2020) ................................ 2, 3, 12, 22

*Mason v. SmithKline Beecham Corp.*, 596 F.3d 387 (7th Cir. 2010) ........................................... 2

*New Mexico Dep't of Human Servs v Dep't of Health & Human Servs Health Care Fin. Admin.*, 4 F.3d 882 (10th Cir. 1993) ................................................................................ 6

*Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041 (7th Cir. 2013) ...................................... 2, 3, 5

*Peaks-Smith vs. St. Anthony Hospital*, 2018 CH 2077 (Cir. Ct. Cook Cty. Jan 7, 2020) ........... 15

*Rogers v. BNSF Railway Co.*, 2019 WL 5635180 (N.D. Ill. Oct. 31, 2019) ................................ 22

*Rogers v. CSX Intermodal Terminals, Inc.*, 409 F. Supp. 3d 612 (N.D. Ill. 2019) ...................... 19

*Rosenbach v. Six Flags Entm't Corp.*, 2019 IL 123186, ¶ 36 ........................................ 7, 9, 19, 21

iii

*Slater, et al. v. H&M, et al.*, 2018 CH 16030 (Nov. 4, 2019, Cir. Ct. Cook Cty., Ill.) ................ 10

*Snider v. Heartland Beef, Inc.*, 2020 WL 4880163 (C.D. Ill. Aug. 14, 2020) ............................ 22

*Tamayo v. Blagojevich*, 526 F.3d 1074 (7th Cir. 2008) ................................................ 10

*Thomas by & through Phillips v. Illinois Dep't of Human Services*, 20-CV-03498, 2021 WL 4439417 (N.D. Ill. Sept. 28, 2021) .............................................. 14

*Thurman v. Northshore University Health System*, 2018 CH 3544 (Cir. Ct. Cook Cty. Dec. 12, 2019) .................................................................. 16

*Treadwell v. Power Sols. Int'l, Inc.*, 427 F. Supp. 3d 984 (N.D. Ill. 2019) ................................ 19

*Vo v. VSP Retail Dev. Holding, Inc.*, 19 C 7187, 2020 WL 1445605 (N.D. Ill. Mar. 25, 2020) ...................................................................... 12

*Wordlaw v. Enter. Leasing Co. of Chicago, LLC*, 20 CV 3200, 2020 WL 7490414 (N.D. Ill. Dec. 21, 2020) ............................................................... 21

*Wyeth v. Levine*, 555 U.S. 555 (2009) ....................................................................... 2

*Wypych v. Cheese Merchants of America, LLC*, 20 CH 2437 (July 21, 2021, Cir. Ct. Cook Cty., Ill.) .................................................................... 10

*Yi v. Sterling Collision Centers, Inc.,* 480 F.3d 505 (7th Cir. 2007) ........................................ 19

## Statutes

740 ILCS 14/1 ...................................................................................... 1

740 ILCS 14/10 ....................................................................... 10, 12, 14, 17

740 ILCS 14/15(a) ............................................................................... 2, 6

740 ILCS 14/15(b) ............................................................................... 6, 8

740 ILCS 14/15(b)(3) ............................................................................... 8

740 ILCS 14/20(1)-(2) ............................................................................ 21

740 ILCS 14/25(c) ................................................................................ 16

740 ILCS 14/5(a)-(c) .............................................................................. 19

## Other Authorities

95th Ill. Gen. Assem., House Proceedings, May 30, 2008, at 249 (statement of Rep. Ryg) ........ 19

https://www.merriam-webster.com ..................................................... 11, 18

## Regulations

21 C.F.R. § 11.200(a) ............................................................................... 3

21 C.F.R. § 606.160(b)(1) ....................................................................... 2, 4

21 C.F.R. § 630.10 ................................................................................. 4

21 C.F.R. § 630.10(g)(1) ........................................................................... 4

21 C.F.R. § 640.65 ................................................................................. 4

21 C.F.R. § 640.65(b)(3) ........................................................................................... 4

21 C.F.R. § 640.72 ..................................................................................................... 4

21 C.F.R. §§ 600.12(a), (b)(1) .................................................................................. 5

45 C.F.R. § 160.103 ................................................................................................. 13

45 C.F.R. §103 ........................................................................................................ 13

65 Fed. Reg. 82,477 (Dec. 28, 2000) ...................................................................... 14

65 Fed. Reg.82,572 ................................................................................................. 15

65 Fed.Reg. 82,572 ................................................................................................. 14

65 FR 82462-01 ...................................................................................................... 15

80 Fed. Reg. 29,869 (May 22, 2015) ........................................................................ 3

## INTRODUCTION

Plaintiffs Brian Vaughan and Jason Darnell ("Plaintiffs") bring this action against Biomat USA, Inc., Talecris Plasma Resources, Inc. and Interstate Blood Bank, Inc. ("Defendants") for invading their privacy by unlawfully collecting, using, storing, and disseminating their biometric data without their consent or providing the statutorily-mandated disclosures in violation of the Illinois Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1, *et seq*.

For years, Defendants have extracted biometric data from some of the most vulnerable people in our society: those people so financially insecure that they sell their plasma for money. Although BIPA has been on the books for over a decade, Defendants did *nothing* to comply with the simple, straightforward, and easy-to-follow requirements. Defendants had to do little more than have their plasma sellers fill out a few-sentences long release describing what was being done with the biometric information.

Defendants' Motion largely parrots the arguments brought by their plasma collection competitors (who were also sued for violating BIPA), arguments already rejected in well-reasoned opinions issued by Judge Chang and Judge Kendall. As these opinions held, there is nothing under federal law that preempts plasma companies from complying with this important privacy legislation and BIPA does not exempt them.

## ARGUMENT

### I.   PLAINTIFFS' CLAIMS ARE NOT PREEMPTED BY FEDERAL LAW

Defendants first argue that conflict preemption bars Plaintiffs' BIPA claims. "The touchstone of preemption analysis is the intent of Congress." *Costello v. BeavEx, Inc.,* 810 F.3d 1045, 1050 (7th Cir. 2016). However, courts must analyze Congressional intent "through a lens that presumes that [] state law has not been preempted" and the party pushing preemption has the

burden of proof. *Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1046, 1049 (7th Cir. 2013). *See also, Wyeth v. Levine*, 555 U.S. 555, 565, 572 (2009)("we start with the assumption that the historic police powers of the States were not to be superseded"). Conflict preemption "applies when federal and state law so directly conflict that it would be 'impossible' for a person or organization simultaneously to comply with both." *Mason v. SmithKline Beecham Corp.*, 596 F.3d 387, 390 (7th Cir. 2010); *Marsh v. CSL Plasma Inc.,* 503 F. Supp. 3d 677, 685 (N.D. Ill. 2020). "[M]ere differences between state and federal regulation of the same subject are not conclusive of preemption ... the crucial inquiry is whether [state law] differs from [federal law] in such a way that achievement of the congressional objective ... is frustrated." *Aux Sable Liquid Products v. Murphy*, 526 F.3d 1028, 1033 (7th Cir. 2008). BIPA is no obstacle to federal law's objectives, far from the "major damage to clear and substantial federal interests" required for conflict preemption. *Id.*

The Defendants attempt to manufacture a conflict by pointing out that a federal regulation requires that "individual product records" be maintained for at least 10 years (21 C.F.R. § 606.160(b)(1)) while BIPA requires that biometric information be destroyed no later than 3 years after the individual's last interaction with the private entity. 740 ILCS 14/15(a). Defendants' preemption argument fails for several reasons:

***First***, there is nothing in the BIPA that is "impossible" to comply with alongside federal law and its regulations. Of course, it is necessary to get proof of a plasma seller's identity, but no federal law or regulation, let alone the FDA, requires plasma donation companies to use biometric identifiers to establish donor identity. The Defendants could use a driver's license or one of the many other forms of photographic identification that we all regularly supply when going to the airport, getting our driver's license renewed, etc.

2

What's more, while federal regulations governing donor collection allow biometrics, they do no not require it. *See* 80 Fed. Reg. 29,869 (May 22, 2015). ("[W]e have not specified the means of establishing proof. We believe that photographic identification, a valid driver's license, validated biometric means, or other means can be useful in establishing identity."). More to the point, federal law governing plasma collection identification allows "signatures that are not based on biometrics." 21 C.F.R. § 11.200(a). To this end, Defendants utilized photographic consent to confirm identity. *See* ¶ 4 of the Consent Agreement, attached as Ex. A ("I understand that before my first donation, my photograph was taken, with my consent, for identification purposes.").[1]

Two decisions in the Northern District of Illinois have analyzed and rejected preemption of a plasma seller's BIPA claim by federal law. *See Crumpton v. Octapharma Plasma, Inc*., 513 F. Supp. 3d 1006, 1014 (N.D. Ill. 2021)(J., Kendall) and *Marsh v. CSL Plasma Inc.*, 503 F. Supp. 3d 677, 685 (N.D. Ill. 2020)(J. Chang). As here, in *Crumpton,* the plasma purchasing company argued that because federal law mandated keeping donor records longer than BIPA allows, conflict preemption applies. (*See* ECF #45, 19-CV-08402). Both decisions rejected conflict preemption:

> Octapharma's decision to use biometric information, or assessment that such a method is superior to the alternatives, does not alter the fact that it is not required by federal law. … Octapharma may satisfy both federal law and BIPA by using an alternate method of proving donor identity. Conflict preemption, then, does not apply.

*Crumpton*, 513 F. Supp. 3d at 1014.

> [Federal law] does not require plasma-donation centers to collect or use biometric data. … Nothing in federal law or regulation prevents CSL from obeying BIPA while complying with federal law. Conflict preemption, then, does not apply.

*Marsh*, 503 F. Supp. 3d at 685; s*ee also Patriotic Veterans*, 736 F.3d at 1049 ("[T]hat a state has more stringent regulations than a federal law does not constitute conflict preemption.")

---

[1] Exhibit A is an unredacted copy of the Exhibit A that the Defendant attached to its Motion to Dismiss as Doc. #54 p. 23.

**Second**, even if federal law required biometrics for donor verification (which it does not), nowhere does 21 C.F.R. § 606.160(b)(1) say that biometric data is part of the "individual product record" that must be maintained for 10 years; in fact, this section does not reference biometrics. After unwinding a small regulatory puzzle—the records referred to by this regulation do not even cover biometric data.

Starting with 21 C.F.R. § 640.65, a plasma company must establish a "donor identification system ... that positively identifies each donor and relates such donor directly to his blood[.]" *Id.* § 640.65(b)(3). Similarly, 21 C.F.R. § 630.10(g)(1) requires plasma collection companies to "obtain proof of identity of the donor and a postal address". Neither the § 640.65 "donor identification system" nor the § 630.10 "proof of identity" records require donors' biometric data. In fact, the FDA has expressly declined to require it. *See* 80 Fed Reg 29,869 (May 22, 2015) ("We have not specified the means of establishing proof."). Thus, § 630.10 and § 640.72 require that "proof of identity" records must be maintained—not that all such records be collected.

Defendants' argument is that any "proof of identity" record that they choose to use then becomes a matter of required retention. That argument has two significant problems. First, it admits there is no conflict between BIPA and the federal regulations. If BIPA prohibits the collection of biometric data that is retained for more than three years, and the FDA requires a longer retention period only if Defendants choose to collect biometric data, the answer is that Defendants may only choose the other options off the menu of the (entirely non-mandated) methods of identification. The second problem—more importantly—is that the regulations do not mandate the retention of everything that Defendants might choose to collect for their "donor identification" system or "proof of identity" records, but only what the respective sections require. *See* 21 C.F.R. § 630.10 and 21 C.F.R. § 640.72. The regulations require the records that would be

4

material (i.e., "as necessary") for inspectors to trace plasma products through the manufacturing process, should problems arise later—as in, the donor's name and contact information, not fingerprints they used to identify themselves. *Id.* §§ 600.12(a), (b)(1).[2] Hence, the "individual product record" does not include biometric data or, at the very least, need not include it.

**Third,** even if there were a conflict (and there is not), and even if federal law mandated biometric identification (it does not), Defendants have not met their burden to show the "major damage" to federal interests for conflict preemption to occur. *Patriotic Veterans*, 736 F.3d at 1050. Defendants would be able to track every single donor using the photo identification and personal information they collect from donors in practice (and in satisfaction of actual FDA requirements).

If the more stringent BIPA standard applied over the FDA's, Defendants could keep records of their donors' biometric data for 3 years—and then keep all the other identifying information for longer. Consider how difficult it would be for an ineligible donor to slip past the Defendants if BIPA's 3-year requirement carried the day. A person would (a) have donated plasma more than 3 years ago, but less than 10 years ago, and (b) present a believably fake photo identification card, name, address, proof of address, and proof of social security number (which would be odd because they would want the payment made out to themselves, as opposed to someone else). Then, the person would have to successfully lie their way through Defendants' questionnaire and screening and blood test. Defendants would have to fail to identify any issues with the plasma sample during their testing process. This does not create a realistic problem and would be a minor interference with the federal interest in protecting the plasma supply chain's safety. *Cf. New Mexico Dep't of Human Servs v Dep't of Health & Human Servs Health Care Fin.*

---

[2] Hence, the Defendants' competing plasma collector Octapharma Plasma, Inc. was able to resolve its BIPA litigation in part by agreeing to prospective relief that if it utilizes biometrics in the future, it will agree to destroy collected biometric information within 3 years. *See Crumption v. Octapharma Plasma, Inc.*, 19-cv-08402 (N.D. Ill.) [ECF #78-1 at par. 2.2].

*Admin.*, 4 F.3d 882, 886 (10th Cir. 1993) (no conflict preemption where differences in national uniformity of marital income distribution process would not significantly undermine Medicaid goals). This risk is not a sufficiently serious threat to federal interests to justify preemption. BIPA is no obstacle to the FDA's objectives. Far from the "major damage to clear and substantial federal interests" required for preemption.[3] For the foregoing reasons, this Court can and should reject any preemption argument.

Finally, even if the Defendants were somehow correct about their twice-rejected preemption argument, it would only apply to Plaintiffs' claim under subsection (a) of the BIPA (740 ILCS 14/15(a)), setting forth the data retention requirement; it would not apply to the claims for failing to obtain written consent as required by 740 ILCS 14/15(b). Plaintiffs have not carved out a separate count for claims under BIPA 15(a), and it is not procedurally proper to consider such an argument because a "motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of parts of claims[.]" *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015).

## II. PLAINTIFF VAUGHAN STATES A CLAIM UNDER SECTION 15(b)

Defendants argue that Vaughan's claim (only to the extent brought pursuant to Section 15(b)) should be dismissed because of a Consent Form that they attached as Exhibit A (unredacted form is Plaintiffs' Exhibit A). This argument is properly rejected for two procedural reasons and one substantive reason.

As a threshold matter, it is not appropriate to consider this unauthenticated 95% redacted document on a motion to dismiss particularly where, as here, the Plaintiffs allege (Amended

---

[3] Notably, the federal rules allowing (but not requiring) biometrics were passed several years after BIPA. *See* 80 Fed. Reg. 29,869 (May 22, 2015). If Congress believed BIPA interfered with the FDA's rules, it presumably would have enacted a pre-emption provision. *See, Wyeth v. Levine*, 555 U.S. 555, 574, 129 S. Ct. 1187, 1200, 173 L. Ed. 2d 51 (2009)("If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision at some point").

Complaint ¶¶ 20, 55) they were not provided a proper BIPA consent. *See Cothron v. White Castle Sys., Inc.*, 467 F. Supp. 3d 604, 614 (N.D. Ill. 2020)(refusing to allow the consideration of a BIPA consent form at the motion to dismiss stage if not specifically referenced in the complaint and noting that consent would relate to an affirmative defense rather than a motion to dismiss in any event); *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) ("[C]ourts should usually refrain from granting Rule 12(b)(6) motions on affirmative defenses."). Defendants' unauthenticated and heavily redacted Exhibit A cannot be considered on a Motion to Dismiss. Even if allowed, it relates to substantive affirmative defenses.

Additionally, as set forth in the previous section, the Amended Complaint does not include a separate Count for a Section 15(b) claim. Under governing Seventh Circuit authority, "[a] motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of parts of claims[.]" *BBL, Inc.*, 809 F.3d at 325. The question at the pleadings stage "is simply whether the complaint includes factual allegations that state a plausible claim for relief." *Id.* Significantly, the Illinois Supreme Court made clear that a person is "aggrieved" and may pursue a cause of action where she alleges that a private entity, like Defendants, violate any of their rights in BIPA Section 15. *Rosenbach v. Six Flags Entm't Corp.,* 2019 IL 123186, ¶ 33. Defendants limited their argument to just Section 15(b) and Defendants have not challenged the other claims within Counts I or II.

From a substantive standpoint, Exhibit A does not comply with BIPA. Exhibit A is several pages long, and the referenced language does not appear until paragraph 16. *See* Exhibit A, at p. 29. The BIPA does not speak to whether the consent language may be buried with other requirements. That the consent language is not immediately apparent or in a standalone form diminishes the effectiveness of the release. Even if the location of the consent language were immaterial, the language at issue is plainly insufficient.

7

Paragraph 16 of Exhibit A provides that the fingerprint is for "authentication," and "acknowledgement" and "verification" that the statements made by the donor during the screening process are accurate. This provision was intended as verification of the truth of the statements made in the screening. This provision is *not* a disclosure related to, or written release authorizing, Defendants' collection of Vaughan's biometric data as required by BIPA Section 15(b).

For ease of reference, the subject provision (paragraph 16) is copied here:

> I understand and agree that I Will provide my fingerprint as biometric authentication of my identity as part of the automated screening process (one time at the beginning of the screening process and one time at the completion of the screening process). I further understand and agree that by and through the provision of my fingerprint following the completion of the health, medical, and lifestyle history questions and acknowledgment and verification statements contained in the automated screening process, I have acknowledged, verified, and agreed to, and will acknowledge, verify, and agree to, all of the information, answers, statements, and representations provided and made in response to such questions and statements and have represented, and will represent, that all such information, answers, statements, and representations are true, accurate, and complete. *Id.*

According to BIPA Section 15(b), the written release must "(1) inform[] the subject…that a biometric identifier or biometric information is being collected or stored; [and] (2) inform the subject…of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used." 740 ILCS 14/15(b). Defendants' purported consent does neither. For example, it leaves the individual with no information about how long the Defendants will keep the biometric information or that the information was turned over to a third party, the vendor who administers the biometric collection device. The disclosure also does not disclose that the biometric information is being stored by the Defendants.

BIPA defines a "written release" as "*informed written consent* or, in the context of employment, a release executed by an employee as a condition of employment." 740 ILCS 14/15(b)(3) (emphasis added). Defendants' claimed BIPA waiver does not qualify as "informed

consent" to the collection of sensitive biometric information. Exhibit A is inadequate to comply with BIPA's "safeguards to insure that individuals' . . . privacy rights in the biometric identifiers and biometric information are properly honored[.]" *Rosenbach*, 2019 IL 123186, ¶ 36. BIPA contains strict, but easy-to-follow, requirements for which a violation, such as Defendants' invalid consent form, is actionable. *Id.* at ¶ 33.

In the state case of *Christmas v. Landmark of Richton Park*, 20CH5439 (Oct. 22, 2021, Cir. Ct. Cook Cty., Ill.) (Exhibit B), the Honorable Neil H. Cohen denied the BIPA defendant's motion for summary judgment where the plaintiff was (a) shown an electronic copy of a BIPA consent form as part of enrolling onto a biometric timeclock and (b) also was provided an employee handbook containing a full BIPA waiver. The Cook County court noted that:

> As to Plaintiff's purported consent to the Biometric Policy based upon the alleged time clock notice, BIPA requires a *written release.* (emphasis in original)

> The court further notes that the Biometric Policy purportedly electronically signed by Plaintiff does not actually identify any of the entities involved in the collection, storing or destruction of the employee's biometric data. Instead, there are empty spaces where the entity's name should be. As to the Employee Handbook, this court questions whether acknowledgment of receiving an employee handbook, which happens to contain a biometric policy, constitutes informed written consent to the biometric policy.

> *Id.* at p. 5.

As stated in *Christmas*, "informed consent" is not accomplished when the subject does not have the "opportunity fully read and comprehend the notice before purportedly acknowledging it." *Id.* Defendants' Exhibit A is deficient in the same regard. The disclosure buried in paragraph 16 does not lend well to "informed written consent" even if it contained all the information required by BIPA (which it clearly does not). Therefore, Defendants are not entitled to dismissal of Plaintiff Vaughan's Section 15(b) allegations. *See id.*

Also, in *Wypych v. Cheese Merchants of America, LLC*, 20 CH 2437 (July 21, 2021, Cir. Ct. Cook Cty., Ill.) (Exhibit C), the Honorable Moshe Jacobius denied a motion to dismiss predicated on a BIPA disclosure being contained in handbook and in onboarding slides. A similar denial was made in *Slater, et al. v. H&M, et al.*, 2018 CH 16030 (Nov. 4, 2019, Cir. Ct. Cook Cty., Ill.), where the Honorable Pamela Meyerson denied a motion to dismiss, finding that whether or not the defendants met Section 15(b)'s requirements with a consent form included in a handbook was *not* an "easily-proved issue[] of fact". Exhibit D (order and transcript at 51:20-52:3 [court ruling] & 21:8-22:12, 25:8-26:8 [plaintiff's argument re: insufficiency of handbook disclosure]). BIPA Section 15(b) requires more to obtain "informed written consent" than what Defendants did.

### III. BIOMETRIC INFORMATION USED TO IDENTIFY A PLASMA SELLER IS NOT EXEMPT UNDER BIPA

#### A. Plasma Sellers are not "Patients" In a "Health Care Setting".

The BIPA, 740 ILCS 14/10 provides in relevant part: "Biometric identifiers do not include information captured from a patient in a health care setting or information collected, used, or stored for health care treatment, payment, or operations under" HIPAA. Defendants argue that plasma sellers are "patients" who are in a "health care setting". As an initial matter, nowhere in the Amended Complaint do Plaintiffs allege that they were "patients" or that the biometric disclosure occurred in a "health care setting". Resolving this dispute on a motion to dismiss is not appropriate. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008)("We construe the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in her favor").

Even if substantively considered, Defendants' position is inaccurate. **First,** Defendants provide no health care or treatment to the Plaintiffs. Defendants have admitted that they do not.

Defendants redacted those portions of the Exhibit A to their Motion to Dismiss that explicitly say they are not providing health care of any kind (the unredacted copy is attached hereto):[4]

> "I understand and agree that the Center is **not a health care provider**, but rather a plasma collection facility, that it and its staff **cannot provide, and are not providing, me with medical advice or treatment…**" (Exhibit A, attached hereto, p. 3, par. 7(E)) (emphasis added).

> "The tests done on my blood and plasma are tests that are required by the FDA for the purpose of screening blood and plasma donors. These screening tests are **NOT medical diagnostic tests and are NOT intended to diagnose any medical condition or obtain a formal medical, diagnosis or medical care** from the Center staff." (*Id.* At p. 4 par. 12) (emphasis added, except "NOT" was capitalized in original).

Defendants' admissions--which they elected to redact--foreclose any possibility that Plaintiffs are patients in a health care setting.

As a *secondary* basis for denying the Motion, common dictionary definitions further undermine Defendants' argument. Merriam-Webster defines a "patient" as "in individual awaiting or under medical care or treatment" or "the recipient of any of various personal services".[5]  It defines "health care" as "efforts made to maintain or restore physical, mental, or emotional well-being especially by trained and licensed professionals". These definitions comport with the commonsense understanding that a patient goes to a health care facility to get treatment (or "care"). To the contrary, here the Plaintiffs make money by selling their plasma to the Defendants; any medical screening that may have existed was to determine eligibility to sell their plasma not because they were "patients" or "in a health care setting".

Judge Chang in *Marsh* rejected an identical argument by analyzing various dictionary definitions of "patient" and "health care setting" and concluded that "a person who

---

[4] While the Plaintiffs have not agreed that this document is admissible on a Motion to Dismiss, after they filed the lawsuit, the Defendants provided them with an unredacted copy of what was attached as Exhibit A to their Motion.

[5] https://www.merriam-webster.com/dictionary/patient

sells plasma to [a plasma collection company] is not a 'patient' in a 'health care setting' within BIPA's meaning. 503 F. Supp. 3d at 683–84.[6] *See also Kaufmann v. Schroeder*, 241 Ill. 2d 194, 197 (2011)(an inappropriate touching by a physician, in a hospital, and during a medical procedure does not arise out of "patient care" for purposes of statute of limitations).[7]

Defendants cite *Vo v. VSP Retail Dev. Holding, Inc.*, 19 C 7187, 2020 WL 1445605, at *2 (N.D. Ill. Mar. 25, 2020). In *Vo*, the plaintiff sued after she used software that provided "a health care service by ensuring the appropriate fit and positioning of corrective eyewear." *Id.* at 2. The defendant, therefore, was helping eyecare patients who had to correct their vision. *Id.* at 2 (noting that "VSP provides health care by selling a device or equipment in accordance with a prescription—namely eyewear—and by offering a service or procedure that affects the function of the body—namely vision."). On its face, the case is readily distinguishable. Plaintiffs, here, were not getting corrections to their blood; they were selling material extracted from their blood for Defendants' manufacturing process (nor were the *Vo* plaintiff selling their eyeballs). *Marsh*

---

[6] Judge Kendall too analyzed this defense in *Crumpton*. Her analysis, however, was on the *Plaintiff's* motion to strike an affirmative defense and therefore procedurally different. From this standpoint, she concluded that based upon the definitions the Court analyzed, that plaintiff "has not demonstrated beyond a reasonable doubt that [defendant] can prove no set of facts indicating donors are also patients under BIPA." 513 F. Supp. 3d at 1016. Of course, the opposite procedural stance is being used here because unlike in *Crumpton* where the Plaintiff's moved, here the Defendants are moving to dismiss and must affirmatively demonstrate that plaintiffs are patients in a health care setting; something they have not done.

[7] BIPA provides a particularized meaning of "biometric identifier," explicitly defined as a "retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry." 740 ILCS 14/10. However, the legislature excluded from this definition all "information captured from a patient in a health care setting or information collected, used, or stored for health care treatment, payment, or operations under [HIPAA]." Id. (emphasis added). Given BIPA's explicit reference to "patient" information and HIPAA's regulation of "patient" privacy exclusively, this limited exclusion unquestionably applies only to patient information. This only makes sense. It would be highly imprudent—and indeed, potentially life-threatening—for a health care provider to withhold emergency treatment involving the collection of biometric identifiers or biometric information from an unconscious patient until they can sign a BIPA-compliant written release. BIPA's explicit reference to biometrics "from a patient" clearly memorializes the legislature's intent to exclude patient biometrics from the BIPA safeguards enacted because patient biometrics are already protected under HIPAA and its strict penalties.

distinguished *Vo* from the plasma seller relationship finding that it is "quite unlike the relationship in *Vo.*" 503 F. Supp. 3d at 684. As *Marsh* explained, "here the plasma donor sells plasma to CSL and receives only money in return, not any kind of health service. *Vo* is not on point …. The exception does not apply."[8]

 In truth, when *Vo*'s reasoning is applied, it offers yet another basis for denying the Motion to Dismiss here. *Vo,* in analyzing the HIPAA exemption (not at issue in this case, because Defendant is not subject to HIPAA as it is not a health care provider), applied HIPAA's definition of "heath care". If that definition is applied, it demonstrates why selling plasma cannot be "health care" of a "patient" under any definition. HIPAA defines "health care" as "care, services, or supplies related to the health of an individual." 45 C.F.R. §103. While "assessment" is listed as an example of such health care, that assessment must of course relate to the "care, services, or supplies related to the health of an individual." *See Heard v. Becton, Dickinson & Co.*, 524 F. Supp. 3d 831, 845 (N.D. Ill. 2021)("The court reads the phrase "for health care treatment ... under [HIPAA]" to mean biometric information 'collected by a HIPAA covered entity for the purpose of health care treatment, payment, or operations.'"). Because the patient in a health care setting exemption does not apply, the Defendants' argument should be denied.

**B.  The Defendants' Reliance Upon "information collected, used or stored for health care treatment" Under HIPAA Is Misplaced.**

Relatedly, the Defendants argue (Motion, p. 12) that biometric data is excluded from BIPA's scope under the exclusion for "information collected, used or stored for health care

---

[8] Furthermore, *Vo* relied upon section 160.103 of the Code of Federal Regulations, which defines health information as "any information,[ ... ], that: (1) Is created or received by a health care provider [ ... ], employer,[ ... ]; and (2) Relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past present, or future payment for the provision of health care to an individual." 45 C.F.R. *§* 160.103. The definition includes information created by a "health provider," which Defendants admit they are not.

treatment" under HIPAA. See 740 ILCS 14/10. To make their point, they cite to their own Internet site for the argument that the plasma they purchase is resold to pharmaceutical companies to make medicine. These, and the other extraneous facts, are not in the Amended Complaint. They must be disregarded on a motion to dismiss. *See Thomas by & through Phillips v. Illinois Dep't of Human Services*, 20-CV-03498, 2021 WL 4439417, at *2 (N.D. Ill. Sept. 28, 2021).

In function, as demonstrated above, Defendants do not provide health care treatment. The common-sense understanding and dictionary definitions of these terms are consistent with the U.S. Department of Health and Human Services ("HHS"). The HHS found that plasma donation centers were not subject to HIPAA compliance. *See* Standards for Privacy of Individually Identifiable Health Information, 65 Fed. Reg. 82,477 (Dec. 28, 2000)(emphasis added)("[T]he procurement or banking of ... blood ... or any other tissue or human product ***is not considered to be health care under this rule and the organizations that perform such activities would not be considered health care providers***[.]"). HHS has exempted plasma centers from the standards for privacy of identifiable health care information specifically because these centers *do not* provide "health care" and do not see "patients". *Cf.* 65 Fed.Reg. 82,572. As HHS explains:

> Comment: Some commenters suggested that blood centers and plasma donor centers that collect and distribute source plasma not be considered covered health care providers because the centers ***do not provide "health care services"*** and the blood ***donors are not "patients" seeking health care***. Similarly, commenters expressed concern that organ procurement organizations might be considered health care providers.

> Response: ***We agree*** and have deleted from the definition of "health care" the term "procurement or banking of blood, sperm, organs, or any other tissue for administration to patients."[9]

---

[9] https://www.ihs.gov/sites/privacyact/themes/responsive2017/display_objects/documents/PvcFR03.pdf

*See* Standards for Privacy of Individually Identifiable Health Information, 65 FR 82462-01[10]

More to the point, while admitting they provide no health care on Exhibit A, Defendants admit to the real reason for biometric collection: to identify the plasma seller. (See Exhibit A at a "fingerprint [is provided] as biometric authentication of my identity as part of the automated screening process").

What the Defendants seem to say is that any biometric information provided in any manner in the health care field is exempt. That is not the law—there must be a *connection* between the collection of a biometric template *with* the health care treatment. *See Crumpton,* 513 F. Supp. 3d at 1015 (striking HIPAA/health care BIPA affirmative defense because it "inadequately pleads a connection between collecting a biometric template" and how that template is used for treatment). As such, biometric claims are routinely allowed in the heath-care industry. *See Peaks-Smith vs. St. Anthony Hospital*, 2018 CH 2077 (Transcript of Proceedings, Exhibit E, at p. 26) (Cir. Ct. Cook Cty. Jan 7, 2020) (J. Gamrath)(in denying hospital's motion to dismiss brought that used a biometric device --for medication disbursement, fraud prevention, and timekeeping--the court explained BIPA was not intended to exempt health care service providers and noting that such an interpretation would "mean that any hospital, any health care provider could say we do not fit under BIPA because we provide health care services, and that does not seem to be the intent of the legislature."); *Bruhn v. New Albertson's Inc.,* No. 18-CH-01737 (Cir. Ct. Cook Cty. July 2, 2019) (J. Loftus)(Exhibit F Transcript of Proceedings at p. 53)(denying motion to dismiss in claim

---

[10] Furthermore, HHS explains that: "Comment: One commenter asked that we revise the definition to explicitly exclude plasmapheresis from paragraph (3) of the definition. It was explained that plasmapheresis centers do not have direct access to health care recipients or their health information, and that the limited health information collected about plasma donors is not used to provide health care services as indicated by the definition of health care. Response: We address the commenters' concerns by removing the provision related to procurement and banking of human products from the definition." Standards for Privacy of Individually Identifiable Health Information, 65 FR 82462-01. *See also* 65 Fed. Reg.at 82,572 (HHS removing provision governing "procurement and banking of human products").

brought by pharmacist who was required to scan fingerprint to access pharmacy computer system and noting that: "[t]o read the exception as Defendants set forth is nonsensical, in this court's opinion, essentially that Defendants argue a blanket exemption for doctors, nurses, physical therapists, CNA's, ultrasound technicians, anyone subject to HIPAA who uses biometric information to access medical records or billing records or hospital records. These large categories of workers cannot look to BIPA to protect their privacy. If the General Assembly intended to exempt BIPA for anyone subject to HIPAA, the legislature would have said so.); *Thurman v. Northshore University Health System*, 2018 CH 3544 (Cir. Ct. Cook Cty. Dec. 12, 2019) (J. Valderrama) (rejecting Defendants hospital's argument that case had to be dismissed under BIPA's health care exception because the device at issue used as "an authorization method to allow access to stored materials and certain restricted areas" at Evanston Hospital). (Exhibit G p. 9). While hospitals and pharmacies may interact with patients in a health care setting, Defendants admit they provide no health services care whatsoever to its plasma sellers.

In *Heard v. Becton, Dickinson & Co.*, 524 F. Supp. 3d 831, 844 (N.D. Ill. 2021), the court noted that if the legislature had intended to grant a sweeping, categorical exemption to a particular industry in BIPA, it knew how to. For instance, the exemption for financial institutions explicitly provides that, "[n]othing in this act shall be deemed to apply ***in any manner*** to a financial institution . . . that is subject to Title V of the federal Gramm-Leach-Bliley Act of 1999 and the rules promulgated there under." 740 ILCS 14/25(c) (emphasis added). Under this exemption, all banks subject to Title V of the Gramm-Leach-Bliley Act are exempt from BIPA. Unlike the banking exemption, "the legislature did not include a provision explicitly stating that BIPA shall not be construed to apply to a health care provider" (*Heard,* 524 F. Supp. 3d at 844) let alone a plasma purchasing company. Defendant's reliance on a Will County transcript in *Diaz v. Silver*

*Cross Hosp. & Med. Ctrs*., No. 2018 CH 001327 (Cir. Ct. Will Cnty. Aug. 29, 2019) is unpersuasive. As Judge Pallmeyer found in *Heard*, regardless of how persuasive its reasoning was (she pointed out it conflicted with four other courts), it is distinguishable because it only applies to hospitals. 524 F. Supp. 3d at 845.

Nowhere does BIPA state, for example, that "nothing in this act shall be deemed to apply in any manner to facilities that have medical professionals working at them." BIPA does not flatly exempt all plasma buyers like it exempts all Title V banks. The legislature's restraint is reasonable. It did not intend for all health care facilities – including, but not limited to, hospitals, pharmacies, insurance companies, nursing homes, etc.– to be exempt from BIPA's security measures. If the legislature intended to create such a broad BIPA exemption, it would have said so. *Cf. In re Jaffe*, 932 F.3d 602, 606 (7th Cir. 2019).

### C.  Finger Scans Do Not "Validate Scientific Testing or Screening"

Defendants argue that the data they collect is exempt from BIPA's definition of "biometric identifier[s]." 740 ILCS 14/10. The exemption reads: "Biometric identifiers do not include an X-ray, roentgen process, computed tomography, MRI, PET scan, mammography, or other image or film of the human anatomy *used to diagnose, prognose, or treat* an illness or other medical condition or to further validate scientific testing or screening." 740 ILCS 14/10 (emphasis added). Defendants' collection of biometric identifiers *to identify its donors* does not "further validate scientific testing or screening" because it makes no claim to be doing any "testing" using biometric data at all. The biometric scan itself is not used for scientific testing or screening. *See Crumpton*, 513 F. Supp. 3d at 1017 (N.D. Ill. 2021)(striking affirmative defense because it "does not allege the biometric identifiers themselves are integral to screening or testing the donor or their plasma or blood for any condition or disease. Moreover, validating donor identity is not the same as validating the underlying testing or screening.").

17

Defendants may argue that they are "screening" their donors because they use biometric data to identify them. Such an interpretation would swallow the law and exempt the most common BIPA cases. The term "screening" is undefined in BIPA. "Screen" has two potentially relevant meanings—only one applies. *See County Of Cook v. Illinois Labor Relations Bd. Local Panel*, 347 Ill. App. 3d 538, 547, 807 N.E.2d 613, 621 (2004) ("If the language of the statute permits two constructions, one of which would render the provision absurd ... and the other of which would render the provision reasonable ... the former construction must be avoided."). The correct meaning is "to test or examine for the presence of something (such as a disease)[.]" Merriam Webster, "Screen[,]" Entry 2(3)(b)(3). This is the only interpretation that makes sense given the language of the exemption as a whole: mammograms, X-rays, MRIs, and the like, are used in relation to evaluative or diagnostic screening, i.e., the assessment of a specific portion of the human anatomy for the detection of a disease in the same body part.[11] These processes are each used to locate and diagnose diseases.

Which brings us to the wrong meaning of "screen"— the one Defendants will advocate for—"to make a separation into different groups[.]" Merriam Webster, "Screen[,]" Entry 2(3)(b)(1). This meaning is not related to the foregoing terms of the exemption and would not make sense in the context of the entire provision, which is concerned with the collection of biometric data to provide health care services. *See Fuesting v. Uline, Inc*., 30 F. Supp. 3d 739, 742 (N.D. Ill. 2014) (language should "not be considered in isolation, but, instead, must be read in context"). Court use the *noscitur a sociis* canon of construction. Adopting the different-groups definition of "screen" would exempt some of the clearest BIPA cases and re-write the statute.

---

[11] *See Ctr. Video Indus. Co. v. Roadway Package Sys., Inc*., 90 F.3d 185, 187 (7th Cir. 1996) ("[W]here a general term follows a series of specific terms, the former ... extends only to matters of the same general class or nature as the terms ... enumerated.")

A company that uses fingerprint scanners to facilitate consumer transactions would be exempt, because it uses "scientific ... screening" to screen for consumers who have financial accounts linked with their biometric data versus those who do not. See 740 ILCS 14/5(a)-(c); 95th Ill. Gen. Assem., House Proceedings, May 30, 2008, at 249 (statement of Rep. Ryg) (describing Pay By Touch bankruptcy that led to passage of BIPA). An employer requiring employees to provide fingerprints to clock into work would be exempt, because it uses biometrics to screen for the correct employee's identity. *Compare with Rogers v. CSX Intermodal Terminals, Inc.*, 409 F. Supp. 3d 612, 615 (N.D. Ill. 2019) (dismissing BIPA claim for damages, but holding employee stated BIPA claim against employer who required fingerprint scanning to obtain access to facilities); *Treadwell v. Power Sols. Int'l, Inc*., 427 F. Supp. 3d 984, 987 (N.D. Ill. 2019) (same, but fingerprint scanning used for timekeeping).

If the legislature intended to create such a broad BIPA exemption encompassing both meanings of "screening[,]" it would have said so. *Cf. In re Jaffe*, 932 F.3d at 606 (7th Cir. 2019) ("[I]f the Illinois legislature wanted to exempt particular interests from the attachment of judgment liens, it had no problem in doing so."). Instead, the legislature used "screening" at the end of a series of procedures used for evaluative and diagnostic health care. The alternate definition is unworkable with "the familiar principle of statutory interpretation that exemptions from a statute that creates remedies should be construed narrowly". *Yi v. Sterling Collision Centers, Inc.,* 480 F.3d 505, 508 (7th Cir. 2007); *Rosenbach*, 2019 IL 123186, ¶ 36 (observing that the legislature's goal was to provide large-scale protection for *all individuals* who have their biometric identifiers and information collected in Illinois).

19

## IV.    PLAINTIFFS SUFFICIENTLY PLEAD A VIOLATION BY EACH DEFENDANT

Defendants argue that the Amended Complaint does not allege a violation against each separate Defendant by, for example, stating at which entity they sold their plasma. Liability in this case is not predicated upon which Defendant purchased the plasma—it is based upon which committed a BIPA violation. The Amended Complaint properly alleges that each of the Defendants committed biometric violations regardless of the specific donation center location. *See, e.g.* Amend Comp. ¶ 87 ("Defendants have been and continue to be in possession of Plaintiffs' biometrics, and it collected, captured, or otherwise obtained their biometric identifiers and biometric information within the meaning of the Act.") ¶ 26 ("Defendants then used Plaintiffs' biometrics as an identification and authentication method to track their plasma donations and identity.") ¶ 27 ("Defendants subsequently stored Plaintiffs' biometric data in their database(s)") ¶ 88  ("Defendants collected, captured, or otherwise obtained, Plaintiffs' biometric identifiers").

Plaintiffs believe that discovery will show that the Defendants operate a common biometric collection system. Plaintiffs allege the Defendants operate as part of the "Grifols network". *Id.* ¶ 5. Defendants' Exhibit A is a *Grifols* form that has the stamp of "Biomat USA, Inc." on the bottom. *Id.* It says that personal identification information may be provided to parents, subsidiaries, and affiliated companies; and all the Defendants share a common Grifols Internet site.[12]

Defendants are each on notice of the claims against them. This is all that is required for notice pleading. *Cunningham v. Foresters Fin. Services, Inc.*, 300 F. Supp. 3d 1004, 1016 (N.D. Ind. 2018)("While Plaintiff must ultimately prove each individual defendant's role and relationship" at the pleading stage "he need only generally allege" claims to provide notice."). For

---

[12] https://www.grifolsplasma.com/en/home    Grifols appears to have created these entities to purchase plasma as it is a publicly-traded Spanish pharmaceutical and chemical manufacturer. https://en.wikipedia.org/wiki/Grifols

example, in *Wordlaw v. Enter. Leasing Co. of Chicago, LLC*, 20 CV 3200, 2020 WL 7490414, at *3 (N.D. Ill. Dec. 21, 2020), the BIPA plaintiff asserted common claims against two related entities. The court noted that while the plaintiff was "currently unable to allege which [defendant] in particular installed and controlled the [biometric] system" the plaintiff for now "alleged enough to put both defendants on notice of their alleged wrongdoing." *Id.* at *3 ("Plaintiff will have to prove unlawful dissemination to prevail, but more detail about how she will do that is not necessary at this stage of the case.").

### A.   State of Mind Allegations Are Irrelevant to Evaluating the Pleading Sufficiency of BIPA Claims, But in Any Event, Are Sufficiently Pled.

Defendants next argue that Plaintiffs' claims are barred because they did not adequately plead recklessness. Defendants are mistaken because federal pleading standards do not permit dismissal of parts of claims, and BIPA does not require factual allegations showing the defendant's state of mind to properly allege BIPA claims under Section 15.

Under governing Seventh Circuity authority, "[a] motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of parts of claims[.]" *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015). The question at the pleadings stage "is simply whether the complaint includes factual allegations that state a plausible claim for relief." *Id.* The Illinois Supreme Court has made clear that a person is "aggrieved" and may pursue a cause of action where she alleges that a private entity, like Defendants, violate any of their rights in BIPA Section 15. *Rosenbach*, 2019 IL 123186, ¶ 33. Critically, only after Plaintiffs qualify as a "prevailing party" is it necessary to determine whether Defendants' BIPA violations were "negligent" or "reckless" for damages purposes. 740 ILCS 14/20(1)-(2).

Considering this standard, one court in the Central District of Illinois concluded that "a BIPA plaintiff need not plead facts showing the defendant's mental state to state a claim for relief."

*Snider v. Heartland Beef, Inc.*, 2020 WL 4880163 at *5 (C.D. Ill. Aug. 14, 2020) (Darrow, C.J.). In reaching this conclusion, the *Snider* court relied on Judge Tharp's opinion in *Cothron v White Castle System, Inc.*, which reasoned that because a BIPA plaintiff may prevail and obtain attorney's fees, costs, and injunctive relief without establishing negligence or recklessness, there is no requirement to plead facts establishing entitlement to liquidated damages within the same claim for relief. 467 F.Supp.3d at 615 ("[Plaintiff's] complaint states a plausible claim for relief under sections 15(b) and 15(d); Rule 12(b)(6) does not require her to plead the facts that will determine the amount of actual damages she may be entitled to recover").[13]

If Plaintiffs were required to plead negligence or recklessness (they do not), they have done so. BIPA was enacted in 2008 and the Defendants violated it more than a decade after BIPA was enacted, which independently supports an inference of negligence and recklessness. *See Rogers v. BNSF Railway Co*., 2019 WL 5635180, at *2 (N.D. Ill. Oct. 31, 2019) ("[T]he BIPA took effect more than ten years ago, and if the allegations of [the] complaint are true—as the Court must assume at this stage— [Defendants] made no effort to comply with its requirements. This is certainly enough, at the pleading stage, to make a claim of negligence or recklessness plausible"); *Figueroa v. Kronos Inc*., 2020 WL 1848206, at *8 (N.D. Ill. Apr. 13, 2020) (same); *Marsh*, 503 F. Supp. 3d at 685–86 (same). Accordingly, state of mind is irrelevant to examining the pleading sufficiency of a BIPA claim and Plaintiffs nevertheless have alleged plausible claims for relief.

## V.    CONCLUSION

Wherefore, Plaintiffs request that the Court deny the Motion to Dismiss.

Dated: January 17, 2022                              Respectfully Submitted:

By: */s/ David Fish*

---

[13] *Bradenberg v. Meridian Senior Living, LLC*, 2021 WL 4494275, at *5–6 (N.D. Ill. Sept., 30, 2021) (explaining the remedies in BIPA Section 14/20 are "just that: a menu of *remedies*"; "other Illinois federal courts have held that plaintiffs need not plead either negligence, intentionality, or recklessness in a BIPA claim to survive a motion to dismiss") (emphasis in original).

David Fish (dfish@fishlawfirm.com)
Mara A. Baltabols (mara@fishlawfirm.com)
**Fish Potter Bolanos PC**
200 East Fifth Avenue, Suite 123
Naperville, Illinois 60563
Tel: 630.355.7590
Fax: 630.778.0400
docketing@fishlawfirm.com

COUNSEL FOR THE PLAINTIFFS AND THE PUTATIVE CLASS

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that a true and correct copy of the foregoing was served via ECM/CF filing system on January 17, 2022 to all counsel of record.


/s/*David Fish*
David Fish