**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **BRIAN R. VAUGHAN, JASON DARNELL, FEBBIE MINNIEFIELD, and ADRIEL VEGA, individually and on behalf of all others similarly situated,** | ) ) ) ) ) | |
| *Plaintiffs,* | ) ) | **Case No.: 20-cv-04241** |
| v. | ) ) | **Honorable Marvin E. Aspen** |
| **BIOMAT USA, INC., TALECRIS PLASMA RESOURCES, INC., and INTERSTATE BLOOD BANK, INC.,** | ) ) ) ) | **Magistrate Judge Jeffrey Cole** |
| *Defendants.* | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO
DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

RELEVANT FACTS AND PLAINTIFFS' CLAIMS ......................................................... 2

LEGAL STANDARD .......................................................................................................... 3

ARGUMENT ....................................................................................................................... 4

I.      PLAINTIFFS' CLAIMS ARE PREEMPTED UNDER THE
        DOCTRINE OF CONFLICT PREEMPTION ......................................................... 4

II.     PLAINTIFFS CANNOT STATE A SECTION 15(b) CLAIM
        AGAINST BIOMAT OR TPR ................................................................................ 9

III.    THE ALLEGED BIOMETRIC IDENTIFIERS ARE EXEMPT
        FROM THE BIPA'S REQUIREMENTS ............................................................... 10

        A.      The BIPA exempts information collected from a patient in
                a health care setting ................................................................................. 11

        B.      The BIPA exempts "information collected, used or stored
                for health care treatment" ........................................................................ 14

        C.      The BIPA exempts "image[s] used to . . . validate scientific
                testing or screening" ................................................................................ 16

IV.     VAUGHAN AND DARNELL'S CLAIMS ARE TIME BARRED ................................. 17

        A.      Vaughan and Darnell's Claims Are Time-Barred by the One-Year Statute of
                Limitations Set Forth in 735 ILCS 5/13-201. ......................................... 18

        B.      In the Alternative, Plaintiff Vaughan's Claims Are Time-Barred by the Two-Year
                Statute of Limitations Set Forth in 735 ILCS 5/13-202 ........................ 20

V.      PLAINTIFFS' CLAIMS THAT DEFENDANTS RECKLESSLY
        OR WILLFULLY VIOLATED THE BIPA ARE
        UNSUPPORTED AND INSUFFICIENTLY PLED ................................................... 22

CONCLUSION .................................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)........................................................................................3, 4

*Benitez v. KFC Nat. Mgmt. Co.,*
  305 Ill. App. 3d 1027 (2d Dist. 1999)..............................................................19

*Blair v. Nevada Landing Partnership,*
  369 Ill. App. 3d 318 (2d Dist. 2006)................................................................19

*Bryson v. News Am. Pub., Inc.,*
  174 Ill. 2d 77 (1996)........................................................................................19

*Clinton v. Jones,*
  520 U.S. 681 (1997)..........................................................................................20

*Cothron v. White Castle Sys.,*
  Case No. 128004 (Ill. S. Ct.)......................................................................17, 20

*Crumpton v. Octapharma Plasma, Inc.,*
  513 F. Supp. 3d 1006 (N.D. Ill. 2021)...............................................................8

*Dahl v. Fed. Land Bank Ass'n of W. Ill.,*
  213 Ill. App. 3d 867 (3d Dist. 1991).................................................................21

*Diaz v. Silver Cross Hosp. & Med. Ctrs.,*
  No. 2018 CH 001327 (Cir. Ct. Will Cnty. Aug. 29, 2019)...............................5

*Doss v. Clearwater Title Co.,*
  551 F.3d 634 (7th Cir. 2008) ............................................................................5

*EEOC v. Concentra Health Servs., Inc.,*
  496 F.3d 773 (7th Cir. 2007) ........................................................................3-4

*Founding Church of Scientology of Wash., D.C. v. Am. Med. Ass'n,*
  60 Ill. App. 3d 586 (1st Dist. 1978) ................................................................19

*Frye v. Auto-Owners Ins. Co.,*
  845 F.3d 782 (7th Cir. 2017) ......................................................................15-16

*Geier v. Am. Honda Motor Co.,*
  529 U.S. 861 (2000)...................................................................................4-5, 8

*Hecker v. Deere & Co.,*
  556 F.3d 575, 583 (7th Cir. 2009) ....................................................................9

*Hoagland v. Town of Clear Lake*,
 415 F.3d 693 (7th Cir. 2005) ................................................................4

*Ibarrola v. Kind, LLC*,
 No. 13 C 50377, 2014 U.S. Dist. LEXIS 95833 (N.D. Ill. July 14, 2014) ..............5

*Jay E. Hayden Found. v. First Neighbor Bank, N.A.*,
 610 F.3d 382 (7th Cir. 2010) ..............................................................17

*Johnson v. Lincoln Christian College*,
 150 Ill. App. 3d 733 (4th Dist. 1986)......................................................19

*Kirwan v. Lincolnshire-Riverwoods Fire Prot. Dist.*,
 349 Ill. App. 3d 150 (2nd Dist. 2004)......................................................22

*Landers v. School Dist.*,
 66 Ill. App. 3d 78 (5th Dist. 1978)........................................................22

*Landis v. N. American Co.*,
 299 U.S. 248 (1936)........................................................................20

*Leopold v. Levin*,
 45 Ill. 2d 434 (1970) ....................................................................19

*Martin v. Direct Wines, Inc.*,
 No. 15 C 757, 2015 U.S. Dist. LEXIS 89015 (N.D. Ill. July 9, 2015) ...................4

*Mosby v. Ingalls Mem'l Hosp.*,
 2022 IL App (1st) 200822................................................................15-16

*Mosby v. The Ingalls Mem'l Hosp.*,
 No. 2018 CH 05031 (Cir. Ct. Cook. Cty. Jan. 13, 2020).....................................23

*Namuwonge v. Kronos, Inc.*,
 418 F. Supp. 3d 279, 286 (N.D. Ill. 2019) ................................................22

*Navarette v. Josam Acquisitions*,
 No. 2019 CH 14368 (Cir. Ct. Cook Cty. Mar. 29, 2021) .....................................23

*Neikirk v. Cent. Ill. Light Co.*,
 128 Ill. App. 3d 1069 (3rd Dist. 1984) ...................................................21

*New York SMSA Ltd. P'ship v. Town of Clarkstown*,
 612 F.3d 97 (2d Cir. 2010)..................................................................8

*Parangao v. Community Health Syst., Inc.*,
 858 F.3d 452 (7th Cir. 2017) ..............................................................4

*Pavlik v. Kornhaber,*
   326 Ill. App. 3d 731 (1st Dist. 2001) ........................................................................21

*Pine Top Receivables of Ill., LLC v. Banco De Seguros Del Estado,*
   No. 12 C 6357, 2013 U.S. Dist. LEXIS 28040 (N.D. Ill. Feb. 25, 2013)................................9

*Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health,*
   699 F.3d 962 (7th Cir. 2012) .....................................................................................5

*Poulos v. Lutheran Soc. Servs. of Ill., Inc.,*
   312 Ill. App. 3d 731 (1st Dist. 2000) ........................................................................19

*Resnick v. Schwartz,*
   No. 17 C 04944, 2018 U.S. Dist. LEXIS 149767 (N.D. Ill. Sep. 3, 2018)................................9

*Rogers v. CSX Intermodal Terminals,*
   409 F. Supp. 3d 612 (N.D. Ill. 2019) ........................................................................22

*Rosenbach v. Six Flags Entm't Corp.,*
   2019 IL 123186........................................................................................17, 18, 20

*State Farm Mut. Auto. Ins. Co. v. Pate,*
   275 F.3d 666 (7th Cir. 2001) ..............................................................................16, 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
   551 U.S. 308 (2007)................................................................................................4

*Thurman v. Northshore Univ. Health Sys.,*
   No. 2018 CH 3544, 2019 WL 7249205 (Cir. Ct. Cook Cty. Dec. 12, 2019) .........................23

*Tims v. Black Horse Carriers, Inc.,*
   2021 IL App (1st) 200563...............................................................................*passim*

*Travelers Cas. & Sur. Co. v. Bowman,*
   229 Ill. 2d 461 (2008) ...........................................................................................18

*Venture Assocs. Corp. v. Zenith Data Sys. Corp.,*
   987 F.2d 429 (7th Cir. 1993) .....................................................................................9

*Vo v. VSP Retail Dev. Holding, Inc.,*
   No. 19 C 7187, 2020 U.S. Dist. LEXIS 53916 (N.D. Ill. Mar. 25, 2020) .................. 11, 13-14

*Webster v. Windsor Estates Nursing and Rehab,*
   No. 2019 CH 11441(Cir. Ct. Cook Cty. Nov. 11, 2020) .....................................................23

*West Bend Mutual Insurance Co. v. Krishna Schaumburg Tan, Inc.,*
   2021 IL 125978.....................................................................................................19

**Statutes**

735 ILCS 5/13-201 ................................................................................................ 2, 18-19

735 ILCS 5/13-202 ......................................................................................... 2, 18, 21-22

735 ILCS 5/13-205 .................................................................................................... 21

740 ILCS 14/10 ................................................................................................... *passim*

740 ILCS 14/15(a) .................................................................................................. 3, 6

740 ILCS 14/15(b) ....................................................................................... 2, 6, 9-10

740 ILCS 14/20 ........................................................................................................ 7

**Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 3, 4

Fed. R. Civ. P. 56 ..................................................................................................... 4

**Other Authorities**

21 C.F.R. § 606.160 ............................................................................................... 1, 5

21 C.F.R. § 630.40 ............................................................................................... 12-13

21 C.F.R § 640.65 .................................................................................................. 7, 16

21 C.F.R § 630.10 ............................................................................................. 11, 16-17

21 C.F.R § 630.15(b) .......................................................................................... 11-12

80 Fed. Reg. 29842 (May 22, 2015) ....................................................................... 7, 8

**INTRODUCTION**

Defendants Biomat USA, Inc. ("Biomat"), Talecris Plasma Resources, Inc. ("TPR") and Interstate Blood Bank, Inc. ("IBBI") operate plasma donation centers across the country. Through a process called plasmapheresis,[1] Defendants obtain qualified donors' plasma, which is then used to create life-saving treatments for individuals across the globe suffering from a variety of medical conditions. Plaintiffs Brian Vaughan, Jason Darnell, Febbie Minniefield and Adriel Vega donated plasma at Defendants' centers in Illinois.

Defendants are licensed and heavily regulated by the U.S. Food and Drug Administration ("FDA"). The relevant FDA regulations and guidance require Defendants to implement and follow thorough strict identification and screening processes for plasma donors, including Plaintiffs. As part of that process, Plaintiffs scanned their fingers in kiosks to verify their identities.

Plaintiffs allege that this identification and screening procedure violated the Illinois Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1, *et seq*. Specifically, Plaintiffs claim that Defendants used a finger-scanner to allegedly capture their biometric identifiers and biometric information but did not (i) make certain disclosures and obtain written releases before doing so, or (ii) make publicly available a policy with guidelines for the retention and destruction of biometric identifiers and biometric information. Second Amended Complaint ("SAC") ¶¶ 83-85, 94-96, 105-107. Plaintiffs' claims should be dismissed on multiple grounds.

*First and foremost*, Plaintiffs' BIPA claims are preempted by FDA regulations mandating a ten-year retention period for records related to the collection of donor plasma. *See* 21 C.F.R. 606.160(d). Because the BIPA's requirement that biometric information be destroyed within three

---

[1] Plasmapheresis is the process used in plasma donation whereby the plasma is separated from blood cells and the blood cells returned to the donor.

years is fundamentally in conflict with Defendants' obligations under federal law, Plaintiffs' claims are barred under the doctrine of conflict preemption.

*Second*, Plaintiffs' Section 15(b) claims against Biomat and TPR should be dismissed because each of the Plaintiffs who donated at Biomat and TPR facilities consented, in writing, to the collection of his biometric information.

*Third*, Plaintiffs' claims should be dismissed in their entirety because the alleged biometric data at issue, which was collected in a health care setting as part of the plasmapheresis screening process, is expressly exempted from the BIPA's scope.

*Fourth*, Plaintiff Vaughan and Darnell's claims should be dismissed as untimely under the one-year statute of limitations set forth in 735 ILCS 5/13-201. Vaughan's claims are alternatively barred by the two-year statute of limitations set forth in 735 ILCS 5/13-202.

*Finally*, to the extent Plaintiffs seek to recover for allegedly reckless or willful violations of the BIPA, Plaintiffs' SAC insufficiently pleads such claims and is devoid of any factual allegations to suggest that Defendants acted recklessly or willfully.

## RELEVANT FACTS AND PLAINTIFFS' CLAIMS[2]

Plaintiffs each "sold" their plasma at federally licensed Plasma donation centers operated by one of the Defendants in Illinois.[3] SAC ¶ 2. As part of that process, they allege that they "were required to scan at least one fingerprint so Defendants could create, collect, capture, construct, store, use, and/or obtain a biometric template for them." SAC ¶ 33. Plaintiffs claim that Defendants then stored their alleged biometric data in Defendants' databases and created templates for each of

---

[2]     Defendants accept Plaintiffs' well-pleaded allegations as true for purposes of this motion, as they must.

[3]     Defendants did not buy plasma from Plaintiffs or anyone else. Individuals donate their plasma to Defendants to enable the production of life-saving treatments. Defendants do compensate plasma donors for their time, as the time it takes to complete the full plasmapheresis process is not insignificant and individuals must be seated and still the entire time.

them based on their biometrics, which could be used for future identification and authentication of Plaintiffs. *Id.* ¶¶ 34-35.

Plaintiffs claim that these practices violated BIPA Sections 15(a) and (b) because Defendants allegedly (i) never informed Plaintiffs of the purpose and length of time for which their alleged biometric data was being collected and kept, (ii) never obtained Plaintiffs' written consent to capture, collect, obtain or store their biometric data, and (iii) never informed Plaintiffs of any biometric data retention policy. SAC ¶¶ 37-39. Plaintiffs seek liquidated damages of $1,000 for each negligent violation, $5,000 for each willful or reckless violation, and other remedies. *Id.* Prayers for Relief, pp. 15, 18, 21.

Plaintiffs Vaughan and Minniefield bring this suit on behalf of themselves and "[a]ll persons who were enrolled in the biometric system used by Defendant Biomat USA, Inc. in Illinois from five years preceding the filing of this action to the date a class notice is mailed[.]" ("Biomat Class") *Id.* ¶ 63. Vega brings this suit on behalf of himself and "[a]ll persons who were enrolled in the biometric system used by Defendant [TPR] in Illinois from five years preceding the filing of this action to the date a class notice is mailed[.]" ("Talecris Class"). *Id.* ¶ 64. Darnell brings this suit on behalf of himself and "[a]ll persons who were enrolled in the biometric system used by Defendant [IBBI] in Illinois from five years preceding the filing of this action to the date a class notice is mailed[.]" ("IBB Class"). *Id.* ¶ 65.

## LEGAL STANDARD

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must "contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). A claim should be dismissed where, accepting all well-pleaded factual allegations in the light most favorable to the plaintiff, the complaint nevertheless fails to "plausibly suggest that the plaintiff has a right to relief." *EEOC v.*

*Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007). Courts "need not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Martin v. Direct Wines, Inc.*, No. 15 C 757, 2015 U.S. Dist. LEXIS 89015, at *2 (N.D. Ill. July 9, 2015). Conclusions of fact and law "are . . . not entitled to the assumption of truth" and may be disregarded. *Iqbal*, 556 U.S. at 679.

A request for dismissal on the basis of an affirmative defense, such as preemption or untimeliness, is properly brought as a Rule 12(b)(6) motion. *Parangao v. Community Health Syst., Inc.,* 858 F.3d 452, 457 (7th Cir. 2017) (dismissal is appropriate if it is clear from the complaint and information about which the court may take judicial notice that the claims are prohibited as a matter of law). In considering this motion, the court may consider "documents incorporated into the complaint by reference" without converting the motion into one for summary judgment under Fed. R. Civ. P. 56. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

## ARGUMENT

### I. PLAINTIFFS' CLAIMS ARE PREEMPTED UNDER THE DOCTRINE OF CONFLICT PREEMPTION

Plaintiffs' must be dismissed in their entirety, first and foremost, pursuant to the doctrine of conflict preemption. Specifically, the BIPA's requirements are in fundamental conflict with federal regulations regarding the retention and preservation of plasma donor records and, as applied, frustrate the FDA's intent with respect to plasma donor identification and screening.

The preemption doctrine, which is rooted in the Supremacy Clause of the U.S. Constitution, holds that federal law can preempt state law three ways: expressly, impliedly (conflict preemption), and where federal law thoroughly occupies the legislative field (field preemption). *Hoagland v. Town of Clear Lake*, 415 F.3d 693, 696 (7th Cir. 2005). Regulations promulgated by a federal agency within its congressionally delegated authority may also have preemptive force. *Geier v. Am.*

4

*Honda Motor Co.*, 529 U.S. 861, 899 (2000). Conflict preemption arises: (1) when "it is impossible for a private party to comply with both state and federal requirements," and (2) when "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 984 (7th Cir. 2012). Plaintiffs' claims are implicitly preempted for both reasons.

First, assuming *arguendo* that the BIPA applies to the data at issue (which Defendants dispute),[4] the BIPA's requirements are in inherent conflict with Defendants' obligations under federal law. The collection of source plasma is subject to numerous and extensive federal regulations, including regarding the retention of donor records. *See* 21 C.F.R. § 606.160(b)(1). One regulatory section, 21 C.F.R. § 606.160, sets forth the retention period for donor records:

> (d) Records shall be retained for such interval beyond the expiration date for the blood or blood component as necessary to facilitate the reporting of any unfavorable clinical reactions. ***You must retain individual product records no less than 10 years after the records of processing are completed or 6 months after the latest expiration date for the individual product, whichever is the later date.*** When there is no expiration date, records shall be retained indefinitely. (Emphasis added.)

The regulations provide additional clarity, requiring the retention of records "for each donor," "including a separate and complete record of initial and periodic examinations, tests, laboratory data, and interviews, etc." as well as "record[s] . . . of the donor's consent for participation in the plasmapheresis program or for immunization." 21 C.F.R. § 640.72 (a)(2)-(3).[5] Under these

---

[4]     Defendants maintain that the data generated from the finger-scanner at issue does not constitute biometric identifiers or information and is not subject to BIPA. Taking Plaintiffs' assertions as true, however, and assuming BIPA does apply to the data at issue, the BIPA is preempted by federal regulations.
[5]     The Court may take judicial notice of documents in the public record, including regulations, without converting a motion to dismiss into a motion for summary judgment. *Doss v. Clearwater Title Co.,* 551 F.3d 634, 640 (7th Cir. 2008); *see also Ibarrola v. Kind, LLC*, No. 13 C 50377, 2014 U.S. Dist. LEXIS 95833, at *5 n.2 (N.D. Ill. July 14, 2014) (holding that the court could consider FDA guidance because it is a matter of public record and relevant to the defendant's motion to dismiss).

regulations, donor data collected as part of the screening process becomes part of the manufacturing record subject to at least a ten-year retention period.[6]

The BIPA's requirements are fundamentally incompatible with these federal regulations. Under the BIPA, biometric identifiers and biometric information must be destroyed "when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever *occurs first*." 740 ILCS 14/15(a) (emphasis added). In other words, the alleged biometric data that federal law requires Defendants to maintain for a minimum of ten years cannot be kept for more than three years after a single donation under the BIPA.[7] Compliance with both federal regulations and the BIPA with respect to maintaining the alleged biometric data of Defendants' plasma donors is therefore impossible and leaves Defendants in a Catch-22. Under the Supremacy Clause, this conflict between federal regulations and state legislation must be resolved in favor of federal law, which therefore preempts the BIPA's requirement with respect to the maximum amount of time biometric data may be maintained, when it must be destroyed and Defendants' disclosures of that information (*see* Sections 15(a), 15(b)(2)).[8] Plaintiffs' claims must be dismissed as a result.

---

[6] Defendants also must comply with the longer retention requirements of the European Medicines Agency. Per directives 2002/98/EC and 2005/61/EC, "facilities to which blood and blood components are delivered, including manufacturers, should retain traceability records for at least 30 years after the time of the donation." Guideline on Plasma-Derived Medicinal Products, EMA/CHMP/BWP/706271/2010 (21 July 2011), *available at*: https://www.ema.europa.eu/en/documents/scientific-guideline/guideline-plasma-derived-medicinal-products_en.pdf (last accessed July 3, 2022). The Guidelines further clarify that "a link from donation/donor to finished product should be maintained by the manufacturer of the plasma derived product for at least 30 years after the time of the donation." *Id.*

[7] The precise retention period for a donor record under the BIPA ultimately depends on the donation history of each donor as the period is keyed off of the date that the "purpose" of the collection has been satisfied and the date of the "last interaction" with Defendants, neither of which is knowable at the time of donation. Without knowing whether a given donor intends to donate again, the retention period under the BIPA is a moving target that changes with each subsequent donation, making the BIPA's retention and destruction guidelines particularly challenging to administer in the event the BIPA actually applies.

[8] Section 15(b) incorporates Section 15(a) by requiring that a private entity "inform[] the subject or the subject's legally authorized representative in writing of the specific purpose and length of term for

In addition, the BIPA's requirements frustrate the purposes stated in federal regulations that *specifically* contemplate the use of "biometric[s]" in the donor screening process and promote "flexibility to accommodate advancing technology." 80 Fed. Reg. 29842, 29869 (May 22, 2015). At present, finger-scan technology provides Defendants with an efficient and reliable method of verifying the identities of donors to ensure prospective donors are eligible to donate under federal law. As a result, finger-scanning provides an important safeguard against abuse in a system where donors have a financial incentive to donate more frequently than the law permits or in circumstances where they would be prohibited from doing so. Finger scanning systems, such as those used by Defendants, are thus a critical method of verifying the identities of prospective donors, which is itself critical to ensuring the viability of the plasma and ultimately, the safety of the recipients of plasma-derived medicines and the donors themselves. *See, e.g.*, 21 C.F.R. § 640.65(b)(3) (requiring a donor identification system); 80 Fed. Reg. 29842 (describing the FDA's revisions to donor testing to "better assure the safety of the nation's blood supply" and ensure "donations are suitable for transfusion or further manufacture").

Assuming the BIPA applies at all (which it should not), subjecting the donor-identification and screening processes to BIPA's data retention and destruction requirements and its draconian damages provisions[9] would discourage the use of this more efficient and reliable technology, despite the FDA expressly contemplating the use of biometrics in the donor screening process and its express commitment to "flexibility to accommodate advancing technology." 80 Fed. Reg. 29869. The practical result of BIPA applying will necessarily be reversion to a less reliable system of donor identification that provides fewer safeguards to ensure the quality and safety of a

---

which a biometric identifier or biometric information is being collected, stored, and used." 740 ILCS 14/15(b). As such, the federal regulations conflict with both Sections 15(a) and 15(b) of the BIPA.

[9] Under the BIPA, a prevailing party may recover $1,000 for each negligent violation and $5,000 for each intentional or reckless violation of the statute, or actual damages, whichever is more. 740 ILCS 14/20.

biological product. Moreover, and decisively, applying the BIPA's requirements would frustrate the purpose of the FDA's extensive regulations aimed at ensuring the integrity, safety, and traceability of each plasma collection and the agency's express intention to "mak[e] the donor eligibility and testing requirements more consistent with current practices," "better assur[e] the safety of the nation's blood supply" and provide "flexibility to accommodate advancing technology." 80 Fed. Reg. 29842. Indeed, at least one court has proposed the adoption of an "alternative method of providing donor identity" as a solution to the inherent conflict between the federal regulations' endorsement of "biometric means" as a valid screening procedure and the BIPA's requirements. *See Crumpton v. Octapharma Plasma, Inc.*, 513 F. Supp. 3d 1006, 1014 (N.D. Ill. 2021). Implicit in that court's suggestion, however, is a recognition that there *is* an actual conflict and the BIPA impedes the FDA's intent of permitting biometrics in the donor screening process. The doctrine of conflict preemption bars Plaintiffs' claims on this basis as well. *Geier*, 529 U.S. at 886 (preemption where state law regarding airbag installation "would have stood as an obstacle to the gradual passive restraint phase-in that the federal regulation deliberately imposed"); *New York SMSA Ltd. P'ship v. Town of Clarkstown,* 612 F.3d 97, 106 (2d Cir. 2010) (federal law preempted local statute establishing a 'preference' for certain wireless technology that interfered with Congress's goal of enabling the spread of new technologies and growth of wireless service).

Because the BIPA and its data retention and destruction requirements are both fundamentally incompatible with federal regulations and in conflict with the federal intention to promote effective donor screening and safe, traceable plasma donations, including through the use of biometrics, Plaintiffs' claims are preempted and must be dismissed.

## II.  PLAINTIFFS CANNOT STATE A SECTION 15(b) CLAIM AGAINST BIOMAT OR TPR

Plaintiffs' Section 15(b) claims against Biomat and TPR must be dismissed because each Plaintiff alleged to have donated at those Defendants' facilities received written information regarding any potential biometric identifiers or information collected and consented to the collection in writing, consistent with the BIPA's requirements.

Though matters outside the pleadings generally may not be considered on a motion to dismiss, "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiffs['] complaint and are central to [their] claim." *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) (admitting letters referred to in complaint establishing the parties' contractual relationship); *see also Hecker v. Deere & Co.*, 556 F.3d 575, 583 (7th Cir. 2009) (proper to consider documents attached to a motion to dismiss which were "central to plaintiffs' case"). Though a "plaintiff is under no obligation to attach to her complaint documents upon which her action is based . . . a defendant may introduce certain pertinent documents if the plaintiff failed to do so." *Venture Assocs.*, 987 F.2d at 431. Indeed, a document that goes to "the basis for plaintiff's claim" or "the heart of the case" is appropriate to consider, as this Court has found. *Pine Top Receivables of Ill., LLC v. Banco De Seguros Del Estado*, No. 12 C 6357, 2013 U.S. Dist. LEXIS 28040, at *6 (N.D. Ill. Feb. 25, 2013) (Aspen, J.) (permitting treaties and agreement that provided "the basis for plaintiff's claim"); *Resnick v. Schwartz*, No. 17 C 04944, 2018 U.S. Dist. LEXIS 149767, at *9 n.8 (N.D. Ill. Sept. 3, 2018) (permitting pension plan attached to motion to dismiss "at the heart of [plaintiff's] case").

Plaintiffs' Section 15(b) claim is premised on allegations that Defendants (1) failed to inform them in writing that their biometric identifiers or biometric information were being collected and the purpose and length of time of that collection; and (2) failed to obtain their written

consent. SAC ¶¶ 84, 95, 106. In fact, Plaintiffs Vaughan, Minniefield and Vega each signed a Consent Agreement for Automated Plasmapheresis ("Consent Agreement"), which specifically informed them that their "fingerprints"[10] would be collected "as biometric authentication of [their] identity as part of the automatic screening process." *See* Consent Agreements, ¶ 16, attached as composite <u>Exhibit A</u>.[11] Vaughan, Minniefield and Vega executed the Consent Agreement in the presence of a medical staff member serving as a witness and in so doing, acknowledged that they "underst[ood] and [agreed]" to "provide [their] fingerprint as biometric authentication" in connection with their donations at Biomat and TPR, respectively. *Id*. The Consent Agreement is unambiguous, directly refutes Plaintiffs' allegations and establishes that Biomat and TPR donors, including Vaughan, Minniefield and Vega, knew they were providing potential biometric identifiers or information during the pre-donation screening process, understood the reason for it, and consented. As a result, Plaintiffs' Section 15(b) claim against Biomat and TPR must be dismissed with prejudice.

### III. THE ALLEGED BIOMETRIC IDENTIFIERS ARE EXEMPT FROM THE BIPA'S REQUIREMENTS

Plaintiffs' claims also fail because the alleged biometric identifiers at issue are explicitly excluded from the BIPA's requirements. The BIPA states that the "biometric identifiers" subject to the statute "do *not* include information captured from a patient in a health care setting or information collected, used, or stored for health care treatment, payment, or operations under [HIPAA]." 740 ILCS 14/10 (emphasis added). In other words, biometric identifiers fall outside

---

[10] Although the Consent Agreement is accurate, to the extent it references a "fingerprint," Defendants assert it does not refer to a "fingerprint" that is a defined "biometric identifier." 740 ILCS 14/10.

[11] Defendants have redacted portions of the Consent Agreements for Automated Plasmapheresis which contain detailed information regarding Defendants' operating procedures and which have no bearing on the claims at issue. Plaintiffs, who have no concerns in this respect, previously filed an unredacted copy with the Court and thus cannot claim any prejudice as a result of the redactions. Dkt. No. 60-1.

the BIPA's scope if they are "(1) obtained from a patient in a health care setting; or (2) ... collected, used, or stored in connection with healthcare treatment[.]" *Vo v. VSP Retail Dev. Holding, Inc.*, No. 19 C 7187, 2020 U.S. Dist. LEXIS 53916, *4 (N.D. Ill. Mar. 25, 2020) (dismissing claims pursuant to this statutory exemption).[12] Here, the alleged biometric identifiers at issue are exempt under both prongs, as well as under a separate exemption excluding from the BIPA's scope all "image[s]….used to…validate scientific testing or screening." 740 ILCS 14/10.

A. The BIPA exempts information collected from a patient in a health care setting

First, the alleged biometric identifiers at issue are excluded from the BIPA's scope under the exception for information obtained from patients in a health care setting. The BIPA does not define "patient" or "healthcare setting," but the plain meaning of those terms suggests a clear intent to exclude individuals undergoing medical procedures. Donors like Plaintiffs preparing to undergo and undergoing plasmapheresis fall within this exception for purposes of the BIPA. For instance, pursuant to strict FDA regulations that Defendants follow, to donate their plasma, donors must be screened and examined by trained personnel who review their medical history, assess their total plasma protein levels, and conduct a "physical examination" for "medical conditions that would place the *donor* at risk from plasmapheresis." 21 CFR § 630.15(b) (emphasis added). Pursuant to further regulations, if a determination is made that plasmapheresis poses a risk to the donor, the donor is deferred from donating. § 630.15(b)(1); *see also* § 630.10 ("A donor is not eligible if the donor is not in good health or if you identify any factor(s) that may cause the donation to adversely affect ... (1) The health of the donor"). In addition, trained medical

---

[12] Defendants do not contend that they are covered entities under HIPAA or that the alleged biometric identifiers at issue were "collected, used or stored" for "operations under HIPAA." Rather, Defendants contend that the alleged biometric identifiers here are excluded from the BIPA's scope based on the exceptions cited above for information "obtained from a patient in a health care setting" or "collected, used, or stored in connection with healthcare treatment."

specialists must and do "explain the risks and hazards of the procedure to the donor, includ[ing] the risks of a hemolytic transfusion reaction if the donor is given the cells of another donor and the risks involved if the donor is immunized." § 630.15(b)(2)(iii). As plaintiffs themselves acknowledged, "if any [] adverse reactions, symptoms, or injuries occur while [the donor is] at the Center, the physician or designated personnel will administer appropriate supportive care and/or, in rare occasions, limited emergency treatment[].]" *See* Exhibit A, ¶ 7C. Moreover, if a donor has a negative reaction to plasmapheresis, it is required that "the donor's record ... contain a full explanation of ... the measures taken to assist the donor." § 640.72(d). In short, while other parties may be the ultimate beneficiaries of plasmapheresis, there is no question that the *donor* undergoes a physical evaluation intended for the *donors' benefit* and may receive additional care if it becomes necessary.

Plaintiffs will likely respond by pointing to *Marsh v. CSL Plasma*, in which the court held that "a person who sells plasma to CSL is not a 'patient' in a 'healthcare setting.'" 503 F. Supp. 3d 677, 683 (N.D. Ill. 2020). In so holding, the court concluded that "the only thing that CSL is providing to the seller is money." *Id*. Regardless of whether that was true of CSL, that is not the case here. As outlined above, per federal regulations, donors at Defendants' facilities, such as Plaintiffs, receive a medical screening and health evaluation performed for *their* benefit to ensure their continued health. Through that screening process, donors like Plaintiffs receive critical information about their own health that they might not have otherwise. For instance, a donor who is deferred from donating based on the results of a blood test is notified of those results and "[w]here appropriate," provided "information concerning medical follow-up and counseling." 21 C.F.R. § 630.40. Donors may very well not receive such important personal health information without visiting Defendants' facilities and undergoing the plasmapheresis screening process.

That donors like Plaintiffs receive compensation for their time does not negate that they receive a medical evaluation and important information about their health during the pre-donation process in order to ensure their continued well-being. This is not, as the *Marsh* court suggested, a bare financial transaction, as if the donor arrives at the center with a bag of his or her plasma in hand and exchanges it for money. Rather, the Defendants' donors, including Plaintiffs, undergo a sensitive, and highly regulated, medical procedure that accounts for the health and safety of both the donor and the ultimate recipient of plasma-derived treatment.[13]

*Vo v. VSP Retail Dev. Holding, Inc.* is instructive. There, an eyewear company used Virtual Try-On software that collected information about customers' facial geometry to help fit them for eyewear. 2020 U.S. Dist. LEXIS 53916 at *2. The plaintiff used the software on the company's website but never requested or received an eye exam and never provided, requested or received a vision prescription. *Id.* at *5-6. The court nevertheless held that because the company sells prescription eyewear, which are Class I medical devices under federal regulations, the company "provides health care." *Id.* at *5. Further, because the Virtual Try-On software "facilitates this health care service," the biometric information allegedly collected from customers was necessarily "collected from a patient in a health care setting" and exempted from BIPA. *Id.* That the plaintiff "never requested an eye exam, never received an eye exam, never provided Defendant with a prescription for corrective lenses, never received any such prescription, and never requested or received any sort of medical treatment or advice" did not change the court's analysis. *Id.* at *5-6. The court held that "even if [the plaintiff] did not proceed past the Virtual Try-On software to the

---

[13]     *Marsh* is also distinguishable because the court found that the "plaintiffs had the better of the argument" after the defendant took the dubious position that a "patient" is secondarily defined as "one that is acted upon." 503 F. Supp. 3d at 684. The court unequivocally rejected the argument, remarking that the secondary definition was attributed to a philosopher in a 1950 book on metaphysics and is a "far, far cry from the plain meaning of the word." *Id.* Defendants do not take the position of the *Marsh* defendant.

eye exam and prescription stage, *the initial evaluation of a prospective patient* still constitutes a health care service." *Id*. at *6 (emphasis added).

This case is even clearer. Unlike the plaintiff in *Vo*, Plaintiffs here *did* undergo a medical evaluation and received information about their health and care to the extent necessary. To the extent prospective customers browsing an eyeglass company website, who provide no medical information and received no medical evaluation constitute "patients in a health care setting," plasma donors like Plaintiffs who are examined and evaluated by health care professionals at Defendants' facilities in preparation for plasmapheresis undoubtedly do too.

B. The BIPA exempts "information collected, used or stored for health care treatment"

Second, the alleged biometric data at issue is also excluded from BIPA's scope as it is "information collected, used or stored for health care treatment." *See* 740 ILCS 14/10 (exempting "information collected, used, or stored for health care treatment, payment, or operations under [HIPAA]"). Though "health care treatment," like "health care setting," is not defined by the BIPA, it is clear that the supposed biometric identifiers and/or information allegedly collected here, which Plaintiffs allege were used to "identif[y] and authenticat[e]" donors and their donations (*see* SAC ¶ 34), were collected in order to ensure the integrity of the plasma collected and for the purpose of providing healthcare treatment to those in need.[14] Indeed, Defendants' mission, and the very purpose of plasma donation and collection in the first place, is to provide health treatment for individuals suffering from illnesses caused by the lack of essential proteins and antibodies found in blood plasma.[15] Any biometric identifiers or information that Defendants allegedly collected were

---

[14] *See generally*, Reasons to Donate, available at: https://www.grifolsplasma.com/en/importance-of-plasma/reasons-to-donate (last accessed July 3, 2022) (explaining the benefits of plasma-derived products and their application for various healthcare treatments).

[15] *Id*.

collected in furtherance of providing those treatments by ensuring the safe and effective collection of plasma. Thus, the process fits squarely in the BIPA's exception.

*Diaz v. Silver Cross Hosp. & Med. Ctrs*., No. 2018 CH 001327 (Cir. Ct. Will Cnty. Aug. 29, 2019) (attached as Exhibit B) supports this conclusion. In *Diaz*, the plaintiff, a nurse, scanned her finger at a medical-supply station to access prescription drugs for patients. The court held that the alleged biometric data generated fell within the "health care" exception BIPA and dismissed plaintiff's claims. That the plaintiff was not the beneficiary of the treatment had no impact on the court's analysis. Nor should it here. As in *Diaz*, Plaintiffs' alleged biometric information was collected to provide healthcare treatment and is exempted under the plain language of the statute.

Defendants anticipate Plaintiffs will cite *Mosby v. Ingalls Mem'l Hosp.*, 2022 IL App (1st) 200822, which, to Defendants' knowledge, is the only other opinion to address this exception. As a preliminary matter, because *Mosby* was an interlocutory appeal that specifically addressed only health care providers and their employees, it is not controlling. Second, *Mosby*'s conclusion that "[w]hat is excluded . . . are (1) information from the patient in a healthcare setting and (2) information that is already protected under [HIPAA]" misreads the plain language of the BIPA.[16] The BIPA excludes from its reach "information collected, used or stored for health care treatment," and not, as *Mosby* suggests, solely information "under" HIPAA. Had the General Assembly intended to exclude only "information that is already protected [by HIPAA]," it would have simply said as much. Instead, it specified three exempted categories of information: information collected for health care treatment, payment, or operations under HIPAA. 740 ILCS 14/10. It is a tenet of statutory construction that courts are to "avoid[] an interpretation that makes any part of the statute superfluous." *Frye v. Auto-Owners Ins. Co.*, 845 F.3d 782, 787 (7th Cir. 2017) (citations

---

[16] The *Mosby* opinion did not find that 740 ILCS 14/10 does not exempt information collected from a patient in a healthcare setting as discussed at *supra* III.A.

and quotations omitted). The First District's interpretation does just that, rendering all but the final clause of the sentence surplusage. As such, and because the facts here are materially different than in *Mosby*, Defendants expect that the Supreme Court would not follow *Mosby*'s analysis if presented with the facts at issue here. *See State Farm Mut. Auto. Ins. Co. v. Pate*, 275 F.3d 666, 669 (7th Cir. 2001) (a federal court "must apply the law of the state as it believes the highest court of the state would apply it if the issue were presently before that tribunal").

C. The BIPA exempts "image[s] used to . . . validate scientific testing or screening"

In addition to exempting information related to healthcare, the BIPA also excludes from its definition of biometric identifiers, and therefore from its definition of biometric information, "image[s] used to . . . validate scientific testing or screening." 740 ILCS 14/10. The finger scans at issue fall within this exemption as well. Donors' finger scans, including Plaintiffs', which Defendants allegedly used to create donor "template[s]" for identification and authentication purposes and to track donations going forward, constitute an integral first step in the screening and testing process used to evaluate donor eligibility and to ensure safe and viable plasma collection. *See* SAC ¶¶ 33-35. Specifically, by using finger-scan technology, Defendants are able to quickly and accurately screen donors, including Plaintiffs, to confirm that they meet the requirements to donate plasma, including, for instance, that they are in good health pursuant to the FDA's regulations and that they have not donated an impermissible number of times.[17] Indeed, federal regulations *require* this initial screening and testing process to confirm that donors, including Plaintiffs, are in "good health and free from transfusion-transmitted infections" prior to the collection of blood or blood components, including plasma. 21 C.F.R. § 630.10; *see also* 21 C.F.R. § 640.65 ("A donor identification system shall be established that positively identifies each donor

---

[17]     21 CFR § 630.10 outlines the limitations on the frequency of plasma donation.

and relates such donor directly to his blood and its components as well as to his accumulated records and laboratory data.").

 Defendants' use of the finger-scanner technology served that purpose by validating the donors' identities and donor histories and ensuring the completion of the requisite testing and health screen, including for Plaintiffs. *See* 21 C.F.R § 630.10; 21 C.F.R § 640.65. Any alleged biometric identifiers or information collected as part of that screening process are therefore excluded from the definition of biometric identifiers under Section 10 of the statute.

## IV. VAUGHAN AND DARNELL'S CLAIMS ARE TIME BARRED[18]

 Vaughan and Darnell's respective claims against Biomat and IBBI are untimely and should be dismissed on that basis as well. Vaughan alleges that he scanned his fingerprint at a Biomat facility beginning in 2017 (SAC ¶ 6), but yet he waited until June 10, 2020 to file his complaint. Dkt. No. 1. Darnell first donated at an IBBI facility in August 2019,[19] but did not bring claims against IBBI until April 8, 2021. Dkt. No 33 (Am. Compl). Assuming Vaughan and Darnell's claims accrued the first time they used the finger scanner at Biomat and IBBI, respectively,[20] their claims are barred by a one-year statute of limitations, 735 ILCS 5/13-201, and Vaughan's claims are alternatively barred by a two-year statute of limitations, 735 ILCS 5/13-202.

---

[18]     Although the statute of limitations is an affirmative defense and must ordinarily be pleaded and proved by the defendant, "if it is plain from the complaint that the defense is indeed a bar to the suit dismissal is proper without further pleading." *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 383 (7th Cir. 2010).

[19]     Darnell alleges in the SAC that he scanned his fingerprint at IBBI from 2016 through 2018. SAC ¶ 8. IBBI's records, however, show that Darnell first donated more recently, beginning in August 2019. IBBI discloses this out of candor to the Court. Using the dates Darnell pleads would be to IBBI's advantage.

[20]     Whether a BIPA claim accrues the first time a person's biometric identifier is scanned or also with each subsequent scan is currently before the Illinois Supreme Court in *Cothron v. White Castle Sys.*, No. 128004. The Court's description of BIPA as seeking to redress a "lost opportunity to say no by withholding consent" suggests the Court views a claim as a singular injury accruing the first time a biometric identifier or biometric information is collected by a private entity without consent and not with every subsequent collection as well. *Rosenbach v. Six Flags Entm't Corp.*, 2019 IL 123186, ¶ 34.

A. Vaughan and Darnell's Claims Are Time-Barred by the One-Year Statute of Limitations Set Forth in 735 ILCS 5/13-201.

Although the BIPA is silent as to the applicable statute of limitations, Illinois law mandates that claims involving "publication of matter violating the ***right of privacy*** shall be commenced within one year next after the cause of action accrued." 735 ILCS 5/13-201 (emphasis added). Under Illinois law, the nature of the injury dictates the applicable statute of limitations. *Travelers Cas. & Sur. Co. v. Bowman*, 229 Ill. 2d 461, 466 (2008) ("it is the nature of the plaintiff's injury rather than the nature of the facts from which the claim arises which should determine what limitations period should apply"). The very title of the BIPA, its legislative history, and the case law interpreting it make clear that the type of harm it seeks to redress is to an individual's privacy rights. *See Rosenbach*, 2019 IL 123186, ¶ 33 ("Through the [BIPA], our General Assembly has codified that individuals possess a right to privacy in and control over their biometric identifiers and biometric information.").

On September 17, 2021, the First District Appellate Court ("First District") addressed this issue in *Tims v. Blackhorse Carriers*, accepting Defendants' position in part. 2021 IL App (1st) 200563, ¶ 3. The court held that the one-year statute of limitation set forth in 735 ILCS 5/13-201 applies to violations of Sections 15(c) and (d), but not to sections 15(a), (b) and (e), which it held were subject to a five-year statute of limitations. *Id*. The defendant in *Tims* appealed the decision to the Illinois Supreme Court, where the case is currently pending (Case No. 127801).

Defendants respectfully disagree with the First District's decision and maintain that because the BIPA inarguably concerns the right to privacy, the one-year limitations period is the proper one for each of the BIPA's subsections. Indeed, Illinois courts have consistently held that a one-year statute of limitations applies to a wide range of privacy claims, including claims for defamation, false light, public disclosure of private facts, misappropriation of an individual's

18

likeness, and violation of the Illinois Right to Publicity Act ("IRPA"), 765 ILCS 1075/1, *et seq.*[21] There is no pertinent distinction between the BIPA, which is indisputably a privacy statute, and the other above claims, to suggest that a different limitations period applies. In fact, Plaintiffs *specifically allege* a privacy injury, claiming Defendants' practice "expose[d]" them to "serious and irreversible privacy risks" and violated their "biometric privacy rights." SAC ¶¶ 16, 47. The nature of the statute and Plaintiffs' own allegations make clear that Section 5/13-201 governs.

Further, *Tims* is not binding on this Court. Federal courts sitting in diversity "must apply the law of the state *as it believes the highest court of the state would apply it* if the issue were presently before that tribunal." *State Farm Mut. Auto. Ins.*, 275 F.3d at 669 (emphasis added). Here, for the reasons above and more, there is reason to believe the Illinois Supreme Court will reach a different conclusion than the court in *Tims* and instead apply the one-year statute of limitations for privacy claims to the entirety of the BIPA. First, the Supreme Court has already made clear on prior occasions that it views the BIPA as a privacy statute involving "publication-based privacy claims." *See West Bend Mutual Insurance Co. v. Krishna Schaumburg Tan, Inc.*, 2021 IL 125978, ¶ 46 (explaining that the BIPA was designed to "protect[] a secrecy interest – here, the right of an individual to keep his or her personal identifying information like fingerprints

---

[21]     *See Bryson v. News Am. Pub., Inc.*, 174 Ill. 2d 77, 105 (1996) (limitations period for invasion of privacy and defamation is one year); *Leopold v. Levin*, 45 Ill. 2d 434, 444 (1970) (applying one-year statute of limitations to claims for misappropriation of likeness); *Blair v. Nev. Landing P'ship*, 369 Ill. App. 3d 318, 323 (2d Dist. 2006) (one-year statute of limitations for claims under IRPA); *Poulos v. Lutheran Soc. Servs. of Ill., Inc.*, 312 Ill. App. 3d 731, 745 (1st Dist. 2000) (one-year statute of limitations for false light claim); *Benitez v. KFC Nat. Mgmt. Co.*, 305 Ill. App. 3d 1027, 1034 (2d Dist. 1999) (one-year limitations period for claims of public disclosure of private facts, appropriation of name or likeness, and false light); *Johnson v. Lincoln Christian College*, 150 Ill. App. 3d 733, 745-46 (4th Dist. 1986) (one-year statute of limitations for claim for public disclosure of private facts); *Founding Church of Scientology of Wash., D.C. v. Am. Med. Ass'n*, 60 Ill. App. 3d 586, 589 (1st Dist. 1978) (one-year statute of limitations for libel claim).

secret"); *see also Rosenbach*, 2019 IL 123186, ¶ 34 (noting that the BIPA seeks to protect "the right of the individual to maintain [his or] her biometric privacy").

Second, the fact that the Illinois Supreme Court decided to hear the appeal in *Tims* suggests that the Court may reach a different result. The Supreme Court was under no obligation to accept the *Tims* appeal and could have easily denied the appellant's Petition for Leave to Appeal ("PLA") and let the First District's decision be the final word on the issue. It granted the PLA presumably because it had something to say on the issue beyond what the First District has already held.

As an alternative to ruling on this issue, Defendants request that the Court stay these proceedings pending the Illinois Supreme Court's decision in *Tims* and *Cothron* on the applicability of the one-year statute of limitations and the question of when BIPA claims accrue. This Court has inherent power to stay proceedings and broad discretion in doing so. *Landis v. N. American Co.,* 299 U.S. 248, 255 (1936); *Clinton v. Jones,* 520 U.S. 681, 707 (1997). Indeed, the Court previously exercised its discretion and stayed this matter pending the First District's decision in *Tims*. (Dkt. No. 26). Now that *Tims* is before the Supreme Court, along with *Cothron*, a brief additional stay to await the highest court's guidance makes eminent sense and will provide important clarity and finality as to the viability of Plaintiffs' claims – including whether Plaintiffs can state a claim against IBBI[22] – and the size and scope of the putative classes in the event Plaintiffs' claims are not dismissed in full.

B. In the Alternative, Plaintiff Vaughan's Claims Are Time-Barred by the Two-Year Statute of Limitations Set Forth in 735 ILCS 5/13-202.

Alternatively, if Vaughan's claims are not subject to a one-year statute of limitations, they are subject to the two-year statute of limitations set forth in 735 ILCS 5/13-202 ("Section 202"),

---

[22] Because Darnell is the only named Plaintiff alleged to have donated plasma at IBBI (*see* SAC ¶ 8), a finding that his claims are time-barred would mandate dismissal of IBBI as a defendant in this suit.

which applies to "actions for damages for an injury to the person," and would also include personal privacy injuries like those alleged here.

The Illinois legislature passed BIPA to protect the "welfare, security, and safety" of the public. *See* 740 ILCS 14/5(g). To the extent the BIPA does not address a privacy injury, it quite plainly is intended to address personal injuries, including the risk of identity theft contemplated in the Complaint. *See* SAC ¶ 16. That Plaintiffs do not allege physical injuries does not make the two-year statute of limitations in Section 202 any less applicable. *See, e.g.*, *Pavlik v. Kornhaber*, 326 Ill. App. 3d 731, 744 (1st Dist. 2001) (finding "emotional distress" to be "a species of personal injury . . . governed by the two-year prescriptive period set out in 735 ILCS 5/13-202"); *Dahl v. Fed. Land Bank Ass'n of W. Ill.*, 213 Ill. App. 3d 867, 872 (3d Dist. 1991) ("emotional harm is a species of 'injury to the person'"). Nor does "the fact that the alleged cause of action [i]s statutory in origin . . . remove plaintiff's personal injury claim from the purview of section 13-202." *Neikirk v. Cent. Ill. Light Co.*, 128 Ill. App. 3d 1069, 1072 (3rd Dist. 1984).

*Tims* does not foreclose the application of a two-year limitations period. In *Tims*, the First District was asked "whether the limitations periods set forth in Section 13-201 or Section 13-205 of the Code of Civil Procedure ("Code") applies to claims under the [BIPA]." The First District's decision considered *only* those two possibilities and focused its analysis entirely on the applicability of Section 13-201 (one-year period). *Tims*, 2021 IL App (1st) 200563, ¶¶ 20-21, 29-33. The First District did not consider the possibility of a two-year limitations period before defaulting to the catchall statute of limitations for civil actions "***not otherwise provided for***." *Id.* at ¶ 22. If this Court finds that a one-year limitations period does not apply, Section 202's two-year limitations period applies and the five-year catchall limitations period to which the First

District defaulted in *Tims*, is not applicable. As such, Vaughan's claims would be time-barred as he asserted them for the first time more than two years after they first accrued.

### V.    PLAINTIFFS' CLAIMS THAT DEFENDANTS RECKLESSLY OR WILLFULLY VIOLATED THE BIPA ARE UNSUPPORTED AND INSUFFICIENTLY PLED

Finally, Plaintiffs' claims should be dismissed to the extent they seek to recover damages for reckless or willful violations of the BIPA. Although not defined by the BIPA, recklessness under Illinois common law is akin to willful and wanton conduct or "a course of action . . . which, if not intentional, shows an utter indifference to or conscious disregard for . . . the safety of others." *Landers v. School Dist.*, 66 Ill. App. 3d 78, 82 (5th Dist. 1978) (citations omitted). Willfulness may also be a form of intentional conduct, "committed with 'actual' or 'deliberate' intent to harm." *Kirwan v. Lincolnshire-Riverwoods Fire Prot. Dist.*, 349 Ill. App. 3d 150, 155 (2nd Dist. 2004).

The SAC contains no allegations that Defendants acted with a conscious disregard for Plaintiffs' privacy – let alone an intent to harm. To the contrary, Plaintiffs allege a bare statutory violation and simply pray for $5,000 in relief for each "willful or reckless violation." (SAC, Prayers for Relief). The absence of any allegations to support a willful or reckless violation of the BIPA is fatal to those claims. Indeed, federal and state courts across Illinois have repeatedly dismissed claims of reckless or intentional conduct in cases where plaintiffs have similarly sought enhanced damages but failed to allege any facts in support. *E.g.*, *Namuwonge v. Kronos, Inc.*, 418 F. Supp. 3d 279, 286 (N.D. Ill. 2019) (finding plaintiff's "abstract statements regarding damages . . . insufficient for the Court to infer that [defendant] acted recklessly or intentionally" and dismissing those claims); *Rogers v. CSX Intermodal Terminals*, 409 F. Supp. 3d 612, 619 (N.D. Ill. 2019) (general allegations that violations were "knowing and willful," were "insufficient to allow us to infer that [defendant] acted intentionally or recklessly and does nothing to distinguish this case from every possible BIPA case where the defendant is alleged to have failed to meet the

22

strictures of Section 15"); *Mosby v. The Ingalls Mem'l Hosp.*, No. 2018 CH 05031, Tr. of Hr'g at 69, 72 (Cir. Ct. Cook. Cty. Jan. 13, 2020) (dismissing a BIPA claim for reckless and intentional damages that was unsupported by facts); *Thurman v. Northshore Univ. Health Sys.*, No. 2018 CH 3544, 2019 WL 7249205, at *12 (Cir. Ct. Cook Cty. Dec. 12, 2019) (striking conclusory allegation that BIPA defendant's actions were "willful and/or reckless"); *Navarette v. Josam Acquisitions,* No. 2019 CH 14368, Tr. of Hr'g at 3:11–22 (Cir. Ct. Cook Cty. Mar. 29, 2021) (allegations of recklessness and intentionality were "insufficient" to allow plaintiff to "proceed with request for enhanced damages"); *Webster v. Windsor Estates Nursing and Rehab.*, No. 2019 CH 11441, Tr. of Hr'g at 33-34 (Cir. Ct. Cook Cty. Nov. 11, 2020) (dismissing allegations of reckless and intentional conduct lacking factual support) (excerpts of transcripts attached as composite Exhibit C). The outcome should be no different here, where Plaintiffs do not make a single allegation of reckless or willful conduct, but nevertheless seek to recover enhanced damages on that basis.

## CONCLUSION

For all the reasons stated above, Defendants respectfully request that the Court grant this Motion and dismiss Plaintiffs' Second Amended Class Action Complaint with prejudice.

Dated: July 8, 2022

Respectfully submitted,

**BIOMAT USA, INC., TALECRIS PLASMA RESOURCES, INC., and INTERSTATE BLOOD BANK, INC.**

By:    /s/ Jason A. Selvey
One of Their Attorneys

Jason A. Selvey
Julia S. Wolf
Jackson Lewis P.C.
150 North Michigan Avenue, Suite 2500
Chicago, Illlinois  60601
Tel.: 312.787.4949
Jason.Selvey@jacksonlewis.com
Julia.Wolf@jacksonlewis.com

## <u>CERTIFICATE OF SERVICE</u>

I, Jason A. Selvey, an attorney, certify that on July 8, 2022, I caused a true and correct copy of the attached *Defendants' Memorandum of Law in Support of Their Motion to Dismiss Plaintiffs' Second Amended Complaint* to be served on the following counsel of record by filing with the Court's CM/ECF filing system:

David A. Fish
Mara Baltabols
Fish Potter Bolaños, P.C.
200 East Fifth Avenue, Suite 123
Naperville, Illinois 60563
(630) 355-7590
dfish@fishlawfirm.com
mara@fishlawfirm.com

/s/ Jason A. Selvey

# EXHIBIT A

CONFIDENTIAL

| GRIFOLS | Form | | Page: 1 of 7 |
|---|---|---|---|
| | Document #: 10-01A_NG | Revision: 2.0 | Effective Date: 15-Feb-2017 |
| Grifols Plasma Operations | Title: Consent Agreement for Automated Plasmapheresis | | |

1.

2.

3.

4.

5.

6.

PROPRIETARY AND CONFIDENTIAL; SOLELY FOR THE AUTHORIZED USE OF THE GRIFOLS PLASMA COMPANIES AND THEIR AFFILIATES. PUBLICATION, REPUBLICATION, DISSEMINATION, OR DISCLOSURE OF THIS DOCUMENT REQUIRES GRIFOLS' SPECIFIC WRITTEN CONSENT. DESTROY IF YOU ARE IN UNAUTHORIZED POSSESSION OF THIS DOCUMENT.

CONFIDENTIAL

| GRIFOLS | Form | | Page: 2 of 7 |
|---|---|---|---|
| | Document #: 10-01A_NG | Revision: 2.0 | Effective Date: |
| Grifols Plasma Operations | Title: Consent Agreement for Automated Plasmapheresis | | 15-Feb-2017 |

7. There is a possibility I may experience adverse reactions, symptoms or injuries during or after plasmapheresis, including after leaving the donation Center:

    A. **Risks associated with the venipuncture** (during or after the plasmapheresis procedure, including after leaving the donation Center) – I understand that:

        a. Some individuals experience discomfort such as pain, itching, or a localized rash at the infusion site. I further understand that sometimes the first needle that is put in the arm may need to be adjusted, and in some cases, additional venipunctures or new needles might be needed. I also understand that a scar can develop at the venipuncture site.

        b. In addition, there is a possibility that a blood clot may develop on or near the venipuncture area. I further understand that blood clots are painful and might require medical attention, which might include hospitalization. I also understand that, although rare, blood clots can spread to other areas of my body which may result in severe consequences, including strokes and death.

        c. The area of the venipuncture might become infiltrated (a leakage of fluids or blood into the surrounding tissues) which may result in a hematoma, bruising or reddish discoloration, swelling, and/or pain that might occur on the same day of donations or several days after the donation is completed. I further understand that this infiltration could extend in the surrounding tissues and through the arm and can cause other symptoms.

        d. There is also a possibility of infection of my skin, my surrounding tissue, or my vein itself. I also understand that a temporary rash may develop where the skin antiseptics are applied.

        e. Rarely, the needle is inserted into my artery instead of my vein, which may cause significant bleeding requiring possible hospital care.

        f. Although rare, there is a possibility that the venipuncture, the adjustment of the needle (if necessary), or an infiltration/hematoma/bruise may cause nerve damage, which may result in pain, numbness, tingling, weakness and/or loss of function of my arm or hand. I also understand that, although, most commonly, the nerve damage is temporary, it could also be permanent.

    B. **Risks associated with the plasmapheresis procedure** (during or after the plasmapheresis procedure, including after leaving the donation Center) – I understand that:

        a. There is the possibility of experiencing visual disturbances, dizziness, fainting, loss of consciousness, trouble breathing, nausea, vomiting, and/or convulsions (seizures) related to the change in my blood volume. I further understand that due to some, or all of these symptoms, and while standing or sitting, I may fall, which may lead to serious injuries, including head injuries, and broken bones.

        b. Although rare, some individuals may experience allergic reactions such as flushing, diffuse rash (all over your arm or body), hives, abdominal cramps, tightness in the throat, difficulty breathing, chest pain, and/or bronchospasm which may possibly be life threatening.

        c. Although the automated plasmapheresis instrument is equipped with air detectors to prevent air embolism, there still is the remote potential for an air embolism, with severe consequences including death.

        d. Due to the use of Sodium Citrate as a blood anticoagulant, there is a possibility I may experience tingling of the fingers, mouth, or hand, or mild or severe muscle cramps, stomach cramps, tightness in the throat, flushing of the skin or hives, chest pain and/or difficulty breathing.

    C. If any of these or any other adverse reactions, symptoms, or injuries occur during or after my donation, I understand and agree to notify the Center Staff immediately, regardless of whether it takes place while I am at the Center or after I leave the Center. If such adverse reactions, symptoms, or injuries occur after I leave and am away from the Center, and if I believe that I need follow-up medical attention, I understand

PROPRIETARY AND CONFIDENTIAL; SOLELY FOR THE AUTHORIZED USE OF THE GRIFOLS PLASMA COMPANIES AND THEIR AFFILIATES. PUBLICATION, REPUBLICATION, DISSEMINATION, OR DISCLOSURE OF THIS DOCUMENT REQUIRES GRIFOLS' SPECIFIC WRITTEN CONSENT. DESTROY IF YOU ARE IN UNAUTHORIZED POSSESSION OF THIS DOCUMENT.

CONFIDENTIAL

| GRIFOLS | Form | | Page: 3 of 7 |
|---|---|---|---|
| | Document #: 10-01A_NG | Revision: 2.0 | Effective Date: |
| Grifols Plasma Operations | Title: Consent Agreement for Automated Plasmapheresis | | 15-Feb-2017 |

and agree that I should contact my doctor, or if I believe I need immediate medical attention, call 911 or go to the emergency room. If any such adverse reactions, symptoms, or injuries occur while I am at the Center, the physician or designated personnel will administer appropriate supportive care and/or, in rare occasions, limited emergency treatment (for example, oxygen, saline solution, epinephrine or aspirin) to me as needed or will refer me to a local medical facility for treatment.

D. If it is recommended to me by the Center staff that I seek medical evaluation or treatment from a medical facility for any adverse reactions, symptoms, or injuries, including those identified above, and if I refuse or decline to seek such medical evaluation or treatment and/or refuse or decline transportation to the emergency room or medical facility to seek such medical evaluation or treatment, I understand and agree that I am assuming the risk that my condition or situation may continue or may become worse and/or cause additional medical conditions and problems to develop or occur, up to and including death.

E. I understand and agree that the Center is not a health care provider, but rather a plasma collection facility, that it and its staff cannot provide, and are not providing, me with medical advice or treatment, other than the supportive care and limited emergency treatment set for in 7.C. above and that the Center does not create or maintain medical records.

F. I also understand and agree that all of these adverse reactions, symptoms, and injuries may occur and are known and expressly agreed upon risks of the plasmapheresis process and donating plasma.



PROPRIETARY AND CONFIDENTIAL; SOLELY FOR THE AUTHORIZED USE OF THE GRIFOLS PLASMA COMPANIES AND THEIR AFFILIATES. PUBLICATION, REPUBLICATION, DISSEMINATION, OR DISCLOSURE OF THIS DOCUMENT REQUIRES GRIFOLS' SPECIFIC WRITTEN CONSENT. DESTROY IF YOU ARE IN UNAUTHORIZED POSSESSION OF THIS DOCUMENT.

CONFIDENTIAL

| GRIFOLS | Form | | Page: 4 of 7 |
|---|---|---|---|
| | Document #: 10-01A_NG | Revision: 2.0 | Effective Date: |
| Grifols Plasma Operations | Title: Consent Agreement for Automated Plasmapheresis | | 15-Feb-2017 |

10.

11.



12. I agree to have my blood and plasma tested for the presence of transmissible disease agents and other antibodies. I understand that all the medical and laboratory evaluations are completed for the sole purpose of evaluating my eligibility as a donor. The tests done on my blood and plasma are tests that are required by the FDA for the purpose of screening blood and plasma donors. These screening tests are NOT medical diagnostic tests and are NOT intended to diagnose any medical condition or obtain a formal medical diagnosis or medical care from the Center staff. I can, however, request a copy of abnormal screening test results so I can provide it to my personal physician or health care provider for formal diagnosis and treatment.

   A. Any screening test can have a false positive result, which means that blood or plasma will be positive by the screening test even though it does not contain the antigen or antibody for which it is being tested.
   B. Any screening test can also have a false negative result, which means that blood or plasma will be negative by the screening test even though it does contain the antigen or antibody for which it is being tested. This could be seen during the "window period" of the infection (the time period early in infection when the tests may be negative although infection is present and could be transmitted).

13.

PROPRIETARY AND CONFIDENTIAL; SOLELY FOR THE AUTHORIZED USE OF THE GRIFOLS PLASMA COMPANIES AND THEIR AFFILIATES. PUBLICATION, REPUBLICATION, DISSEMINATION, OR DISCLOSURE OF THIS DOCUMENT REQUIRES GRIFOLS' SPECIFIC WRITTEN CONSENT. DESTROY IF YOU ARE IN

CONFIDENTIAL

| GRIFOLS | Form | | Page: 5 of 7 |
|---|---|---|---|
| | Document #: 10-01A_NG | Revision: 2.0 | Effective Date: |
| Grifols Plasma Operations | Title: Consent Agreement for Automated Plasmapheresis | | 15-Feb-2017 |

PROPRIETARY AND CONFIDENTIAL; SOLELY FOR THE AUTHORIZED USE OF THE GRIFOLS PLASMA COMPANIES AND THEIR AFFILIATES. PUBLICATION, REPUBLICATION, DISSEMINATION, OR DISCLOSURE OF THIS DOCUMENT REQUIRES GRIFOLS' SPECIFIC WRITTEN CONSENT. DESTROY IF YOU ARE IN UNAUTHORIZED POSSESSION OF THIS DOCUMENT.

CONFIDENTIAL

| GRIFOLS | Form | | Page: 6 of 7 |
|---|---|---|---|
| Grifols Plasma Operations | Document #: 10-01A_NG | Revision: 2.0 | Effective Date: 15-Feb-2017 |
| | Title: Consent Agreement for Automated Plasmapheresis | | |



16. I understand and agree that I will provide my fingerprint as biometric authentication of my identity as part of the automated screening process (one time at the beginning of the screening process and one time at the completion of the screening process). I further understand and agree that by and through the provision of my fingerprint following the completion of the health, medical, and lifestyle history questions and acknowledgment and verification statements contained in the automated screening process, I have acknowledged, verified, and agreed to, and will acknowledge, verify, and agree to, all of the information, answers, statements, and representations provided and made in response to such questions and statements and have represented, and will represent, that all such information, answers, statements, and representations are true, accurate, and complete.

PROPRIETARY AND CONFIDENTIAL; SOLELY FOR THE AUTHORIZED USE OF THE GRIFOLS PLASMA COMPANIES AND THEIR AFFILIATES. PUBLICATION, REPUBLICATION, DISSEMINATION, OR DISCLOSURE OF THIS DOCUMENT REQUIRES GRIFOLS' SPECIFIC WRITTEN CONSENT. DESTROY IF YOU ARE IN

**CONFIDENTIAL**

| GRIFOLS | Document #: 10-01A_NG | Revision: 2.0 | Effective Date: |
|---|---|---|---|
| Grifols Plasma Operations | Title: Consent Agreement for Automated Plasmapheresis | | 15-Feb-2017 |

23. I have read (or have had its contents read to me) and understand this Consent Agreement, had explained to me the information provided regarding, and have had a chance to discuss and ask questions about, this Consent Agreement, the plasmapheresis procedure, the risks involved, the necessary testing, the evaluation process, and the spread of HIV by blood or plasma, and I agree to participate in Grifols' automated plasmapheresis program under and pursuant to the terms and conditions contained herein.

Donor Signature _____     Date 06/14/17

Donor Name _Brian Vaughan_     Donor Number _____

Witnessing Medical Staff Member Signature _____     Date 06/14/2017

Witnessing Medical Staff Member Name _Rhonda Hagen_

GRIFOLS PLASMA DONATION FACILITY (stamp or write Center name, address, and telephone number here):

Biomat USA, Inc.
3280 West 87th Street
Chicago, IL 60652
(708) 459-9888

PROPRIETARY AND CONFIDENTIAL; SOLELY FOR THE AUTHORIZED USE OF THE GRIFOLS PLASMA COMPANIES AND THEIR AFFILIATES. PUBLICATION, REPUBLICATION, DISSEMINATION, OR DISCLOSURE OF THIS DOCUMENT REQUIRES GRIFOLS' SPECIFIC WRITTEN CONSENT. DESTROY IF YOU ARE IN UNAUTHORIZED POSSESSION OF THIS DOCUMENT.

| | Form | | Page: 1 of 7 |
|---|---|---|---|
| **GRIFOLS** Grifols Plasma Operations | Document #: DE-013A | Revision: 1.0 | **Effective Date:** 24-Aug-2018 |
| | Title: Consent Agreement for Automated Plasmapheresis | | |



PROPRIETARY AND CONFIDENTIAL; SOLELY FOR THE AUTHORIZED USE OF THE GRIFOLS PLASMA COMPANIES AND THEIR AFFILIATES. PUBLICATION, REPUBLICATION, DISSEMINATION, OR DISCLOSURE OF THIS DOCUMENT REQUIRES GRIFOLS' SPECIFIC WRITTEN CONSENT. DESTROY IF YOU ARE IN UNAUTHORIZED POSSESSION OF THIS DOCUMENT.

| **GRIFOLS** | Form | | **Page:** 2 of 7 |
|---|---|---|---|
| **Grifols Plasma Operations** | **Document #:** DE-013A | **Revision:** 1.0 | **Effective Date:** 24-Aug-2018 |
| | **Title:** Consent Agreement for Automated Plasmapheresis | | |

7. There is a possibility I may experience adverse reactions, symptoms or injuries during or after plasmapheresis, including after leaving the donation Center:

   A. **Risks associated with the venipuncture** (during or after the plasmapheresis procedure, including after leaving the donation Center) – I understand that:

      a. Some individuals experience discomfort such as pain, itching, or a localized rash at the infusion site. I further understand that sometimes the first needle that is put in the arm may need to be adjusted, and in some cases, additional venipunctures or new needles might be needed. I also understand that a scar can develop at the venipuncture site.

      b. In addition, there is a possibility that a blood clot may develop on or near the venipuncture area. I further understand that blood clots are painful and might require medical attention, which might include hospitalization. I also understand that, although rare, blood clots can spread to other areas of my body which may result in severe consequences, including strokes and death.

      c. The area of the venipuncture might become infiltrated (a leakage of fluids or blood into the surrounding tissues) which may result in a hematoma, bruising or reddish discoloration, swelling, and/or pain that might occur on the same day of donations or several days after the donation is completed. I further understand that this infiltration could extend in the surrounding tissues and through the arm and can cause other symptoms.

      d. There is also a possibility of infection of my skin, my surrounding tissue, or my vein itself. I also understand that a temporary rash may develop where the skin antiseptics are applied.

      e. Rarely, the needle is inserted into my artery instead of my vein, which may cause significant bleeding requiring possible hospital care.

      f. Although rare, there is a possibility that the venipuncture, the adjustment of the needle (if necessary), or an infiltration/hematoma/bruise may cause nerve damage, which may result in pain, numbness, tingling, weakness and/or loss of function of my arm or hand. I also understand that, although, most commonly, the nerve damage is temporary, it could also be permanent.

   B. **Risks associated with the plasmapheresis procedure** (during or after the plasmapheresis procedure, including after leaving the donation Center) – I understand that:

      a. There is the possibility of experiencing visual disturbances, dizziness, fainting, loss of consciousness, trouble breathing, nausea, vomiting, and/or convulsions (seizures) related to the change in my blood volume. I further understand that due to some, or all of these symptoms, and while standing or sitting, I may fall, which may lead to serious injuries, including head injuries, and broken bones.

      b. Although rare, some individuals may experience allergic reactions such as flushing, diffuse rash (all over your arm or body), hives, abdominal cramps, tightness in the throat, difficulty breathing, chest pain, and/or bronchospasm which may possibly be life threatening.

      c. Although the automated plasmapheresis instrument is equipped with air detectors to prevent air embolism, there still is the remote potential for an air embolism, with severe consequences including death.

      d. Due to the use of Sodium Citrate as a blood anticoagulant, there is a possibility I may experience tingling of the fingers, mouth, or hand, or mild or severe muscle cramps, stomach cramps, tightness in the throat, flushing of the skin or hives, chest pain and/or difficulty breathing.

   C. If any of these or any other adverse reactions, symptoms, or injuries occur during or after my donation, I understand and agree to notify the Center Staff immediately, regardless of whether it takes place while I am at the Center or after I leave the Center. If such adverse reactions, symptoms, or injuries occur after I leave and am away from the Center, and if I believe that I need follow-up medical attention, I understand

PROPRIETARY AND CONFIDENTIAL; SOLELY FOR THE AUTHORIZED USE OF THE GRIFOLS PLASMA COMPANIES AND THEIR AFFILIATES. PUBLICATION, REPUBLICATION, DISSEMINATION, OR DISCLOSURE OF THIS DOCUMENT REQUIRES GRIFOLS' SPECIFIC WRITTEN CONSENT. DESTROY IF YOU ARE IN UNAUTHORIZED POSSESSION OF THIS DOCUMENT.

| **GRIFOLS** | **Form** | | **Page:** 3 of 7 |
|---|---|---|---|
| Grifols Plasma Operations | Document #: DE-013A | **Revision:** 1.0 | **Effective Date:** 24-Aug-2018 |
| | **Title:** Consent Agreement for Automated Plasmapheresis | | |

and agree that I should contact my doctor, or if I believe I need immediate medical attention, call 911 or go to the emergency room. If any such adverse reactions, symptoms, or injuries occur while I am at the Center, the physician or designated personnel will administer appropriate supportive care and/or, in rare occasions, limited emergency treatment (for example, oxygen, saline solution, epinephrine or aspirin) to me as needed or will refer me to a local medical facility for treatment.

D. If it is recommended to me by the Center staff that I seek medical evaluation or treatment from a medical facility for any adverse reactions, symptoms, or injuries, including those identified above, and if I refuse or decline to seek such medical evaluation or treatment and/or refuse or decline transportation to the emergency room or medical facility to seek such medical evaluation or treatment, I understand and agree that I am assuming the risk that my condition or situation may continue or may become worse and/or cause additional medical conditions and problems to develop or occur, up to and including death.

E. I understand and agree that the Center is not a health care provider, but rather a plasma collection facility, that it and its staff cannot provide, and are not providing, me with medical advice or treatment, other than the supportive care and limited emergency treatment set for in 7.C. above and that the Center does not create or maintain medical records.

F. I also understand and agree that all of these adverse reactions, symptoms, and injuries may occur and are known and expressly agreed upon risks of the plasmapheresis process and donating plasma.



PROPRIETARY AND CONFIDENTIAL; SOLELY FOR THE AUTHORIZED USE OF THE GRIFOLS PLASMA COMPANIES AND THEIR AFFILIATES. PUBLICATION, REPUBLICATION, DISSEMINATION, OR DISCLOSURE OF THIS DOCUMENT REQUIRES GRIFOLS' SPECIFIC WRITTEN CONSENT. DESTROY IF YOU ARE IN UNAUTHORIZED POSSESSION OF THIS DOCUMENT.

| **GRIFOLS** | **Form** | | **Page:** 4 of 7 |
|---|---|---|---|
| **Grifols Plasma Operations** | Document #: DE-013A | **Revision:** 1.0 | **Effective Date:** 24-Aug-2018 |
| | **Title:** Consent Agreement for Automated Plasmapheresis | | |



12. I agree to have my blood and plasma tested for the presence of transmissible disease agents and other antibodies. I understand that all the medical and laboratory evaluations are completed for the sole purpose of evaluating my eligibility as a donor. The tests done on my blood and plasma are tests that are required by the FDA for the purpose of screening blood and plasma donors. These screening tests are NOT medical diagnostic tests and are NOT intended to diagnose any medical condition or obtain a formal medical diagnosis or medical care from the Center staff. I can, however, request a copy of abnormal screening test results so I can provide it to my personal physician or health care provider for formal diagnosis and treatment.

A. Any screening test can have a false positive result, which means that blood or plasma will be positive by the screening test even though it does not contain the antigen or antibody for which it is being tested.

B. Any screening test can also have a false negative result, which means that blood or plasma will be negative by the screening test even though it does contain the antigen or antibody for which it is being tested. This could be seen during the "window period" of the infection (the time period early in infection when the tests may be negative although infection is present and could be transmitted).



PROPRIETARY AND CONFIDENTIAL; SOLELY FOR THE AUTHORIZED USE OF THE GRIFOLS PLASMA COMPANIES AND THEIR AFFILIATES. PUBLICATION, REPUBLICATION, DISSEMINATION, OR DISCLOSURE OF THIS DOCUMENT REQUIRES GRIFOLS' SPECIFIC WRITTEN CONSENT. DESTROY IF YOU ARE IN UNAUTHORIZED POSSESSION OF THIS DOCUMENT.

| GRIFOLS | Form | | Page: 5 of 7 |
|---|---|---|---|
| **Grifols Plasma Operations** | Document #: DE-013A | Revision: 1.0 | **Effective Date:** 24-Aug-2018 |
| | Title: Consent Agreement for Automated Plasmapheresis | | |

PROPRIETARY AND CONFIDENTIAL; SOLELY FOR THE AUTHORIZED USE OF THE GRIFOLS PLASMA COMPANIES AND THEIR AFFILIATES. PUBLICATION, REPUBLICATION, DISSEMINATION, OR DISCLOSURE OF THIS DOCUMENT REQUIRES GRIFOLS' SPECIFIC WRITTEN CONSENT. DESTROY IF YOU ARE IN UNAUTHORIZED POSSESSION OF THIS DOCUMENT.

| **GRIFOLS** | **Form** | | **Page:** 6 of 7 |
|---|---|---|---|
| **Grifols Plasma Operations** | **Document #:** DE-013A | **Revision:** 1.0 | **Effective Date:** 24-Aug-2018 |
| | **Title:** Consent Agreement for Automated Plasmapheresis | | |



automated plasmapheresis program at any time.

16. I understand and agree that I will provide my fingerprint as biometric authentication of my identity as part of the automated screening process (one time at the beginning of the screening process and one time at the completion of the screening process). I further understand and agree that by and through the provision of my fingerprint following the completion of the health, medical, and lifestyle history questions and acknowledgment and verification statements contained in the automated screening process, I have acknowledged, verified, and agreed to, and will acknowledge, verify, and agree to, all of the information, answers, statements, and representations provided and made in response to such questions and statements and have represented, and will represent, that all such information, answers, statements, and representations are true, accurate, and complete.



PROPRIETARY AND CONFIDENTIAL; SOLELY FOR THE AUTHORIZED USE OF THE GRIFOLS PLASMA COMPANIES AND THEIR AFFILIATES. PUBLICATION, REPUBLICATION, DISSEMINATION, OR DISCLOSURE OF THIS DOCUMENT REQUIRES GRIFOLS' SPECIFIC WRITTEN CONSENT. DESTROY IF YOU ARE IN UNAUTHORIZED POSSESSION OF THIS DOCUMENT.

| **GRIFOLS** | **Form** | | **Page:** 7 of 7 |
|---|---|---|---|
| **Grifols Plasma Operations** | **Document #:** DE-013A | **Revision:** 1.0 | **Effective Date:** 24-Aug-2018 |
| | **Title:** Consent Agreement for Automated Plasmapheresis | | |



23. I have read (or have had its contents read to me) and understand this Consent Agreement, had explained to me the information provided regarding, and have had a chance to discuss and ask questions about, this Consent Agreement, the plasmapheresis procedure, the risks involved, the necessary testing, the evaluation process, and the spread of HIV by blood or plasma, and I agree to participate in Grifols' automated plasmapheresis program under and pursuant to the terms and conditions contained herein.

_Adriel Vega_
Donor Signature

_10 / 08 / 19_
Date

_Vega        Adriel F._
Donor Name

Donor Number

_10/08/19_
Date

_Jasmine Pethylen_
Witnessing Medical Staff Member Name

GRIFOLS PLASMA DONATION FACILITY (stamp or write Center name, address, and telephone number here):

Talecris Plasma Resources
511 W. Washington St.
Bloomington, IL 61701
(309) 827-3031

PROPRIETARY AND CONFIDENTIAL; SOLELY FOR THE AUTHORIZED USE OF THE GRIFOLS PLASMA COMPANIES AND THEIR AFFILIATES. PUBLICATION, REPUBLICATION, DISSEMINATION, OR DISCLOSURE OF THIS DOCUMENT REQUIRES GRIFOLS' SPECIFIC WRITTEN CONSENT. DESTROY IF YOU ARE IN UNAUTHORIZED POSSESSION OF THIS DOCUMENT.

# Biomat USA

## Consent Agreement for Automated Plasmapheresis

Donor Name: FEBBIE A. MINNIEFIELD

Donor ID:

7. There is a possibility I may experience adverse reactions, symptoms or injuries during or after plasmapheresis, including after leaving the donation Center:

A. **Risks associated with the venipuncture** (during or after the plasmapheresis procedure, including after leaving the donation Center) – I understand that:

    a. Some individuals experience discomfort such as pain, itching, or a localized rash at the infusion site. I further understand that sometimes the first needle that is put in the arm may need to be adjusted, and in some cases, additional venipunctures or new needles might be needed. I also understand that a scar can develop at the venipuncture site.

    b. In addition, there is a possibility that a blood clot may develop on or near the venipuncture area. I further understand that blood clots are painful and might require medical attention, which might include hospitalization. I also understand that, although rare, blood clots can spread to other areas of my body which may result in severe consequences, including strokes and death.

    c. The area of the venipuncture might become infiltrated (a leakage of fluids or blood into the surrounding tissues) which may result in a hematoma, bruising or reddish discoloration, swelling, and/or pain that might occur on the same day of donations or several days after the donation is completed. I further understand that this infiltration could extend in the surrounding tissues and through the arm and can cause other symptoms.

    d. There is also a possibility of infection of my skin, my surrounding tissue, or my vein itself. I also understand that a temporary rash may develop where the skin antiseptics are applied.

    e. Rarely, the needle is inserted into my artery instead of my vein, which may cause significant bleeding requiring possible hospital care.

    f. Although rare, there is a possibility that the venipuncture, the adjustment of the needle (if necessary), or an infiltration/hematoma/bruise may cause nerve damage, which may result in pain, numbness, tingling, weakness and/or loss of function of my arm or hand. I also understand that, although, most commonly, the nerve damage is temporary, it could also be permanent.

B. **Risks associated with the plasmapheresis procedure** (during or after the plasmapheresis procedure, including after leaving the donation Center) – I understand that:

    a. There is the possibility of experiencing visual disturbances, dizziness, fainting, loss of consciousness, trouble breathing, nausea, vomiting, and/or convulsions (seizures) related to the change in my blood volume. I further understand that due to some, or all of these symptoms, and while standing or sitting, I may fall, which may lead to serious injuries, including head injuries, and broken bones.

    b. Although rare, some individuals may experience allergic reactions such as flushing, diffuse rash (all over your arm or body), hives, abdominal cramps, tightness in the throat, difficulty breathing, chest pain, and/or bronchospasm which may possibly be life threatening.

    c. Although the automated plasmapheresis instrument is equipped with air detectors to prevent air embolism, there still is the remote potential for an air embolism, with severe consequences including death.

    d. Due to the use of Sodium Citrate as a blood anticoagulant, there is a possibility I may experience tingling of the fingers, mouth, or hand, or mild or severe muscle cramps, stomach cramps, tightness in the throat, flushing of the skin or hives, chest pain and/or difficulty breathing.

C. If any of these or any other adverse reactions, symptoms, or injuries occur during or after my donation, I understand and agree to notify the Center Staff immediately, regardless of whether it takes place while I am at the Center or after I leave the Center. If such adverse reactions, symptoms, or injuries occur after I leave and am away from the Center, and if I believe that I need follow-up medical attention, I understand and agree that I should contact my doctor, or if I believe I need immediate medical attention, call 911 or go to the emergency room. If any such adverse reactions, symptoms, or injuries occur while I am at the Center, the physician or designated personnel will administer appropriate supportive care and/or, in rare occasions, limited emergency treatment (for example, oxygen, saline solution, epinephrine or aspirin) to me as needed or will refer me to a local medical facility for treatment.

D. If it is recommended to me by the Center staff that I seek medical evaluation or treatment from a medical facility for any adverse reactions, symptoms, or injuries, including those identified above, and if I refuse or decline to seek such medical evaluation or treatment and/or refuse or decline transportation to the emergency room or medical facility to seek such medical evaluation or treatment, I understand and agree that I am assuming the risk that my condition or situation may continue or may become worse and/or cause additional medical conditions and problems to develop or occur, up to and including death.

E. I understand and agree that the Center is not a health care provider, but rather a plasma collection facility, that it and its staff cannot provide, and are not providing, me with medical advice or treatment, other than the supportive care and limited emergency treatment set for in 7.C. above and that the Center does not create or maintain medical records.

F. I also understand and agree that all of these adverse reactions, symptoms, and injuries may occur and are known and expressly agreed upon risks of the plasmapheresis process and donating plasma.



12. I agree to have my blood and plasma tested for the presence of transmissible disease agents and other antibodies. I understand that all the medical and laboratory evaluations are completed for the sole purpose of evaluating my eligibility as a donor. The tests done on my blood and plasma are tests that are required by the FDA for the purpose of screening blood and plasma donors. These screening tests are NOT medical diagnostic tests and are NOT intended to diagnose any medical condition or obtain a formal medical diagnosis or medical care from the Center staff. I can, however, request a copy of abnormal screening test results so I can provide it to my personal physician or health care provider for formal diagnosis and treatment.

    A. Any screening test can have a false positive result, which means that blood or plasma will be positive by the screening test even though it does not contain the antigen or antibody for which it is being tested.

    B. Any screening test can also have a false negative result, which means that blood or plasma will be negative by the screening test even though it does contain the antigen or antibody for which it is being tested. This could be seen during the "window period" of the infection (the time period early in infection when the tests may be negative although infection is present and could be transmitted).

16. I understand and agree that I will provide my fingerprint as biometric authentication of my identity as part of the automated screening process (one time at the beginning of the screening process and one time at the completion of the screening process). I further understand and agree that by and through the provision of my fingerprint following the completion of the health, medical, and lifestyle history questions and acknowledgment and verification statements contained in the automated screening process, I have acknowledged, verified, and agreed to, and will acknowledge, verify, and agree to, all of the information, answers, statements, and representations provided and made in response to such questions and statements and have represented, and will represent, that all such information, answers, statements, and representations are true, accurate, and complete.



23. I have read (or have had its contents read to me) and understand this Consent Agreement, had explained to me the information provided regarding, and have had a chance to discuss and ask questions about, this Consent Agreement, the plasmapheresis procedure, the risks involved, the necessary testing, the evaluation process, and the spread of HIV by blood or plasma, and I agree to participate in Grifols' automated plasmapheresis program under and pursuant to the terms and conditions contained herein.

Donor Signature _Febbie Minniefield_ Date _1-28-2020_

Witnessing Medical Staff Member Signature ▮▮▮▮▮ Date _01/28/2020_

Witnessing Medical Staff Member Name _Angela Barron-Wilson_

Form 10-01A_NG, effective 15FEB17. Revision: 2.0

PROPRIETARY AND CONFIDENTIAL; SOLELY FOR THE AUTHORIZED USE OF THE GRIFOLS PLASMA COMPANIES AND THEIR AFFILIATES. PUBLICATION, REPUBLICATION, DISSEMINATION, OR DISCLOSURE OF THIS DOCUMENT REQUIRES GRIFOLS' SPECIFIC WRITTEN CONSENT. DESTROY IF YOU ARE IN UNAUTHORIZED POSSESSION OF THIS DOCUMENT.

Donor Center Telephone Number: _708-865-1235_

**Donor:** ▮▮▮ FEBBIE A. MINNIEFIELD

Biomat USA Maywood

215 Madison Street

Maywood, IL 60153, US

**Laboratory Director:**

Dr. Joy West
Biomat USA
215 Madison Street
Maywood, IL 60153

# EXHIBIT B

```
 1                  IN THE CIRCUIT COURT

 2            OF THE TWELFTH JUDICIAL CIRCUIT

 3                 WILL COUNTY, ILLINOIS

 4

 5    YESENIA DIAZ,                    )

 6                    Plaintiff,  )

 7        -vs-                         )      Case No.

 8    SILVER CROSS HOSPITAL AND        )  2018 CH 001327

 9    MEDICAL CENTERS,                 )

10                    Defendant.  )

11

12

13            TRANSCRIPT OF PROCEEDINGS had in the

14    above-entitled cause in Room A201 of the Will

15    County Court Annex, 57 North Ottawa Street,

16    Joliet, Illinois, on Thursday, August 29, 2019,

17    commencing at 10:14 a.m.

18

19

20

21    BEFORE:  HONORABLE JUDGE RAYMOND E. ROSSI.

22

23

24
```

```
 1    APPEARANCES:

 2

      STEPHAN ZOURAS, LLP
 3    BY:  JAMES B. ZOURAS, ESQUIRE
             jzouras@stephanzouras.com
 4    BY:  HALEY R. JENKINS, ESQUIRE
             hjenkins@stephanzouras.com
 5    100 North Riverside Plaza, Suite 2150
      Chicago, Illinois  60606
 6    312-233-1550

 7           appeared on behalf of the Plaintiff
             Yesenia Diaz
 8

 9

      SHOOK, HARDY & BACON L.L.P.
10    BY:  MELISSA A. SIEBERT, ESQUIRE
             masiebert@shb.com
11    BY:  ERIN BOLAN HINES, ESQUIRE
             ehines@shb.com
12    111 South Wacker Drive, Suite 4700
      Chicago, Illinois  60606
13    312-704-7700

14           appeared on behalf of the Defendant
             Silver Cross Hospital and Medical
15           Centers

16

17

18

19

20

21

      STENOGRAPHICALLY REPORTED BY:
22         ROSANNE M. NUZZO, CSR, RMR, CRR
               CSR License No. 84-1388
23

24
```

| | |
|---|---|
| 1  THE COURT: Anybody on the 9:00 call that | 1  This is about whether BIPA's HIPAA exemption |
| 2  hasn't been heard? | 2  excludes the information collected here. And as |
| 3      (No audible response). | 3  you can -- as you read in our motion, we contend |
| 4  THE COURT: All right. Then 37, 18 CH 1327. | 4  that it clearly falls within BIPA's HIPAA |
| 5      Good morning. | 5  exemption because Plaintiff's finger scan is being |
| 6  MS. SIEBERT: Good morning, your Honor. | 6  collected, stored, and used for health care |
| 7  THE COURT: Hi. | 7  treatment, payment, and operations. |
| 8  MS. HINES: Hi. | 8      The parties have filed several |
| 9  MR. ZOURAS: Good morning, your Honor. | 9  pleadings, including yesterday's notice of a |
| 10      Jim Zouras for the Plaintiff. | 10  supplemental authority that are directed to the |
| 11  MS. JENKINS: Good morning, your Honor. | 11  2 -- primarily to the hospital's 2-615 motion; |
| 12      Haley Jenkins on behalf of the | 12  actually, only to the hospital's 2-615 motion. |
| 13  Plaintiff. | 13      With the Court's permission, we want to |
| 14  MS. SIEBERT: Good morning, your Honor. | 14  address the 2-619 portion of our motion first, the |
| 15      Melissa Siebert and Erin Hines on | 15  HIPAA BIPA exemption, because if this Court |
| 16  behalf of Silver Cross Hospital. | 16  decides that the hospital and the finger scans |
| 17  THE COURT: Okay. I've read through it, but | 17  fall within BIPA's HIPAA exemption, we do not need |
| 18  if you want to summarize or supplement briefly, | 18  to proceed any further, and this case should be |
| 19  have at it. | 19  dismissed outright. |
| 20      Movant? | 20      To our knowledge, this case is a matter |
| 21  MS. SIEBERT: That's us, your Honor. | 21  of first impression as to the HIPAA BIPA -- the |
| 22      Your Honor, we're here today, as you | 22  BIPA HIPAA exemption applicability to hospitals. |
| 23  know, on our motions, the combined 2-615 and 2-619 | 23  This is an important distinction because of the |
| 24  motion. | 24  Illinois Assembly's expressed acknowledgment that |
| Page 3 | Page 5 |
| 1      Plaintiff, a registered nurse who | 1  hospitals were one of the few entities where |
| 2  worked at the hospital, has filed a lawsuit | 2  exemptions would be placed within BIPA, and they |
| 3  contending that the hospital's use of her finger | 3  were. |
| 4  scan violated Illinois' Biometric Information | 4      So Ms. Hines is going to address any |
| 5  Privacy Act, also known as BIPA. BIPA provides | 5  questions that the Court may have about our 2-619 |
| 6  protections for certain biometric information. | 6  portion of our motion with respect to the HIPAA |
| 7      Although BIPA's legislative history is | 7  BIPA exemption. And we're happy to take your |
| 8  sparse, the Illinois legislature clearly indicated | 8  Honor through why treatment, payment, and |
| 9  that it intended to provide exemptions for | 9  operations under HIPAA is applicable here with the |
| 10  hospitals such as Silver Cross. That legislative | 10  BIPA exemption. |
| 11  history is Exhibit 1 to our motion to dismiss. | 11  THE COURT: All right. Thank you. |
| 12      Consistent with the legislative | 12  MS. HINES: Would you like to hear about the |
| 13  history, BIPA contains exemptions related to | 13  treatment, payment, and operations? We're |
| 14  hospitals. Specifically, BIPA excludes from the | 14  primarily referring to the affidavit that is |
| 15  definition of "biometric information" | 15  attached. |
| 16  "information collected, used, or stored for health | 16  THE COURT: For dismissal under 2-619? |
| 17  care treatment, payment, or operations." That's | 17  MS. SIEBERT: Yes. |
| 18  in BIPA Section 10. | 18  THE COURT: All right. Briefly. |
| 19      The health -- that information -- that | 19  MS. HINES: Okay, your Honor. |
| 20  definition is important because the definition of | 20      As Ms. Siebert just stated, BIPA |
| 21  "health care treatment, payment, or operations" is | 21  excludes "information collected, used," and |
| 22  as defined in HIPAA. So this is the second HIPAA | 22  "stored for health care treatment, payment, or |
| 23  motion involving Silver Cross today that's before | 23  operations" under HIPAA. Those are specifically |
| 24  your Honor, but it's a different type of motion. | 24  defined terms under HIPAA. "Treatment" is |
| Page 4 | Page 6 |

1  treatment or management of healthcare; "payments"
2  are payments for healthcare; and "health care
3  operations" includes several things, but what's
4  relevant here is conducting or arranging for
5  auditing. These are definitions found under HIPAA
6  45 CFR 164.501.
7          Silver Cross is a healthcare provider
8  and falls under HIPAA. Plaintiff is a registered
9  nurse. She has scanned her finger in medical
10 supply stations at Silver Cross Hospital in order
11 to access prescription drug medication.
12 Plaintiff's finger scan data is the information
13 that was collected, used, and stored for
14 treatment, payment, and operations under HIPAA.
15         And you asked why does her finger scan
16 fall under operations? We'll start there. Silver
17 Cross is required, as laid out in Mr. Butler's
18 affidavit which is Exhibit 2 to the motion to
19 dismiss to have an audit trail of the prescription
20 drugs it dispenses to its patients.
21         When a registered nurse puts her finger
22 scan on the med station to access that, those
23 prescription drugs, it's because she's a
24 registered nurse, but it's also because it's

Page 7

1  that the Court dismiss the Complaint outright
2  pursuant to 2-619, which is supported by the
3  affidavit of Mr. Butler that is undisputed that's
4  attached to the motion to dismiss, that this
5  information collected from the Plaintiff's finger
6  scans falls under BIPA's HIPAA exemption.
7          THE COURT: Okay. In your brief, you had
8  cited five independent reasons for dismissal. Do
9  you still support -- do you still stand by that?
10         MS. SIEBERT: We do. We do. But we feel it's
11 appropriate under 619, given that this is an
12 affirmative matter, that this is an exemption --
13         THE COURT: Yes.
14         MS. SIEBERT: -- an exemption where we have
15 submitted an affidavit that is uncontroverted,
16 that it can be decided on that basis alone.
17         We are -- we've all filed extensive
18 pleadings here which I know your Honor has read.
19 We are happy to address any questions you have
20 about our 615 basis or our supplemental authority,
21 but that all goes to the 615 portion of our motion
22 which we stand on here.
23         THE COURT: Okay. Hi.
24         MR. ZOURAS: Good morning, your Honor.

Page 9

1  claims to be. And that is what falls under
2  claims to be. And that is what falls under
3  HIPAA's -- the auditing that is required under
4  "operations." And this information alone under
5  this definition is enough to qualify as exempting
6  her finger scan data from BIPA, and this case can
7  be dismissed based on that.
8          But we have two more definitions. We
9  have payment. When a registered nurse puts her
10 finger scan on the medical supply station, it
11 tracks the prescription drugs that she is taking
12 for that patient to the billing module, and that
13 is "payment" under the HIPAA definition which is
14 excluded under BIPA. Again, the information under
15 this term alone is a basis for dismissal.
16         We also have "treatment." When the
17 registered nurse scans her finger on a medical
18 supply station, it records who she is giving --
19 the patient that is getting the prescription
20 medication, the dosage, and when they're getting
21 that medication. And, again, it's information --
22 the information under this definition is enough to
23 exclude the information from BIPA.
24         For these reasons, your Honor, we ask

Page 8

1          THE COURT: Good morning.
2          Response?
3          MR. ZOURAS: With respect to the motion to
4  supplement, very quickly, your Honor, that was
5  just submitted late last night. We're obviously
6  prepared to fully argue the motion. We would just
7  like an opportunity to address that supplemental
8  filing in writing if the Court is going to
9  entertain it.
10         THE COURT: Wait a minute.
11         MR. ZOURAS: We can do that.
12         THE COURT: Right. By the way, this is up for
13 hearing today.
14         MR. ZOURAS: Correct, and we're prepared to
15 argue.
16         THE COURT: All right. Well, what -- no
17 offense, but what good is a supplemental brief
18 going to have after argument today and a ruling
19 today?
20         MR. ZOURAS: Fair enough, your Honor.
21         They filed a supplemental pleading to
22 brief it last night. That wasn't our decision.
23         THE COURT: Okay. Well, if it's any
24 consolation, I haven't seen their supplemental

Page 10

1 brief.
2 MR. ZOURAS: Okay. Fair enough. Fair enough,
3 Judge.
4 With respect to the fully-briefed
5 matter before the Court --
6 (Laughter.)
7 MR. ZOURAS: -- what the Defendants want the
8 Court to do is to take a limited exemption, your
9 Honor, which has to do with patients' biometrics,
10 not employees' biometrics, and expand it to
11 include biometric collection for any caregiver
12 touching patient care, so they're talking about
13 not just nurses but anybody in a hospital
14 environment or a healthcare environment for whom
15 they collect biometrics.
16 This argument is essentially identical
17 to the one that Judge Loftus just a few weeks ago
18 rejected in a comprehensive oral ruling. We
19 recognize that's not binding, but it is directly
20 on point. And after fully vetting these
21 arguments, she not only rejected the arguments,
22 but she decided that the argument was actually, in
23 her words, nonsensical. There's no reason to
24 deviate from that ruling here, your Honor.

Page 11

1 The essential facts are that we have an
2 employee of Silver Cross here. As a condition of
3 employment, she has to disclose and produce for
4 collection her biometric identifiers in order to
5 access certain machines, essentially, certain
6 devices. Now, the efficiencies and the cost
7 savings are the reasons for that to be done.
8 The Biometric Information Privacy Act
9 has been on the books for eleven years now. And
10 as the legislature addressed and as the Supreme
11 Court has now addressed, this was done to address
12 a very serious need for protections of biometric
13 information.
14 The requirements are very easy to
15 follow. They're very easy to learn. Before you
16 collect biometric information in any context, you
17 need a written consent. You need a written
18 consent before disseminating to third parties.
19 You need a written release. You need to establish
20 a public retention and destruction schedule.
21 Here, we have the Defendant that did
22 none of that.
23 The default rule under BIPA, your
24 Honor, is that everybody is entitled to this

Page 12

1 protection. There are a couple of exemptions, and
2 they are all-encompassing. For example, the
3 financial institution exemption, all financial
4 institutions are basically shielded from having to
5 comply; the same thing for the government.
6 Hospitals are not one of them, though.
7 There are -- there is no all-encompassing
8 exemption for hospitals, as the Defendant is
9 apparently suggesting. And that is why the
10 language they are citing, your Honor, is not from
11 the exemptions. It's not in the part of the
12 statute where they list these exemptions.
13 It's from the part of the statute where
14 they define what biometrics is at all, and they
15 define biometric identifiers in a very specific
16 way. They exclude from the definition of
17 biometric identifiers, essentially, information
18 collected under HIPAA.
19 HIPAA is a statute designed to protect
20 patient information, your Honor, and that is why
21 they excluded BIPA from anything that was covered
22 by HIPAA patient-protected data. Why? It's
23 already protected by HIPAA. There are already
24 stern penalties, stern procedures in place to

Page 13

1 protect patient biometrics, not to mention the
2 practical effect of perhaps having to get a
3 consent from a patient before treating them.
4 I think the legislature was clearly concerned with
5 that.
6 So what BIPA does under the definition,
7 not an exemption, is exclude information captured
8 from a patient. And there are specific examples;
9 diagnostic testing, they refer to different types
10 of tests, x-rays, erosion process, and so forth.
11 So the entire focus of this, this definition, what
12 is excluded has to do with patients, and that is
13 something that hasn't been addressed.
14 And there isn't also any mention of
15 what possible -- and this is a glaring
16 exclusion -- what possible policy could there be
17 that the legislature had in mind to say that
18 employees of a hospital like the plaintiff
19 shouldn't have the protections under this very
20 important statute, as Judge Loftus found.
21 And so if we look at this in its proper
22 context on what a biometric identifier is,
23 clearly, this is not the situation contemplated by
24 the HIPAA -- what we're calling the exclusion for

Page 14



1 HIPAA information which, again, has to do with
2 patients' information, not employee information,
3 your Honor.
4     We're happy to just address any
5 additional questions.
6     THE COURT: Yeah. A HIPAA -- a typical HIPAA
7 order would allow for production/reproduction of
8 medical records. There's really nothing
9 earth-shattering there.
10     MR. ZOURAS: Right.
11     THE COURT: But those medical records are
12 sometimes, you know, not just generated but are
13 created and interpreted by medical personnel.
14     MR. ZOURAS: Um-hum, about a patient.
15     THE COURT: About a patient, yes.
16     MR. ZOURAS: Right.
17     THE COURT: But, nevertheless, it's not like
18 the medical personnel are strangers to the
19 process.
20     MR. ZOURAS: Um-hum. Um-hum. But the
21 information is the patient's information, and that
22 is exactly the point. It's the patient's data.
23 It's the patient's records, the patient's
24 information, the patient's testing --

Page 15

1 in fact, not even an employee; a third-party,
2 well, consultant.
3     MR. ZOURAS: Um-hum.
4     MS. SIEBERT: Your Honor, that is why it's so
5 important to read that exemption for Section 10 in
6 its entirety. And what we're saying is, this is
7 an exemption because it's excluding an entire
8 class of information from the definition of what's
9 protected under BIPA.
10     What that definition actually says is:
11 "...information captured from a patient in a
12 health care setting or information collected,
13 used, or stored for health care treatment, payment
14 or operations..."
15     We are not asserting that this is
16 information captured from a patient in a
17 healthcare setting. That's the PHI that Plaintiff
18 is referencing and relying on.
19     What we are saying is what your Honor
20 is saying. This is information collected, used,
21 and stored for our operations; for example, the
22 required audit, which is an abuse audit as well as
23 a prescription trail audit that Silver Cross is
24 required to keep as a matter of licensing and law,

Page 17

1     THE COURT: Well --
2     MR. ZOURAS: -- the patient's everything.
3     THE COURT: All right. Let me give one other
4 example.
5     MR. ZOURAS: Um-hum.
6     THE COURT: Counsel, I'm sure -- I can tell
7 you know --
8     MR. ZOURAS: Well, let's not be sure.
9     THE COURT: That's all right. We're on the
10 record.
11     Well, in typical medical litigation --
12     MR. ZOURAS: Right.
13     THE COURT: -- there is (f)(3)s that come into
14 play.
15     MR. ZOURAS: Um-hum.
16     THE WITNESS: And for, let's say, a medical
17 expert who is identified as a 213(f)(3) witness,
18 if he has created publications, books, articles,
19 whatnot --
20     MR. ZOURAS: Um-hum.
21     THE COURT: -- those are produced, and I
22 believe they are subject to a HIPAA that may be in
23 place; and yet, yes, those relate to patients, but
24 they are created and produced by a third-party --

Page 16

1 as stated in the affidavit that we provided to
2 you.
3     So taking your analogy to its
4 conclusion, we are contending that this is
5 information collected, used, or stored under that
6 portion of BIPA which is not direct patient
7 information or any of the types of x-rays or other
8 things that are excluded from a BIPA definition of
9 "biometric information" on the grounds that
10 Plaintiff's counsel envisions.
11     MR. ZOURAS: We have to look -- and I have a
12 copy of the definition they're referring to, your
13 Honor, right here, and it's not in the exemptions.
14 The exemptions is in 740 ILCS 14/25. This is the
15 definition of what a biometric identifier is under
16 740 ILCS 14/10.
17     We're not stopping the Defendant -- we
18 have no issue with the Defendant conducting
19 audits, your Honor. That's perfectly appropriate.
20 But if they are going to use biometric information
21 for any reason, they have to comply with BIPA
22 unless it involves patient information. That is
23 the all-encompassing definition of "biometric
24 identifiers" as found in this definition. By

Page 18



1 default, everyone is entitled to protection unless
2 there is a specific exemption.
3       And with respect to this definition, it
4 has to do with information captured from a patient
5 in a healthcare setting or information collected,
6 used, or stored for healthcare treatment, payment
7 or operations under -- and this is very
8 important -- under HIPAA.
9       And then they go on to talk about other
10 information which only is collected by -- or from
11 patients. So by looking at the definition here in
12 its entirety in its context, clearly as found by
13 another court, your Honor, this is something
14 speaking purely to patient information, not
15 employee information, not employee biometrics.
16       THE COURT: Well, BIPA exempts, quote,
17 "information collected, used, or stored for health
18 care treatment," unquote, under HIPAA.
19       MR. ZOURAS: Under HIPAA.
20       What they're describing is a situation
21 where it is not under HIPAA; that that's the
22 point, that is what they are excluding. It's not
23 under HIPAA. HIPAA governs --
24       THE COURT: Is that true?

Page 19

1       MS. SIEBERT: No. The definition that we read
2 to you is "treatment, payment, and operations,"
3 commonly known as TPO. Those are from HIPAA.
4       "Operations" has no reference to
5 patients -- to patient information. That clause
6 as read -- as stated in our brief and as read by
7 Ms. Hines relates to a hospital's auditing trail,
8 including for abuse and control.
9       And as Mr. Barley's affidavit
10 attests --
11       MR. ZOURAS: Butler.
12       MS. SIEBERT: -- Butler -- that's exactly what
13 was -- what the information was used for here,
14 which we're required to do under other laws.
15       MR. ZOURAS: The purpose of HIPAA, which is
16 what we're talking about, is to protect patient
17 data. That is why this is referenced here. It is
18 a patient-focused statute. If --
19       THE COURT: All right. I'm sorry. I don't
20 mean to cut you off.
21       MR. ZOURAS: No. I -- if we have it their
22 way, Judge, the evil that we are attempting to
23 protect here is -- it's going to continue to
24 exist; and that is, any employee at a hospital who

Page 20

1 uses -- who they have used biometrics -- a
2 biometric device will be left with no protection
3 under HIPAA or BIPA.
4       So HIPAA is already protecting the
5 patient information, and that's why this exclusion
6 from the definition exists. Nothing in HIPAA
7 protects the employee data. There is simply no
8 logical purpose or policy reason or legislative
9 history or anything else to back that up. There's
10 nothing.
11       THE COURT: Thank you.
12       MR. ZOURAS: Thank you, your Honor.
13       THE COURT: I'm sorry, though. I feel that a
14 practical application of HIPAA that exists in
15 nearly any HIPAA order is such that, yes, it
16 relates to the patient, but it need not be only
17 patient-driven, that there are -- as I indicated
18 in my examples, there are other publications and
19 treatises and other data that are captured by
20 HIPAA that don't relate to the patient in a
21 primary sense but, rather, secondary.
22       I'm going to grant the 2-619 motion for
23 the reasons stated on the record, for the reasons
24 stated in the briefs in the motion.

Page 21

1       MS. SIEBERT: Thank you, your Honor.
2       MS. HINES: Thank you, your Honor.
3       MR. ZOURAS: Thank you, your Honor.
4       MS. JENKINS: Thanks, Judge.
5             (WHEREUPON, discussion was had off
6             the record.)
7       MS. JENKINS: Your Honor, apologies, we're
8 not -- what's your Honor's preference? Would you
9 like a written order? Or would you like us to
10 type up an order, or would you like a handwritten
11 order for today?
12       THE COURT: We will leave it to counsel for
13 the Plaintiff.
14       MR. ZOURAS: Ah.
15       MS. JENKINS: We will write an order today --
16       MR. ZOURAS: Sure.
17       MS. JENKINS: -- for the reasons stated on the
18 record.
19       MR. ZOURAS: We're dismissing the prejudice --
20       MS. JENKINS: Is this a dismissal with or
21 without prejudice?
22       MR. ZOURAS: -- I presume, without -- without
23 leave to amend. We would ask for leave to
24 amend --

Page 22

1 MS. JENKINS: Sure.
2 MR. ZOURAS: -- for the record.
3 THE COURT: Oh.
4 MS. SIEBERT: Your Honor, this would be a
5 dismissal -- this should be a dismissal with
6 prejudice. If you are ruling that the exemption
7 applies or the definition for this information --
8 THE COURT: No, no, no. Well, I am ruling
9 that way. But I always -- I always give at least
10 one additional bite of the apple.
11 MR. ZOURAS: Okay. Fair enough.
12 THE COURT: 28 days?
13 MR. ZOURAS: Sure.
14 MS. JENKINS: Sure.
15 THE COURT: You will agree to --
16 MR. ZOURAS: Sure. We will be happy to
17 type -- or, sorry -- write up the order today,
18 your Honor.
19 THE COURT: All right. Okay. Pick a date
20 shortly thereafter.
21 MR. ZOURAS: To come back?
22 MS. JENKINS: Sure.
23 THE COURT: Yeah.
24 MS. SIEBERT: So it's a dismissal without

Page 23

1 reporting system that is the official court
2 reporter. By agreement, the parties can certainly
3 agree to a live court reporter, as we have here
4 today, but it's up to you.
5 MS. HINES: Yes, yes. We will do that, then.
6 MR. ZOURAS: In the future, we will
7 coordinate, your Honor.
8 MS. HINES: Yes.
9 MS. SIEBERT: We agree that this can be --
10 MR. ZOURAS: I mean, we -- we --
11 MS. SIEBERT: -- the transcript, then?
12 MS. JENKINS: We both had court reporters.
13 MS. HINES: Yes, for sure.
14 MS. SIEBERT: We agree that this can be the
15 transcript.
16 MS. JENKINS: Right, from our live reporter.
17 THE COURT: From our live reporter?
18 MS. HINES: Yes.
19 MS. SIEBERT: From our live reporter here.
20 THE COURT: Right. Okay.
21 MR. ZOURAS: We agree, Judge.
22 THE COURT: All right. Thanks.
23 MR. ZOURAS: Sure.
24 (Short pause.)

Page 25

1 prejudice?
2 MS. HINES: With leave to replead?
3 THE COURT: Yes.
4 MS. SIEBERT: Thank you.
5 Your Honor, we would just question
6 whether a repleading is possible if we have
7 determined that this information is not --
8 THE COURT: Well, I would agree. But if it is
9 possible, I'd like to leave the door open for that
10 to change our minds.
11 MS. SIEBERT: Understood.
12 THE COURT: All right.
13 MR. ZOURAS: Thank you, your Honor.
14 MS. JENKINS: Thanks, Judge.
15 MS. SIEBERT: Thank you.
16 MS. HINES: Thank you.
17 (WHEREUPON, a recess was had from
18 10:40 a.m. until 10:43 a.m.)
19 THE COURT REPORTER: Do you want this on the
20 record, Judge?
21 THE COURT: Well, I guess you know. I need to
22 ask a question that I should have asked at the
23 beginning.
24 Counsel, we have an electronic court

Page 24

1 THE COURT: Thank you.
2 MS. JENKINS: Thanks, Judge.
3 MS. SIEBERT: Thank you, Judge. Have a
4 wonderful holiday weekend.
5 THE COURT: You, too.
6 MR. ZOURAS: Thank you, Judge.
7 MS. SIEBERT: Thank you, Judge.
8 MS. HINES: Thank you, your Honor.
9 (Which were all the proceedings
10 had at the hearing of the
11 above-entitled cause on this date,
12 Thursday, August 29, 2019.)
13
14 (Time noted: 10:46 a.m.)
15
16
17
18
19
20
21
22
23
24

Page 26

```
 1    STATE OF ILLINOIS )

 2                      ) SS:

 3    COUNTY OF W I L L )

 4              I, ROSANNE M. NUZZO, a Certified

 5    Shorthand Reporter of the State of Illinois,

 6    CSR No. 84-1388, do hereby certify that I reported

 7    in shorthand the proceedings had at the hearing

 8    aforesaid, and that the foregoing is a true,

 9    complete, and correct transcript of the

10    proceedings of said hearing as appears from my

11    stenographic notes so taken and transcribed under

12    my personal direction.

13              IN WITNESS WHEREOF, I do hereunto set my

14    hand at Chicago, Illinois this 2nd day of

15    September, 2019.

16

17              /s/ Rosanne M. Nuzzo

18              ROSANNE M. NUZZO, CSR, RMR, CRR, CRC

19              C.S.R. Certificate No. 84-1388.

20

21

22

23

24
```

# EXHIBIT C

Page 1

FILED DATE: 11/17/2020 5:17 PM   2019CH14368

1  STATE OF ILLINOIS   )
                        ) SS:
2  COUNTY OF C O O K  )
3          IN THE CIRCUIT COURT OF COOK COUNTY
           COUNTY DEPARTMENT - CHANCERY DIVISION
4
5  LUCILLE MOSBY, individually     )
   and on behalf of all others     )
6  similarly situated,             )
                                   )
7              Plaintiffs,         )
                                   )
8      -vs-                        ) No. 18 CH 05031
                                   )
9  THE INGALLS MEMORIAL HOSPITAL   )
   UCM COMMUNITY HEALTH &          )
10 HOSPITAL DIVISION, INC., and    )
   BECTON DICKINSON and COMPANY,   )
11                                 )
               Defendants.         )
12
13
14         REPORT OF PROCEEDINGS before the HONORABLE
15 PAMELA McLEAN MEYERSON, Judge of the Circuit Court of
16 Cook County, Illinois, commencing at 2 p.m. on the
17 13th day of January, 2020, upon the hearing of the
18 above entitled case.
19
20
21
22
23
24

FILED DATE: 11/17/2020 5:17 PM   2019CH14368

Page 68

1    that impact HIPAA protected patients and I don't

2    think that that's warranted.  So the motions to

3    dismiss that were based on this argument are denied.

4            As for the standing argument, you've made

5    your arguments for the record.  I'm going to deny

6    them for the reasons that were set forth in my

7    decisions in Roach vs. Wal-Mart which was 19 CH 1107

8    and Hughes vs. Mayfield, 18 CH 13122.  Moving on to

9    the Workers' Compensation preemption argument, I'm

10   going to deny that for the reasons set forth in the

11   Hughes case.

12           The next argument, that the prayer for

13   liquidated damages should be stricken for failure to

14   adequately plead negligence, I think there's a reason

15   that the cases that defendant was able to find that

16   found a failure to adequately plead damages were all

17   cases dealing with the higher measure of damages,

18   that is to say, the $5,000 for violation for

19   intentional or reckless violation.  And that is, to

20   state the cause of action in BIPA, you just have to

21   plead a violation of the statute.  And if you pled

22   that violation and you stated a cause of action, the

23   next question is, well, was it negligent, in which

24   case you get a thousand per violation, or is it

Page 69

1    subject to a higher award of $5,000 in the case of

2    intentional or reckless.  It's either one or the

3    other.  And essentially either you meant to do it or

4    didn't mean to do it.  But nothing further is

5    required to state a cause of action for the

6    negligence.  If you've stated the cause of action for

7    violation of statute, you don't have to plead

8    additional amounts.  It's only if you want the

9    enhanced damages that you have to plead more.  So I'm

10   going to deny the motion to dismiss on those grounds.

11        Regarding the motions to dismiss Count III

12   for failure to adequately plead the disclosure and

13   dissemination, I want to address this together with

14   the argument that was made just by BD, which was that

15   the complaint doesn't state a claim against BD at

16   all.  As to BD, the argument is well taken.  The key

17   allegation of fact as to what it did is contained in

18   paragraph 35, which says Ingalls and Ingalls Health

19   System use and have used software supplied by BD that

20   requires employees to use their fingerprints as a

21   means of authentication.  And then it does go on to

22   allege in paragraph 36 upon information and belief,

23   Ingalls and Ingalls Health System failed and continue

24   to fail to inform employees that they disclose or

1  disclosed their fingerprints to at least one out of

2  state third party vendor, BD, and likely others,

3  failed to inform employees that they disclose their

4  fingerprints to other currently unknown third parties

5  that post the biometric data in their data centers,

6  failed to inform employees of the purposes and

7  duration for which they collect their sensitive

8  biometric data and failed to obtain written releases

9  from employees before collecting their fingerprints.

10      So the allegations in paragraph 36 don't

11  actually state that those things happened, only that

12  there is a failure to inform the employees that those

13  things happened.  And I think that's an important

14  distinction.  If you're going to rely upon the theory

15  that in fact there was a violation, you need to say

16  it in a straightforward way rather than just saying

17  that there was a failure to inform that this

18  happened.

19      So I am going to grant defendant BD's 2-615

20  motion to dismiss and it will be without prejudice.

21  We need more allegations about specifically what was

22  BD's role.  In saying that Ingalls and Ingalls Health

23  System have used software supplied by BD, that does

24  not indicate any ongoing relationship.  It doesn't

FILED DATE: 11/17/2020 5:17 PM  2019CH14368

1    indicate in fact that after it was sold, then that

2    was the end of it and they had nothing more to do

3    with it.  It doesn't indicate anything about what

4    happened after that and whether there's an ongoing

5    relationship and whether in fact they did host the

6    data and whether in fact they now possess it or

7    obtain it or if it's just possessed or obtained and

8    kept by Ingalls on some software that they got from

9    BD.  So I am going to grant the 2-615 portion of BD's

10   motion to dismiss without prejudice.

11        I'm also going to grant Ingalls' motion to

12   dismiss Count III without prejudice.  I do need more

13   facts as opposed to conclusions about how each

14   defendant disclosed, re-disclosed or otherwise

15   disseminated the information.  What we have is too

16   conclusory.

17        So 28 days to re-plead, okay?  That puts you

18   on February 10th.  And then the defendants will have

19   28 thereafter to answer or otherwise plead and that

20   puts you on March 9th.  And let's have you come back

21   for a status sometime in the next week.  The week of

22   the 16th is wide open, so the parties can take a look

23   at your schedules and see what works out for you, any

24   day of the week of March 16th.  If the defendants

FILED DATE: 11/17/2020 5:17 PM   2019CH14368

1  choose to file another motion, you can notice it up

2  for presentment at that time, okay?  Question?

3      MR. STRUBBE:  Your Honor, I have a question with

4  respect to the liquidated damages.

5      THE COURT:  Yes.

6      MR. STRUBBE:  You were pretty clear that with

7  respect to negligence, the motion to strike was

8  denied.

9      THE COURT:  Mm hmm.

10      MR. STRUBBE:  I'm a little unclear as to the

11  higher pleading standard.

12      THE COURT:  Well, I don't think, you didn't pray

13  for $5,000, did you?  Or did you?

14      MR. FICZKO:  It is in our prayer for relief, your

15  Honor.

16      THE COURT:  Okay.  Well, then I'm going to strike

17  that portion.  And if you want to plead that you're

18  entitled to it, you need more facts to support it,

19  okay?

20      MR. ZOURAS:  In terms for today's order, your

21  Honor, can we say for the reasons set forth?

22      THE COURT:  Yes, please.  And then I would like

23  you folks to file a copy of the transcript just

24  sometime before the next status, okay?  Good, thank

Page 73

1  you.

2      MR. FICZKO:  Thank you, your Honor.

3      MR. STRUBBE:  Thank you, your Honor.

4          (Which were all the proceedings had or

5      offered at hearing of said cause.)

Transcript of Proceedings - 3/29/2021
Xiomara Navarrete, et al. vs. Josam Acquisitions, d/b/a Good 2 Go Food
Case: 1:20-cv-04241 Document #: 80 Filed: 07/08/22 Page: 70 of 77 PageID #:984

```
 1   STATE OF ILLINOIS   )
                         )  SS:
 2   COUNTY OF C O O K   )


 3        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
              COUNTY DEPARTMENT - CHANCERY DIVISION
 4


 5   XIOMARA NAVARETTE, on        )
     behalf of herself and other  )
 6   similarly situated           )
     employees, known and         )
 7   unknown,                     )
                                  )
 8                   Plaintiff,   )
                                  )
 9      vs.                       )  No. 2019 CH 14368
                                  )
10   JOSAM ACQUISITIONS,  d/b/a   )
     Good 2 Go Food,              )
11                                )
                     Defendant.   )
12                                )


13          REPORT OF PROCEEDINGS had via Zoom at the

14   hearing of the above-entitled cause, before the Honorable

15   MICHAEL T. MULLEN, Judge of said court, on Monday, the

16   29th day of March, 2021, at the hour of approximately

17   11:00 o'clock a.m.

18       PRESENT VIA ZOOM:

19          RAISE THE FLOOR ALLIANCE,
            BY:  MS. MIRANDA HUBER,
20          BY:  MS. ADA SANDOVAL, and
            NATIONAL LEGAL ADVOCACY NETWORK,
21          BY: MR. CHRIS WILLIAMS,
                On behalf of the Plaintiff;
22
            SHOOK, HARDY, & BACON, LLP.,
23          BY:  MS. KATHARINE R. PAINE,
                On behalf of the Defendant.
24
     Laurel E. Laudien, RMR, RPR, CSR #084-001871
```

Transcript of Proceedings - 3/29/2021
Case: 1:20-cv-04241 Document #: 80 Filed: 07/08/22 Page 71 of 77 PageID #:985
Xiomara Navarrete, et al. vs. Josam Acquisitions, d/b/a Good 2 Go Food

 1          THE COURT:  So this is Navarrete versus Josam

 2   Acquisitions.

 3               If everyone would identify themselves as well

 4   as who they represent starting with Plaintiff's Counsel,

 5   and, Counsel, just you so know, you are on mute.

 6          MS. HUBER:  Good morning, your Honor.

 7               Miranda Huber on behalf of the Plaintiff.

 8               I'm joined today by Ada Sandoval, a new

 9   attorney in our office, and my Co-Counsel, Chris

10   Williams, from the National Legal Advocacy Network has

11   also joined this morning.

12          THE COURT:  Very good.

13               Good morning.

14          MS. HUBER:  Good morning.

15          MS. PAINE:  Morning, your Honor.

16               This is Kate Paine from Shook, Hardy, and Bacon

17   on behalf of the Defendant, Josam Acquisitions, who I'll

18   probably mostly be referring to today as Good 2 Go or

19   Good 2 Go Food.

20               And it's just me today, your Honor.

21          THE COURT:  Okay.  Well, that's enough, right?

22               Good morning to you.

23          MS. PAINE:  Good morning.

24          THE COURT:  So the motion that I have in front of me

Transcript of Proceedings - 3/29/2021
Case: 1:20-cv-04241 Document #: 80 Filed: 07/08/22 Page 72 of 77 PageID #:986
Xiomara Navarrete, et al. vs. Josam Acquisitions, d/b/a Good 2 Go Food

```
 1    is fully briefed, and it's brought pursuant to Section

 2    619.1.  It's directed at the Complaint, and it

 3    incorporates -- it's actually a first amended complaint.

 4    It incorporates two parts.  One is a 615 motion directed

 5    at the legal sufficiency of the Complaint itself, as well

 6    as a 619 motion.

 7              I have reviewed the submissions, and I do want

 8    argument, but I'm going to structure this so that the

 9    parties can focus their arguments on issues that I think

10    the parties should highlight.

11              So I'm just going through some rulings right

12    now, and there is a 615 motion directed at Count 1, and

13    in the initial motion, which I do not need argument on,

14    the motion seeks to strike the enhanced damages, if you

15    will, being sought in terms of $5,000 per violation which

16    is for intentional or reckless conduct as opposed to

17    $1,000 in damages for essentially what would be referred

18    to as negligent conduct, and this is a tort that goes

19    into a separate issue; but in terms of the way I view it,

20    the factual allegations are insufficient to allow the

21    Plaintiff to proceed with a request for enhanced damages.

22    The motion to strike is granted as to that.

23              I do want argument as to the state contractor

24    exclusion, but not until I am done with my further
```



# Angela Webster
## vs.
# Windsor Estates Nursing and Rehab

## No. 2019 CH 11441

---

## Report of Proceedings

## 11/16/2020

---

**TRANSCRIPT AND WORD INDEX**

**CASALE REPORTING SERVICE, INC.**
161 North Clark Street
Suite 1600
Chicago, Illinois  60601

tel:312.332.7900
fax: 312.332.6555

e-mail: crs@casalereporting.com
www.casalereporting.com

Case: 1:20-cv-04241 Document #: 80 Filed: 07/08/22 Page 74 of 77 PageID #:988

1      at this point of the litigation that

2      indicates that she clearly intended to waive

3      any expectation of privacy by the submission

4      of those fingerprints as set forth within the

5      complaint.

6             The motion pursuant to Section 619

7      as to that argument also, that theory, is

8      denied.

9             As we discussed, the McDonald

10     decision was decided somewhat recently, and

11     it is controlling.  Even if I disagreed with

12     it, I would be obligated to follow it.  I

13     agree with it, and I am going to follow it.

14     So the motion pursuant to Section 619

15     relative to the exclusivity of the Workers'

16     Compensation Act is also denied.

17            There's a further argument relative

18     to 615.  I agree with this argument.  The

19     Code of Civil Procedure and specifically

20     Section 603, clearly obligates the plaintiff

21     to assert in a factual manner all -- assert

22     in a factual manner any allegation that is

23     made against the defendant.  No conclusory

24     allegations are acceptable.  It's right in

1       the code.  It's a fact-pleading state.

2               One cannot jump to the conclusion

3       that the defendant in this case, based upon

4       the conduct that is set forth in the

5       complaint, intentionally or recklessly

6       violated Ms. Webster's protected rights.

7       There is a subset of this argument, and that

8       argument is that plaintiff did not even

9       assert in a factual manner any negligent

10      violations of the identified statute.

11              In terms of any scienter

12      requirements, I don't think we need to

13      address that at this point.  Is mens rea now

14      a part of every of BIPA complaint?  I don't

15      think we need to address that.  But what we

16      do need to address is whether or not the

17      conduct that is identified in the complaint

18      establishes in a factual way that the

19      defendant violated the BIPA protections that

20      Ms. Webster had.  And I do not believe it is

21      anywhere close.  Any references to remedies

22      beyond the $1,000 statutory violations based

23      upon any intentional and/or reckless conduct

24      are stricken.  That motion is granted in

1    part, and it's also denied in part, as the

2    motion went further than seeking the striking

3    and/or dismiss of intentional and/or reckless

4    references to the defendant's conduct as

5    being characterized as intentional or

6    reckless.  It went and asserted that the

7    conduct did not rise to the level of

8    negligence.

9         The key here is that there are

10    factual allegations that would allow one to

11    conclude, such as myself, that there was a

12    properly pled complaint that identified

13    specific statutory protections that were

14    violated by the defendant.  Do we have to

15    characterize that as intentional conduct or

16    negligent conduct?  I don't know that you do

17    have to characterize it as negligent, and

18    that motion is denied.

19         So it is abundantly clear, though,

20    if there is going to be a request for

21    enhanced damages beyond the identified

22    statutory minimum, then you're going to have

23    to support that in a factual way.  That

24    motion has been granted in part, denied in

Case: 1:20-cv-04241 Document #: 80 Filed: 07/08/22 Page 77 of 77 PageID #:991

1    part.

2              So where does that take us?  We need

3    an answer to the remaining portion of the

4    complaint.

5              Mr. Wolfe, how much time?

6         MR. WOLFE:  Your Honor, could I have

7    28 days?

8         THE COURT:  Absolutely.  28 days is

9    December 14th.

10             I didn't finish my thought, which

11   one might consider -- could characterize as a

12   rant, but in terms of the striking of the

13   intentional and/or reckless conduct, Counsel,

14   it is without prejudice, but you're going to

15   need my permission, of course, to amend the

16   complaint, if that's what you intend to do at

17   a future date and time.

18             28 days to file an answer.  That's

19   December 14th.

20             Has anyone talked about a discovery

21   schedule?

22        MR. ZOURAS:  We have not, your Honor.

23        THE COURT:  So here's what I want to

24   do.