# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| BRIAN R. VAUGHAN, JASON DARNELL, FEBBIE MINNIEFIELD, and ADRIEL VEGA, individually and on behalf of all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 20-cv-4241 |
| | ) ) | Judge Marvin E. Aspen |
| BIOMAT USA, INC., TALECRIS PLASMA RESOURCES, INC., and INTERSTATE BLOOD BANK, INC., | ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

Plaintiffs Brian R. Vaughan, Jason Darnell, Febbie Minniefield, and Adriel Vega claim that Defendants Biomat USA, Inc. ("Biomat"), Talecris Plasma Resources, Inc. ("Talecris"), and Interstate Blood Bank, Inc. ("Interstate") violated the Illinois Biometric Information Privacy Act ("BIPA"). (Second Amended Class Action Complaint ("Second Amended Complaint") (Dkt. No. 72) ¶¶ 16–18, 20, 22.)[1] Defendants have moved to dismiss the Second Amended Complaint. (Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Motion") (Dkt. No. 79).) For the reasons set forth below, we deny the Motion.

---

[1] For ECF filings, we cite to the page number(s) set forth in the document's ECF header unless citing to a particular paragraph or other page designation is more appropriate.

## BACKGROUND

We take the following facts from the Second Amended Complaint and accept them as true for this Motion. *O'Brien v. Vill. of Lincolnshire*, 955 F.3d 616, 621 (7th Cir. 2020); *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013).

Defendants, which are all subsidiaries of a Spanish pharmaceutical and chemical manufacturer, operate plasma donation centers in Illinois. (Second Amended Complaint ¶¶ 3–10.) Each Plaintiff sold plasma at one of the Defendants' Illinois locations—Minniefield at Biomat in 2020, Vaughan at Biomat in 2017 through 2019, Vega at Talecris in 2019 through 2021, and Darnell at Interstate in 2016 through 2018. (*Id.* ¶¶ 5–8.)

Each time Plaintiffs sold plasma, Defendants required them to scan their fingerprint at a kiosk for identification and tracking. (*Id.* ¶¶ 5–8, 15, 20, 29–32.) Defendants used this information to generate a biometric template, which Defendants then stored in a database to track Plaintiffs' plasma donations. (*Id.* ¶¶ 33–36.) Defendants never notified Plaintiffs of the "specific limited purposes or length of time for which Defendants collected, stored, or used their biometrics." (*Id.* ¶ 37.) Nor did Defendants develop, publicly disclose, or comply with a retention schedule or guidelines for deleting Plaintiffs' biometric data.[2] (*Id.* ¶¶ 26–27, 38, 53–54.) Defendants also never obtained written releases from Plaintiffs before capturing their fingerprints. (*Id.* ¶ 39.) Finally, Defendants did not destroy Plaintiffs' "biometric data when the initial purpose for collecting or obtaining such data ha[d] been satisfied or within three years of their last interactions with the company." (*Id.* ¶ 27.) As a result of Defendants' conduct,

---

[2] BIPA distinguishes between "biometric information" and "biometric identifiers," but those distinctions are irrelevant for our purposes. 740 Ill. Comp. Stat. 14/10. Unless otherwise warranted, we refer to both categories together as "biometric data."

Plaintiffs have been exposed to "serious and irreversible privacy risks" and have been deprived of certain information to which they are entitled. (*Id*. ¶¶ 16, 40, 86, 97, 108.)

Vaughan initiated this putative class action against Biomat and Talecris in June 2020. (Class Action Complaint (Dkt. No. 1-1).) Biomat and Talecris removed the action under the Class Action Fairness Act. (Notice of Removal (Dkt. No. 1).) On Biomat and Talecris's motion, (Dkt. No. 14), we stayed this case pending resolution of *Tims v. Black Horse Carriers, Inc.*, an Illinois Appellate Court case determining whether a one- or five-year statute of limitations applied to certain BIPA claims. (Dkt. No. 26.) In April 2021, while the case was stayed, Vaughan and Darnell filed a First Amended Complaint, adding a putative class claim by Darnell against Interstate. (Amended Class Action Complaint (Dkt. No. 33).) The Illinois Appellate Court ruled in September 2021 that the five-year limitations period applies, which is currently under appeal in the Illinois Supreme Court. *Tims v. Black Horse Carriers, Inc.*, 2021 IL App (1st) 200563, 184 N.E.3d 466 (2021), *appeal allowed*, 184 N.E.3d 1029 (Ill. 2022). We then lifted the stay (Dkt. No. 48) and, on Defendants' motion, dismissed the First Amended Complaint without prejudice for improper group pleading. (Dkt. No. 70.)

In the Second Amended Complaint, Minniefield and Vega have joined as plaintiffs against Biomat and Talecris, respectively, and Plaintiffs allege that each Defendant violated Sections 15(a) and (b) of BIPA. (Second Amended Complaint ¶¶ 83–87, 94–98, 105–109.) Plaintiffs bring these putative class actions on behalf of themselves and "[a]ll persons who were enrolled in the biometric system used by [the respective Defendants] in Illinois from five years preceding the filing of this action to the date a class notice is mailed in this action." (*Id*. ¶¶ 63–65.) They seek, among other things, liquidated damages of $1,000 per negligent violation and $5,000 per reckless or intentional violation. (*Id*. ¶¶ 87, 98, 109.)

Plaintiffs assert, Defendants do not dispute, and we agree that we have subject matter jurisdiction over this matter under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because "Plaintiffs and Defendants are citizens of different states," "over $5,000,000 is in controversy," and each class against each Defendant includes more than 100 members. (*Id*. ¶¶ 13, 67); *see* 28 U.S.C. § 1332(d)(2), 1332(d)(5)(B). We have reviewed the complaint for standing *sua sponte* and are satisfied that Plaintiffs allege an injury-in-fact for Defendants' alleged failure to comply with a retention schedule under BIPA Section 15(a). *Fox v. Dakkota Integrated Sys., LLC*, 980 F.3d 1146 (7th Cir. 2020) (holding that plaintiffs whose biometric data is captured have standing to challenge failure to comply with data-retention schedule and guidelines); (Second Amended Complaint ¶ 27 (alleging injury from failure to destroy Plaintiffs' biometric data).)

## STANDARD OF LAW

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint, not its merits. *McReynolds v. Merrill Lynch & Co*., 694 F.3d 873, 878 (7th Cir. 2012); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). When considering such motions, courts "construe the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in her favor." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). We may grant a motion to dismiss under Rule 12(b)(6) only if a complaint lacks sufficient facts "to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. A facially plausible complaint need not give "detailed factual allegations," but it must allege facts sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. These requirements ensure that a defendant receives "fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555.

## ANALYSIS

### I.    Introduction

"In response to growing public concern about the increased commercial use of biometric data, the Illinois General Assembly enacted BIPA in 2008 'to help regulate the collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information.'" *Sosa v. Onfido, Inc.*, No. 20 C 4247, 2022 WL 1211506, at *3 (N.D. Ill. Apr. 25, 2022) (quoting *Cothron v. White Castle Sys., Inc.*, 20 F.4th 1156, 1159 (7th Cir. 2021); *Rosenbach v. Six Flags Ent. Corp.*, 2019 IL 123186, ¶ 19, 129 N.E.3d 1197, 1203)). "To that end, [S]ection 15 of BIPA 'imposes on private entities . . . various obligations regarding the collection, retention, disclosure, and destruction of biometric identifiers and biometric information." *Id.* (quoting *Rosenbach*, 2019 IL 123186, ¶ 20, 129 N.E.3d at 1203). Section 20 creates a private right of action for violations of BIPA. 740 Ill. Comp. Stat. 14/20.

Section 15(a) governs *retention* and *destruction* of biometric data. It provides:

> A private entity in possession of biometric identifiers or biometric information must develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first. Absent a valid warrant or subpoena issued by a court of competent jurisdiction, a private entity in possession of biometric identifiers or biometric information must comply with its established retention schedule and destruction guidelines.

740 Ill. Comp. Stat. 14/15(a). By virtue of its requirements that an entity both "develop" and "comply with" a written retention and destruction policy, Section 15(a) effectively requires

5

entities to destroy biometric data within a maximum of 3 years of obtaining them with limited exceptions. *Id.* Section 15(e), which is not at issue in this case, further clarifies the standard of care private entities must take when storing biometric data. 740 Ill. Comp. Stat. 14/15(e).

Section 15(b) governs *collection* of biometric data. Broadly speaking, it requires private entities to obtain informed consent before obtaining people's biometric data. 740 Ill. Comp. Stat. 15(b). It provides:

> (b) No private entity may collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier or biometric information, unless it first:
>
> > (1) informs the subject or the subject's legally authorized representative in writing that a biometric identifier or biometric information is being collected or stored;
> >
> > (2) informs the subject or the subject's legally authorized representative in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and
> >
> > (3) receives a written release executed by the subject of the biometric identifier or biometric information or the subject's legally authorized representative.

740 Ill. Comp. Stat. Ann. 14/15(b)(1)–(3).

Section 15(c) and (d) govern the *dissemination* of biometric data. Section 15(c) bans disclosing biometric data for profit. 740 Ill. Comp. Stat. 15(c). And Section 15(d) prohibits other disclosures of biometric data subject to certain exceptions. 740 Ill. Comp. Stat. 15(d).

Plaintiffs challenge Defendants' alleged improper collection of biometric data without informed consent under Section 15(b) and failure to destroy that data under Section 15(a). (Second Amended Complaint ¶¶ 83–84, 94–95, 105–06.) Plaintiffs nowhere claim that Defendants carelessly stored, sold, or otherwise disclosed their biometric data and thus raise no claims under Sections 15(c), (d), or (e). (*See generally* Second Amended Complaint.)

Defendants' Motion challenges the sufficiency of the Second Amended Complaint on five grounds. First, they argue that federal regulations related to plasma preempt BIPA Sections 15(a) and (b). (Defendants' Memorandum of Law in Support of Their Motion to Dismiss Plaintiffs' Second Amended Complaint ("Memo") (Dkt. No. 80) at 10–14). Second, Biomat and Talecris argue that Vaughan, Minniefield, and Vega in fact gave informed consent for collection of biometric data and therefore cannot state claims under Section 15(b). (*Id.* at 15–16.) Third, Defendants argue that BIPA does not apply to their collection of Plaintiffs' fingerprints under three statutory exemptions. (*Id.* at 16–23.) Fourth, Biomat and Interstate claim that Vaughan and Darnell's claims are untimely under either a one- or two-year statute of limitations. (*Id.* at 23–28.) Fifth, Defendants argue that Plaintiffs have not stated claims for reckless violations of BIPA. (*Id.* at 28–29.)

## II.     Federal Regulations Do Not Preempt BIPA.

Defendants contend that federal law preempts Plaintiffs' BIPA claims. (*Id.* at 10–14.) At the outset, we must mention that this argument is procedurally improper. "Preemption . . . is an affirmative defense upon which the defendants bear the burden of proof. Affirmative defenses do not justify dismissal under Rule 12(b)(6)." *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 645 (7th Cir. 2019). "A party seeking to dismiss a claim at the outset of a case based on an affirmative defense should first raise the defense in its answer and then move for judgment on the pleadings under Rule 12(c)." *Williams v. City of Chicago*, No. 22 C 1084, 2022 WL 3716214, at *6 (N.D. Ill. Aug. 29, 2022). This is not a mere formality—raising the issue under Rule 12(b)(6) instead of Rule 12(c) requires us to decide the issue without important facts. For instance, Defendants argue that federal regulations governing plasmapheresis (the process of extracting blood, separating out plasma, and returning red blood cells to the donor during a single visit, *see* 21 C.F.R. § 640.65) preempt BIPA Section 15(a). (Memo at 13 (citing 21 C.F.R.

§ 640.65(b)(3).)  But Plaintiffs do not allege that Defendants use plasmapheresis, as opposed to some other method, to extract their donors' plasma.  (*See generally* Second Amended Complaint); *cf.* 21 C.F.R. § 640.30(b) (identifying two ways to obtain plasma: "separating plasma from blood collected from blood donors or by plasmapheresis").  But because Plaintiffs do not raise this procedural issue in their response (Plaintiffs' Response to Defendants' Motion to Dismiss the Second Amended Complaint ("Resp") (Dkt. No. 81). at 7–13), we consider it now.

Even if we assume that the federal regulations Defendants cite in their briefing apply, those regulations would not preempt BIPA Section 15(a) or (b).  "Article VI of the Constitution provides that the laws of the United States 'shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'"  *Fifth Third Bank ex rel. Tr. Officer v. CSX Corp.*, 415 F.3d 741, 745 (7th Cir. 2005).  "Preemption doctrine stems from the Supremacy Clause. . . . In cases where federal and state law conflict, 'federal law prevails and state law is preempted.'"  *McHenry Cnty. v. Raoul*, 44 F.4th 581, 587 (7th Cir. 2022) (quoting *Murphy v. NCAA*, --- U.S. ---, 138 S. Ct. 1461, 1467 (2018)).  "The Supreme Court has recognized three different types of preemption—conflict, express, and field."  *Id.* (quoting *Murphy*, 138 S. Ct. at 1480) (quotation marks omitted).  Defendants do not allege express or field preemption, instead relying on conflict preemption. (Memo at 10–14.)  Conflict preemption includes "cases where compliance with both federal and state regulations is a physical impossibility and those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Id.* (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)).

Defendants first argue that there is an actual conflict between duly enacted Food and Drug Administration ("FDA") regulations and BIPA. (Memo at 10–12.) One way to establish conflict preemption is to show that "state law conflicts with federal law to the extent that compliance with both federal and state regulations is a physical impossibility." *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 984 (7th Cir. 2012) (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quotation marks omitted)). The potentially applicable federal regulations require entities engaged in plasmapheresis to establish a "donor identification system" that "positively identifies each donor and relates such donor directly to his blood and its components as well as to his accumulated records and laboratory data." 21 C.F.R. § 640.65(b)(3); *see also* 21 C.F.R. § 630.10(g)(1) (anyone collecting "blood components" must "obtain proof of identity of the donor"). And those collecting "blood components" must maintain "individual product records," including "donor records," for at least "10 years after the records of processing are completed." 21 C.F.R. § 606.160(b)(1). Defendants assert that the combination of these requirements forces them to collect biometric data and retain it for ten years, whereas BIPA Section 15(a) requires them to destroy biometric data within three years. (Memo at 11–12 (citing 21 C.F.R. § 606.160).) Because it is impossible to maintain a record for at least ten years and destroy it within three, Defendants posit, there is a direct conflict that must be resolved in favor of federal law.[3] (*Id.*) Plaintiffs respond that the regulations do not

---

[3] Defendants also observe that European regulations require some records to be maintained for 30 years, but they do not explain why these regulations are relevant or how we ought to resolve a purported conflict between state and foreign law. (*See, e.g.,* Memo at 12 n.6; Reply at 8 n.2.) We disregard this undeveloped argument. *See Maheffy v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived.")

require Defendants to collect biometric data and that the donors' fingerprints are not part of the "donor record." (*See* Resp. at 7–13.)

We agree with Plaintiffs on the former point without deciding the latter. Federal law allows, but does not require, the use of biometric data to verify plasma donors' identities. "Blood component" centers must "obtain proof of identity of the donor," 21 C.F.R. § 630.10(g)(1), and plasmapheresis centers in particular must adopt a "donor identification system" that "include[s] either a photograph of each donor which shall be used on each visit to confirm the donor's identity, or some other method that provides equal or greater assurance of positively identifying the donor." 21 C.F.R. § 640.65. Thus, Defendants can comply with both federal and Illinois law by obtaining proof of identity and establishing a donor identification system using photographic identification, a valid driver's license, or any other non-biometric means. *See* 740 Ill. Comp. Stat. 14/10 ("Biometric identifiers do not include . . . photographs . . . ."). This does not, as Defendants argue, require them to "cease acting altogether in order to avoid liability." (Defendants' Reply in Support of Their Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint ("Reply") (Dkt. No. 84) at 8–9.) Unlike cases where the only way to resolve the conflict between state and federal regulation is to exit the market altogether, *see, e.g.*, *Mutual Pharmaceutical Co., Inc. v. Bartlett*, 570 U.S. 472, 488–90 (2013) (rejecting argument that party could comply with state law requiring alteration of drug label and federal law prohibiting alteration of drug label by not selling the drug), Defendants could easily continue their operations in Illinois by taking donors' photo IDs instead of their fingerprints. *See Crumpton v. Octapharma Plasma, Inc.*, 513 F. Supp. 3d 1006, 1013–14 (N.D. Ill. 2021) ("Octapharma may satisfy both federal law and BIPA by using an alternative method of proving donor identity. Conflict preemption, then, does not apply."); *Marsh v. CSL Plasma Inc.*, 503 F.

10

Supp. 3d 677, 685 (N.D. Ill. 2020) ("Nothing in federal law or regulation prevents CSL from obeying BIPA while complying with federal law.").

Second, Defendants argue that BIPA conflicts with the purpose of FDA regulations. (Memo at 13–14.) This kind of conflict preemption applies when "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Planned Parenthood of Ind.*, 699 F.3d at 984. "A court should not find [this kind of] conflict preemption 'unless that was the clear and manifest purpose of Congress.'" *C.Y. Wholesale, Inc. v. Holcomb*, 965 F.3d 541, 546 (7th Cir. 2020) (quoting *Arizona*, 567 U.S. at 400). The challenger must show that applying the state law would do 'major damage' to clear and substantial federal interests." *Id.* (quoting *Patriotic Veterans, Inc. v. Ind.*, 736 F.3d 1041, 1049 (7th Cir. 2013)). Defendants claim that the purpose of FDA regulations requiring donor identification systems is to ensure that prospective donors are eligible and that fingerprint scans best serve this purpose. (Memo at 13.) But they cite no authority that fingerprint scans are superior to the other forms of identification that regulators accept. (*Id.*) Indeed, federal regulations set "a photograph"—not a fingerprint or other biometric data—as the benchmark identification method and permits "some other method that provides equal or greater assurance of positively identifying the donor." 21 C.F.R. § 640.65. The FDA also has not "specifically endorse[d] 'biometric means,'" as Defendants argue in reply. (Reply at 7 (citing 80 Fed. Reg. 29842-01, 29869 (May 22, 2015).) To the contrary, in the very same sentence that Defendants cite, the FDA expressly refused to endorse any "means of establishing proof" and stated, instead, that it "believe[s] that photographic identification, a valid driver's license, valid biometric means, or other means can be useful in establishing the donor's identity." 80 Fed. Reg. 29842-01, 29869 (May 22, 2015). Accordingly, Defendants have not met their burden to show that

applying BIPA would do "'major damage' to clear and substantial federal interests." *C.Y. Wholesale*, 965 F.3d at 546 (quoting *Patriotic Veterans*, 736 F.3d at 1049). Because Defendants have not met their burden to show impossibility or frustration of Congressional objectives, Plaintiffs' claims are not preempted.

## III.   Vaughan, Minniefield, and Vega State Claims Under Section 15(b).

Biomat and Talecris next assert that Vaughan, Minniefield, and Vega fail to state claims under Section 15(b) of BIPA because they signed written waivers before Biomat and Talecris collected their biometric data. (Memo at 15–19.) Defendants attach these purported waivers ("Consent Agreements") as Exhibit A to their Memorandum. (Consent Agreements (Dkt. 80 at 31–51).)[4] Biomat and Talecris argue that because of the Consent Agreements, Vaughan, Minniefield, and Vega "knew they were providing potential biometric identifiers or information during the pre-donation screening process, understood the reason for it, and consented." (Memo at 16.)

The Consent Agreements do not defeat these plaintiffs' Section 15(b) claims against Biomat and Talecris because they do not provide the information required under Section 15(b). In addition to requiring written releases, BIPA Section 15(b) required Defendants to inform Plaintiffs in writing (1) "that a biometric identifier or biometric information is being collected or stored"; and (2) "the purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used". 740 Ill. Comp. Stat. 14/15(b)(1)–(2).

---

[4] On a Rule 12(b)(6) motion to dismiss, courts may consider well-pled factual allegations in the complaint, "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Phillips*, 714 F.3d at 1019–20 (quoting *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012)). Because the Consent Agreements are not dispositive, we will assume without deciding that we may consider them.

The Consent Agreements do not contain the full information required under Section 15(b). Paragraph 16 of each Consent Agreement reads as follows:

> I understand and agree that I will provide my fingerprint as biometric authentication of my identity as part of the automated screening process (one time at the beginning of the screening process and one time at the completion of the screening process). I further understand and agree that by and through the provision of my fingerprint following the completion of the health, medical, and lifestyle history questions and acknowledgement and verification statements contained in the automated screening process, I have acknowledged, verified, and agreed to, and will acknowledge, verify, and agree to, all of the information, answers, statements and representations provided and made in response to such questions and statements and have represented, and will represent, that all such information, answers, statements, and representations are true, accurate, and complete.

(Consent Agreements at 37 ¶ 16, 44 ¶ 16, 50 ¶ 16.) Nowhere in the Consent Agreements are the required disclosures that biometric data is being stored or the length of term for which the data is being collected, stored, and used. (Consent Agreements at 37 ¶ 16, 44 ¶ 16, 50 ¶ 16.) Accordingly, these Consent Agreements do not foreclose Vaughan, Minniefield, or Vega's Section 15(b) claims.

## IV.    The Biometric Data at Issue Is Not Exempt from BIPA.

Defendants next argue in the alternative to their preemption claim (which requires BIPA to apply to them) that BIPA does not apply to them. (Memo at 16–23.) Although a "fingerprint" constitutes a "biometric identifier" under BIPA, "[b]iometric identifiers do not include," as relevant here, (1) "information captured from a patient in a health care setting," (2) "information collected, used, or stored for health care treatment, payment, or operations under the federal Health Insurance Portability and Accountability Act of 1996," and (3) "an X-ray, roentgen process, computed tomography, MRI, PET scan, mammography, or other image or film of the human anatomy used to diagnose, prognose, or treat an illness or other medical condition or to

further or validate scientific testing or screening." 740 Ill. Comp. Stat. 14/10.  At this stage of the litigation, we do not find that any of these exemptions applies.

> ### A.     Plaintiffs' Fingerprints Were Not "Information Captured from a Patient in a Health Care Setting."

Under BIPA, the term "biometric identifiers" does not include "information captured from a patient in a health care setting."  *See* 740 Ill. Comp. Stat. 14/10.  Because BIPA does not define the terms "patient" or "health care setting," we must look outside the statute to understand these terms' meanings.  *See Marsh*, 503 F. Supp. 3d at 683 (observing that BIPA does not define these terms and looking to the Merriam-Webster dictionary for guidance).  Defendants insist without authority or explanation that "patients in a health care setting" means "individuals undergoing medical procedures."  (Memo at 16.)  By contrast, Plaintiffs cite a dictionary definition of the term "patient" as "an individual awaiting or under medical care and treatment" (*see* Resp. at 17 (quoting Merriam-Webster, *Patient Definition & Meaning*, https://www.merriam-webster.com/dictionary/patient (last accessed Sept. 9, 2022)), and "health care" as "efforts made to maintain or restore physical, mental, or emotional well-being especially by trained and licensed professionals. . . ."  (*Id.*); *see* Merriam-Webster, *Health Care Definition & Meaning*, https://www.merriam-webster.com/dictionary/health%20care (last accessed Sept. 9, 2022)).  Because Plaintiffs' interpretation is supported by authority and consistent with case law, *see Marsh*, 503 F. Supp. 3d at 683; *Svoboda v. Frames for America, Inc.*, No. 21 C 5509, 2022 WL 4109719, at *2 (N.D. Ill. Sept. 8, 2022) (adopting same dictionary definitions), we adopt Plaintiffs' definitions for the purpose of this analysis.[5]

---

[5] *Svoboda* was published after briefing on this motion closed.  Defendants moved to submit the opinion as supplemental authority (Dkt. No. 87), which we allow.

14

Nothing that we can infer from the Second Amended Complaint makes plasma sellers "patients" or plasma centers "health care settings" under the definitions we adopt above. Plasma donors are not "under medical care or treatment" by virtue of selling a component of their blood. Plaintiffs nowhere allege that they had conditions that required removing the plasma from their blood as a course of medical care or treatment. (*See generally* Second Amended Complaint.) Nor can we infer that plasma centers are "health care settings," because Plaintiffs do not allege that these centers "maintain or restore physical, mental, or emotional well-being" of their donors by removing plasma. (*Id.*)[6]

These features of plasma donation distinguish this case from *Vo v. VSP Retail Development Holding, Inc.*, No. 19 C 7187, 2020 WL 1445605 (N.D. Ill. Mar. 25, 2020) and *Svoboda*. In *Vo*, the defendant offered software that captured the plaintiff's facial geometry—a type of biometric data—to "replicat[e] 'the diagnostic services typically performed by an [eye care] professional,' such as measuring an individual's face to ensure the appropriate fit of corrective eyewear . . . .'" *Id.* at *2. The plaintiff used the service to ensure the appropriate fit of corrective eyewear but argued that she neither requested nor received other health care services, like an eye exam or a prescription for corrective lenses. *Id.* The court found that both ensuring appropriate fit and undergoing an initial evaluation for corrective eyewear were "health care services." *Id. Svoboda* reached the same result under "nearly identical" facts. 2022 WL 4109719, at *2. Unlike the plaintiff in *Vo*, who received a fitting evaluation for her own face and an initial evaluation for her own eyes, Plaintiffs here do not allege that they provided plasma to

---

[6] Although not essential to our analysis, we must remark that Biomat and Talecris adamantly deny being health care providers in the Consent Agreements, which they urge us to consider for other purposes in this motion. (*See, e.g.*, Unredacted Consent Agreement (Dkt. 81-1) at 4 ("I understand and agree that [Biomat] is not a health care provider, but rather a plasma collection facility . . . .).)

treat an ailment of theirs. Rather, Plaintiffs allege that they "sold plasma," which is not health care treatment. (Second Amended Complaint ¶¶ 29–32.)

Defendants reach outside the Second Amended Complaint to argue that they must perform ancillary medical services for Plaintiffs' own benefit, thereby qualifying Defendants as a "health care setting" and turning Plaintiffs into "patients." Defendants argue that federal regulations obligate them to (1) perform screening examinations to ensure that the donors' health permits them to donate and (2) provide emergency medical services if donors suffer some adverse reaction from the donation process. (Memo at 17–18 (citing 21 C.F.R. §§ 630.10, 630.15).) But Plaintiffs allege only that the fingerprints were used "as an identification and authentication method to track [Plaintiffs'] identity," not that Plaintiffs received medical screening examinations or emergency medical services. (Second Amended Complaint ¶ 34.) Defendants do not even assert in their memorandum that they performed such services for Plaintiffs. (Memo at 17–20.) Accordingly, at this stage, we cannot conclude that Plaintiffs were "patients" in a "health care setting" when Defendants captured their fingerprints for identification. *See Marsh*, 503 F. Supp. 3d at 683 (concluding that plasma donors were not patients in a health care setting under BIPA).

**B.     The Fingerprints Were Not "Collected, Used or Stored for Health Care Treatment, Payment, or Operations under" HIPAA.**

BIPA also provides that "[b]iometric identifiers do not include . . . information collected, used or stored for health care treatment, payment, or operations under the federal Health Insurance Portability and Accountability Act of 1996 ["HIPAA"]." 740 Ill. Comp. Stat. 14/10. Defendants contend that the fingerprint scans at issue fall within this exemption because "Defendants' mission, and the very purpose of plasma donation and collection . . . is to provide health treatment for individuals suffering from illnesses . . . ." (Memo at 20.) According to

16

Defendants, "[a]ny biometric identifiers" that they collected "were in furtherance" of those efforts. (*Id*. at 20–21.) In response, Plaintiffs observe that Defendants' argument goes beyond the four corners of the Second Amended Complaint and relies on information that we cannot consider at this stage. (Resp. at 20.) Additionally, they argue that Defendants do not provide health care treatment and are not covered entities under HIPAA. (*Id*. at 20–21.) In reply, Defendants concede that they are not covered entities under HIPAA and argue that so long as the biometric data is used "in connection with" health care, the exemption applies. (Reply at 16–17.)

First, nothing in the Second Amended Complaint suggests that Defendants took Plaintiffs' fingerprints in connection with anyone's "health care treatment." As explained above, Plaintiffs do not allege that Defendants provided "health care treatment" to Plaintiffs, only that Plaintiffs sold plasma to Defendants. (*E.g.*, Second Amended Complaint ¶ 2.) Defendants claim that "it is clear that the supposed biometric identifiers and/or information allegedly collected here . . . were collected in order to ensure the integrity of the plasma collected and for the purpose of providing health care treatment to those in need." (Memo at 20 & nn.14–15.) But that claim is far from "clear" from the face of the Second Amended Complaint, which alleges that Defendants send plasma to their parent company for "use in its manufacturing operations." (Second Amended Complaint ¶ 4.) Thus, Defendants must support their assertion not with the Plaintiffs' allegations but with their parent company's website. (Memo at 20 & nn.14–15 (citing Grifols, *Reasons to Donate*, https://www.grifolsplasma.com/en/importance-of-plasma/reasons-to-donate (last accessed Sept. 9, 2022).) No exception permits us to consider contested information from a private website concerning matters so far outside the Second Amended Complaint. *See Phillips*, 714 F.3d at 1019–20.

Second, Defendants did not collect the fingerprints for "treatment, payment, or operations under [HIPAA]." 740 Ill. Comp. Stat. 14/10. The phrase "for health care treatment, payment, or operations under [HIPAA]" means "information 'collected by a HIPAA covered entity for the purpose of health care treatment, payment, or operations.'" *Heard v. Becton, Dickinson & Co.*, 524 F. Supp. 3d 831, 845 (N.D. Ill. 2021); *see also Mosby v. Ingalls Memorial Hosp.*, 2022 IL App (1st) 200822 ¶ 43, --- N.E.3d --- (Ill. App. 2022) (construing the exemption to mean "information that is already protected 'under [HIPAA]'"). Because Defendants concede that they are not covered entities under HIPAA and the Plaintiffs' fingerprints therefore could not be regulated under HIPAA, (Reply at 22 n.13, 24 n.14), the HIPAA exemption does not apply. *Heard*, 524 F. Supp. 3d at 845 ("[I]f HIPAA does not apply to BD, then BD cannot claim protection from the HIPAA exemption.").

Defendants argue that the HIPAA exemption is not a HIPAA exemption at all, because the phrase "under HIPAA" modifies only the word "operations." (Memo at 21–22.) Thus, when the General Assembly excluded information gathered in connection with "health care treatment, payment, or operations under [HIPAA]," Defendants argue it meant information in connection with "any health care treatment," "any health care payment," and "only health care operations under HIPAA." (*Id.*) That is not a sensible reading because "treatment, payment, and operations" is a phrase the Illinois General Assembly borrowed from HIPAA regulations. *See, e.g.*, 45 C.F.R. § 164.506 (titled "Uses and disclosures to carry out treatment, payment, or health care operations."). The General Assembly's use of a phrase from federal regulation conveys its intent that BIPA should not apply to information that is already governed by and subject to the use and disclosure standards for "treatment, payment, and operations" under federal law. The General Assembly thus did not intend to carve up "treatment, payment, and operations under

HIPAA" into "any treatment," "any payment," and "operations under HIPAA." Because Defendants purport to rely on the exemption for "treatment . . . under [HIPAA]" but concede that HIPAA does not apply, the exemption does not apply. *Heard*, 524 F. Supp. 3d at 845.

### C. Plaintiffs' Fingerprints Are Not Images Used to Validate Scientific Testing or Screening.

Under BIPA, the term "[b]iometric identifiers" does not include "an X-ray, roentgen process, computed tomography, MRI, PET scan, mammography, or other image or film of the human anatomy used to diagnose, prognose, or treat an illness or other medical condition or to further validate scientific testing or screening." *See* 740 Ill. Comp. Stat. 14/10. Defendants contend that they use donor fingerprints as part of their screening process to ensure "donor eligibility and to ensure safe and viable plasma collection." (Memo at 22.) Plaintiffs counter that the finger scans Defendants collect from plasma donors are used to identify donors—not to "further validate scientific testing or screening." (Resp. at 23–26.) Plaintiffs also argue it would be nonsensical to interpret fingerprinting for identification as a form of screening because such a reading "would swallow the law and exempt the most common BIPA cases." (*Id.* at 24.) And although there are multiple definitions for the word "screen," Plaintiffs continue, the one that makes the most sense within the context of the exception is "to test or examine for the presence of something (such as a disease)[.]" (*Id.* (quoting Merriam-Webster Dictionary, "Screen[,]" Entry 2(3)(b)(3)).) In reply, Defendants elaborate that the finger scans they collect satisfy the exception because "the very purpose of the finger-scan process is to screen donors for the absence of disease or infection that would make them ineligible." (Reply at 18.)

Again, Defendants' position depends on facts outside the Second Amended Complaint. Plaintiffs allege that Defendants required them to scan at least one fingerprint so that "Defendants could create, collect, capture, construct, store, use, and/or obtain a biometric

template for them." (Second Amended Complaint ¶ 33.) Defendants then used their "biometrics as an identification and authentication method to track their plasma donations and identity." (*Id.* ¶ 34.) Thus, according to the Second Amended Complaint, Defendants collected Plaintiffs' fingerprints at most to corroborate the Plaintiffs' identities, not to "diagnose, prognose, or treat an illness" or "validate scientific testing or screening." 740 Ill. Comp. Stat. 14/10. If Defendants contend that they use fingerprints to "screen donors for the absence of disease or infection," (Reply at 18), they can produce that evidence in discovery and argue that this exemption applies at summary judgment or trial. At this early stage of litigation, however, we hold that this exemption does not apply, agreeing with the other court in this District that has addressed this issue. *Crumpton*, 513 F. Supp. 3d at 1017 ("[V]alidating donor identity is not the same as validating the underlying testing or screening.").

## V.     All Claims Are Timely Under the Five-Year Statute of Limitations.

Defendants next argue that Vaughan's and Darnell's claims are untimely. (Memo at 23–28.) Vaughan alleges that he scanned his fingerprint at Biomat from "approximately 2017 through 2019" (Second Amended Complaint ¶ 6) and originally filed this action in state court on June 10, 2020. (Dkt. No. 1-1 at 1.) Darnell allegedly scanned his fingerprint at Interstate Blood Bank in "approximately 2016 through 2018" (Second Amended Complaint ¶ 8) and joined as a plaintiff with the filing of the First Amended Complaint on April 8, 2021. (*See generally* First Amended Complaint (Dkt. No. 33).) At Biomat and Talecris's urging, we stayed the case for nearly a year for the Illinois Appellate Court to determine whether a one- or five-year statute of limitations applies. (Dkt. No. 26.) That court held that the five-year catch-all statute of limitations for actions "not otherwise provided for," 735 Ill. Comp. Stat. 5/13-205, governs claims under BIPA Sections 15(a) and (b). *Tims*, 2021 IL App (1st) 200563, ¶¶ 30–33, 184

20

N.E.3d at 472–73. Under this five-year limitations period, neither Darnell's nor Vaughan's claims are untimely on the face of the Second Amended Complaint.[7]

Defendants now argue that *Tims* was wrongly decided and ask us either to predict that it will be reversed (Memo at 24–26) or stay the case even further until the Illinois Supreme Court has ruled in *Tims v. Black Horse Carriers, Inc.*, 184 N.E.3d 1029 (Ill. Jan 26, 2022). (*Id.* at 26.) Finally, they argue that even if the one-year statute of limitations does not apply, the two-year statute of limitations for personal-injury claims should apply, which would bar only Vaughan's claim. (*Id.* at 26–28 (citing 735 Ill. Comp. Stat. 5/13-202).)

### A. The One-Year Limitations Period for Publication-Based Actions Does Not Apply.

Sitting in diversity, we must apply state law, and "[w]here the Illinois Supreme Court has not ruled on an issue, decisions of the Illinois Appellate Courts control, unless there are persuasive indications that the Illinois Supreme Court would decide the issue differently." *Nationwide Agribusiness Ins. Co. v. Dugan*, 810 F.3d 446, 450 (7th Cir. 2015). In *Tims*, the Illinois Appellate Court ruled that a five-year statute of limitations applies to claims like the Plaintiffs' under BIPA Sections 15(a) and (b). *Tims*, 2021 IL App (1st) 200563, ¶¶ 30–33, 184 N.E.3d at 472–73. Defendants argue that there are persuasive indications that the Illinois Supreme Court would rule differently, including the court's decision to grant leave to appeal, which, according to Defendants, has telegraphed the court's intent to reverse. (Memo at 26.) Plaintiffs respond that *Tims* is binding, well-reasoned, and represents the unanimous judgment of

---

[7] In this posture, we must take inferences in Darnell's favor and assume that "approximately 2016" was less than five years before April 8, 2021. Because we find that Darnell's claim would be timely even if it accrued at the earliest possible time—"approximately 2016"—we need not consider Defendants' commendably candid assertion that Darnell did not in fact donate plasma until August 2019. (Memo at 23 n.19.)

every court that has considered the issue. (Resp. at 26–27 & n.11 (collecting 21 other state and federal cases holding that the five-year statute of limitations applies).)

Defendants have not provided the "persuasive indications" that the Illinois Supreme Court will reverse *Tims*. First, *Tims* is well reasoned. The one-year statute of limitations applies to "[a]ctions for slander, libel, or for *publication* of matter violating the right of privacy . . . ." 735 Ill. Comp. Stat. 5/13-201 (emphasis added). In this context, "publication" means disclosure. *See Meegan v. NFI Indus., Inc.*, No. 20 C 465, 2020 WL 3000281, at *3 (N.D. Ill. June 4, 2020). *Tims* thus held that the one-year statute of limitations applied to the portions of BIPA regulating disclosure (Sections 15(c) and (d)), but not those concerning retention (Sections 15(a) and (e)) or collection (Section 15(b)) of biometric data. *Tims*, 2021 IL App (1st) 200563 ¶¶ 30–33, 184 N.E.3d at 472–73. Because Sections 15(a) and (b) do not have publication as an element, the five-year limitations period applies. *Id.* We adhere to the persuasive reasoning in *Tims*. The one-year limitations period applies only to actions with "publication" as an element, 735 Ill. Comp. Stat. 5/13-201, and Sections 15(a) and (b) do not require proof of publication. 740 Ill. Comp. Stat. 14/15(a)–(b).

Second, Defendants cite and we have found no opinion that has reached a different conclusion than *Tims*, whereas many opinions have agreed with *Tims*. *See, e.g.*, *Burlinski v. Top Golf USA Inc.*, No. 19 C 6700, 2020 WL 5253150, at *6 (N.D. Ill. Sept. 3, 2020) ("The Section 15(b) claims do not involve any 'publication' element, so this one-year limitations period cannot apply to the Section 15(b) claims."); *Cothron v. White Castle Sys., Inc.*, 477 F. Supp. 3d 723, 729 n.4 (N.D. Ill. 2020) ("[T]he court . . . acknowledges Ms. Cothron's argument that '[e]very trial court that has decided the issue has unanimously held the five-year 'catch-all' limitations period applies."); *Meegan*, 2020 WL 3000281, at *2 ("BIPA subsections (a) and (b) do not have a

22

publication element, so § 13-201 cannot provide the statute of limitations for subsections (a) or (b).”); (Resp. at 26 n.11 (collecting state trial court cases).)  Because no court has ever applied the one-year limitations period, we lack a “persuasive indication” that the Illinois Supreme Court will be the first.

Finally, we reject Defendants’ argument that the one-year limitations period applies here notwithstanding *Tims* because Plaintiffs in fact raise publication-based claims.  (Reply at 26.)  First, Defendants argue that Sections 15(a) and (b) are “inherently predicated on preventing unauthorized publication.”  (*Id.*)  That argument both ignores the clear language of those subsections and contravenes the express holding in *Tims* that Sections 15(a) and (b) have “absolutely no element of publication or dissemination.”  2021 IL App (1st) 200563, ¶ 31, 184 N.E.3d at 472–73.  Defendants support their argument with a quote from *West Bend Mutual Insurance Co. v. Krishna Schaumburg Tan, Inc.*, which noted that “[BIPA] protects a secrecy interest—here, the right of an individual to keep his or her personal identifying information like fingerprints secret.”  2021 IL 125978, ¶ 46, 183 N.E.3d at 58 (citing 740 Ill. Comp. Stat. 14/15(d)).  From this, Defendants conclude that all of BIPA protects the right to keep information secret from disclosures to third parties.  (Reply at 26.)  But *West Bend* concerned Section 15(d)—which indeed prevents unauthorized disclosure of biometric data—not Sections 15(a) and (b) concerning retention, destruction, and collection of biometric data.  740 Ill. Comp. Stat. 14/15(a)–(b), (d).  *West Bend* does not apply here.  Defendants also argue that Plaintiffs’ “own allegations refer to publication.”  (Reply at 26.)  They do not.  Rather, a stray word in Plaintiffs’ response to the motion to dismiss references “disseminating,” (Resp. at 7), but the Second Amended Complaint expressly alleges that Plaintiffs “have no idea whether Defendants

sell, disclose, re-disclose, or otherwise disseminate[] their biometric data." (Second Amended Complaint ¶ 59.) Therefore, Plaintiffs' BIPA claims are not based on publication.

### B. A Further Stay Is Inappropriate.

Defendants ask in the alternative that we stay the case to await the Illinois Supreme Court's ruling in *Tims*. (Memo at 26.) We have "inherent power to exercise [our] discretion to stay proceedings to avoid unnecessary litigation . . . ." *Munson v. Butler*, 776 F. App'x 339, 342 (7th Cir. 2019) (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)). We may consider whether a stay (1) will prejudice the non-moving party; (2) simplify the issues; and (3) reduce the burden of litigation. *Obrzut v. LVNV Funding, LLC*, No. 19 C 1780, 2020 WL 3055958, at *1 (N.D. Ill. June 8, 2020).

We deny Defendants' request because the three factors weigh against a stay. We already have delayed prosecution of Plaintiffs' claims for a year pending the Illinois Appellate Court's ruling in *Tims*. (Dkt. Nos. 26, 28.) Although a stay was justified when the Illinois Appellate Court had not yet definitively ruled on this issue, *Tims* is now binding law in Illinois, giving us "enough guidance" to permit Plaintiffs to press their claims. *Fleury v. Union Pac. R.R. Co.*, No. 20 C 390, 2022 WL 1803357, at *5 (N.D. Ill. June 2, 2022) (denying stay despite pendency of *Tims* in Illinois Supreme Court); *see Nationwide Agribusiness*, 810 F.3d at 450 (holding intermediate appellate decisions are binding on diversity absent persuasive indications that supreme court will decide differently). Moreover, when we granted the stay, Vaughan was the only plaintiff, making the statute of limitations issue potentially dispositive of the whole case. (Dkt. No. 26 at 2–3.) That is no longer true, meaning two of the three putative classes and two of the four individual plaintiffs must proceed regardless of the outcome in the Illinois Supreme Court. Thus, even if the Illinois Supreme Court reverses, the issues will be nearly as complex and burdensome as they are now. Finally, because Defendants do not point to any "persuasive

24

indication" that the Illinois Supreme Court will reverse *Tims*, we do not find it likely that any claims will become simpler or the litigation less burdensome after the Illinois Supreme Court decides *Tims*. *Horn v. Method Prods., PBC*, No. 21 C 5621, 2022 WL 1090887, at \*5 (N.D. Ill. Apr. 12, 2022) (denying stay after Illinois Supreme Court granted leave to appeal in *Tims*).

### C. The Two-Year Statute of Limitations for Personal Injuries Does Not Apply.

Defendants argue in the alternative that the two-year statute of limitations for personal injury claims should apply. (Memo at 26–28.) "Actions for damages for an injury to the person . . . shall be commenced within 2 years next after the cause of action accrued . . . ." 735 Ill. Comp. Stat. 5/13-202. Defendants argue that Sections 15(a) and (b) guard against "the risk of identity theft" and "emotional distress," which it characterizes as "personal injuries." (Memo at 27 (citing *Pavlik v. Kornhaber*, 326 Ill. App. 3d 731, 744, 761 N.E.2d 175, 186 (Ill. App. 2001).) Defendants further argue that *Tims* does not foreclose this argument because it did not consider the potential applicability of the two-year limitations period. (*Id.*) Plaintiffs respond that they do not "allege that Defendants injured them physically or emotionally." (Resp. at 28.) Defendants reply that "Plaintiffs injuries must be emotional in character, stemming from concerns over the risk of exposure of their alleged biometric information." (Reply at 27.)

The two-year statute of limitations for personal injuries does not apply to Plaintiffs' claims under BIPA Sections 15(a) or (b). Although emotional injury is a species of personal injury under Illinois law, *Pavlik*, 326 Ill. App. at 744, 761 N.E.2d at 186, Plaintiffs do not allege that Defendants caused them emotional injuries. Nowhere do Plaintiffs allege that Defendants' alleged violations caused them mental anguish, anxiety, depression, or other forms of emotional distress. (*See generally* Second Amended Complaint.) They simply allege that Defendants "deprived them of benefits, rights, opportunities and decisions" and "illegally captured . . . their finger scans, biometrics, and property." (Second Amended Complaint ¶ 86, 97, 108.) Those are

neither physical nor emotional injuries. *Quarles v. Pret A Manger (USA) Ltd.*, No. 20 C 7179, 2021 WL 1614518, at *4 (N.D. Ill. Apr. 26, 2021) ("[T]he harm Quarles alleges concerns her inability to control information. This decision-making harm is not analogous to mental anguish, nor does it fit neatly into a traditional tort or contract theory that forms the basis of personal injury claims." (citations omitted)). We therefore conclude that the two-year limitations period therefore does not apply, agreeing with every other court in this Circuit that considered the issue. *See, e.g.*, *Quarles*, 2021 WL 1614518, at *4 ("Because Quarles alleges an informational injury and not a physical or mental one, the two-year statute of limitations does not apply.");

*Bradenberg v. Meridian Senior Living, LLC*, 564 F. Supp. 3d 627, 633 (C.D. Ill. 2021) ("Plaintiff does not state in her Complaint that she suffered physical or psychological injuries, and neither does BIPA require her to."); *Burlinski*, 2020 WL 5253150, at *7 ("Topgolf fails to explain why an alleged violation of purely statutory rights under BIPA—which is meant to give the Plaintiffs some degree of control over the collection and disclosure of their biometric data—should count as "an injury to the person" as that phrase is used in 735 ILCS 5/13-202.").

## VI. Plaintiffs Need Not Plead Recklessness to State a Claim.

Finally, Defendants argue that Plaintiffs' requests for enhanced liquidated damages should be stricken because they do not plausibly allege recklessness or willfulness. (Memo at 28–29.) BIPA Sections 15(a) and (b) impose strict liability; an alleged violator's state of mind is not an element of either claim. *See* 740 Ill. Comp. Stat. 14/15(a), (b); *see also Bradenberg*, 564 F. Supp. 3d at 634 ("[N]owhere in Section 14/15 does BIPA mention any mental state as an element for a violation."); *Snider v. Heartland Beef, Inc.*, 479 F. Supp. 3d 762, 772 (C.D. Ill. 2020) ("BIPA imposes liability . . . regardless of the violator's state of mind."). But BIPA authorizes liquidated damages of $1,000 per negligent violation and $5,000 per reckless or intentional violation. 740 Ill. Comp. Stat. 14/20; (Second Amended Complaint ¶¶ 87, 98, 109.)

As we recently explained in *Sosa v. Onfido, Inc.*, "[r]equests for liquidated damages [under BIPA] are not 'claims,' . . . but demands for relief. [A plaintiff] need not plead facts (such as plausibly suggesting negligence, recklessness, or intentional conduct) that show his entitlement to these precise forms of relief." 2022 WL 1211506, at *10 (collecting cases). We adhere to that decision and hold that Plaintiffs need not plead facts showing Defendants' recklessness or willfulness to state a claim for which relief can be granted under Sections 15(a) and (b) of BIPA or to request liquidated damages based on reckless or willful conduct.

## CONCLUSION

For the reasons set forth above, we grant Defendants' Motion for Leave to File Supplemental Authority (Dkt. No. 84) and deny Defendants' Motion to Dismiss (Dkt. No. 79). Defendants shall have until October 3, 2022 to answer the Second Amended Complaint. The status hearing set for September 22, 2022, is stricken and reset to October 27, 2022 at 10:30 a.m. It is so ordered.

_____
Honorable Marvin E. Aspen
United States District Judge

Dated: September 19, 2022

27