## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BRIAN VAUGHAN, JASON DARNELL, FEBBIE MINNIEFIELD, and ADRIEL VEGA, individually and behalf of all others similarly situated, | Case No. 20-cv-04241 |
| Plaintiffs, | Honorable Marvin Aspen |
| v. | |
| BIOMAT USA, INC., TALECRIS PLASMA RESOURCES, INC., and INTERSTATE BLOOD BANK, INC., | |
| Defendants. | |

## PLAINTIFFS' MOTION AND MEMORANDUM
## IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION
## <u>SETTLEMENT, ATTORNEY FEES, AND INCENTIVE AWARDS</u>

David Fish
**FISH POTTER BOLAÑOS, P.C.**
111 East Wacker Drive, Suite 2300
Chicago IL 60601
dfish@fishlawfirm.com
(312) 861-1800

Mara Baltabols
**FISH POTTER BOLAÑOS, P.C.**
200 E. 5th Ave., Suite 115
Naperville, IL 60563
mara@fishlawfirm.com
(630) 264-4061

*Attorneys for Plaintiffs and*
*Others Similarly Situated*

## I.     Introduction

Plaintiffs Brian Vaughan, Jason Darnell, Febbie Minniefield, and Adriel Vega, (collectively "Plaintiffs") filed this action against Defendants Biomat USA, Inc. ("Biomat"), Talecris Plasma Resources, Inc. ("TPR"), and Interstate Blood Bank, Inc. (together, "Defendants") (collectively the "Parties") alleging violations of the Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1 *et seq*. On March 9, 2023, this Court granted preliminary approval of the Parties' $16,750,000 non-reversionary class action Settlement. (Exhibit 1).

Following preliminary approval, the Settlement Administrator notified (through mail, text message, and a reminder text) Settlement Class Members of their rights under the Settlement, including the right to submit a claim for payment, request exclusion, or submit an objection. Not a single Settlement Class Member objected or asked to be excluded from the class. The lack of objections or requests for exclusion, the substantial recovery, and the high claims rate (32%), underscore the strength of the Settlement.

The requested percentage fee award of one-third is well in line with common fund fee awards in BIPA cases in this District (*see* Exhibit 2, Chart 1 [listing 33.3% fee awards in BIPA cases in the Northern District of Illinois]), and is in fact less as a percentage than that typically awarded in BIPA cases, (*see id.*, Chart 2 [listing 35% fee awards], Chart 3 [listing 40% fee awards]). As explained further below, Class Counsel's request is reasonable and should be approved.

Named Plaintiffs' requested incentive award of $5,000 each is similarly reasonable. Incentive awards in class action settlements frequently exceed $10,000. (*See* Exhibit 2, Chart 4 [listing incentive awards ranging from $5,000 to $10,000 in BIPA cases]). Plaintiffs' requested awards warrant approval.

II.     **Legal Background and Procedural History**

In 2008, Illinois enacted BIPA to regulate "the collection, use, safeguarding, handling, storage, retention, and destruction" of individuals' biometric data. 740 ILCS 14/5(g). The Illinois General Assembly found that the new legislation was necessary for several reasons. First, individuals cannot change their biologically unique identifiers, like fingerprints, and so they have no recourse when those identifiers are compromised. 740 ILCS 14/5(c). Second, an "overwhelming majority" of the public are concerned about use of biometric data tied to finances and other personal information. 740 ILCS 14/5(d). Third, the "full ramifications of biometric technology are not yet fully known." 740 ILCS 14/5(f). BIPA addresses these concerns, in part, by creating a privacy interest in a person's biometric data and giving individuals the right to control when a private entity collects that data. *Rosenbach v. Six Flags Entm't Corp.*, 2019 IL 123186, ¶¶ 34-35 (Ill. 2019).

On June 10, 2020, Plaintiff Vaughan filed a putative class action complaint in the Circuit Court of Cook County, Illinois alleging violations of the Biometric Information Privacy Act, 740 ILCS 14/1, et seq. ("BIPA"). Plaintiff Vaughan claimed, among other things, that Defendants Biomat and TPR collected and stored his biometric data without authorization through the use of a finger-scanning devices at Biomat and TPR plasma donation facilities in Illinois. On July 17, 2020, Defendants Biomat and TPR removed the case to the United States District Court for the Northern District of Illinois, pursuant to the Class Action Fairness Act ("CAFA"). (*See* dkt. 1.) On October 23, 2020, on Defendants Biomat and TPR's motion, the Court stayed all proceedings pending the Appellate Court of Illinois, First District's decision in *Tims v. Black Horse Carriers, Inc.*, Case No. 1-20-0563 (1st Dist.). (*See* dkt. 26.)

On April 8, 2021, Plaintiff Vaughan filed an Amended Complaint, adding Plaintiff Jason Darnell and Defendant Interstate Blood Bank, with Darnell asserting essentially the same

2

allegations against Interstate Blood Bank that Vaughan asserted against Biomat and TPR. (*See* dkt. 33.) After the stay was lifted, on December 17, 2021, Defendants moved to dismiss the Amended Complaint. (*See* dkt. 53-54.) The Court granted Defendants' Motion to Dismiss on April 28, 2022, and granted Plaintiffs Vaughan and Darnell leave to amend. (*See* dkt. 69-70.)

Plaintiff filed the operative Second Amended Complaint on May 16, 2022, adding Plaintiffs Minniefield and Vega. (*See* dkt. 72.) Plaintiffs Minniefield asserted essentially the same claims against Biomat that Vaughan made. (*Id.*) Plaintiff Vega asserted claims against TPR. (*Id.*) On July 8, 2022, Defendants moved to dismiss the Second Amended Complaint. (Dkt.80-81). On September 19, 2022, the Court entered a Memorandum Opinion and Order denying the Defendants' Motion to Dismiss the Second Amended Complaint. (*See* dkt. 88.)

Eventually the Parties came to an agreement to resolve the case and Plaintiffs filed their Motion for Preliminary Approval on February 9, 2023. (*See* dkt. 100.) On February 27, 2023, the Court raised several thoughtful questions about the Settlement. (*See* dkt. 102.) In response to the Court's questions, the Parties modified the content of the Notice and the Preliminary Approval Order. (*See* dkt. 103, pp. 4, 7). After the Parties modified these items, the Court then entered Preliminary Approval finding that on a preliminary basis the settlement was "fair, reasonable and adequate". (*See* dkt. 102.)

## III. Summary of Settlement Terms

The terms of the Settlement are set forth in Exhibit 1 and are briefly summarized here:

### A. Class Definition
(Ex. 1, Settlement Agreement, § 1.26)

The Plaintiffs seek preliminary approval of the following Settlement Class:

All individuals who had their Biometric Identifiers and/or Biometric Information collected, captured, stored, possessed, received, transmitted, converted or otherwise obtained by either (i) Biomat USA, Inc. or Talecris Plasma Resources, Inc. at one of their plasma donation centers in Illinois as part of their plasma donation processes

3

between June 10, 2015 and June 10, 2022, or (ii) Interstate Blood Bank, Inc. at its plasma donation center in Illinois as part of their plasma donation process between April 8, 2016 and July 25, 2022; and whose name appears on the Class List ("Settlement Class")

**B.**     **Settlement Fund; Allocation of the Fund; Payments to Class Members**
(Ex. 1, Settlement Agreement, § 1.28-1.30)

While denying all liability and wrongdoing Defendants will pay a gross Settlement Fund of $16,750,000 to resolve the claims in this case on a class action basis. If the Settlement is approved as presented, each Settlement Class Participant will receive approximately $500. (*See* Exhibit 3, Declaration of Caroline P. Barazesh, Analytics Consulting, LLC, at ¶ 11).

This amount is largely in-line with what Settlement Class Counsel estimated in the Notice. As the Court may recall, as part of the Court's questions at the Preliminary Approval stage, the Parties agreed to modify the Notice so that instead of saying that payout was estimated between $200 and $600, Class Members were provided a chart showing the anticipated recovery at various Participation Rates/Claims Rates (ranging between $300 and $1,100). The middle example on the Notice estimated that a 30% Participation Rate would yield a recovery of $550 per person. (*Id.* at Exhibit thereto). The actual 32% Participation Rate supports a net recovery of approximately $500 per person (because the more claims, the less per person).

The "Net Fund" is the gross Settlement Fund minus the following deductions, subject to Court approval: Settlement Class Counsel's attorney fees and costs; the Settlement Administrator's Expenses; the Plaintiffs' Incentive Awards and any other payments made associated with the settlement. Payments will be made from the Net Fund pro rata for each Class Member that timely returned a valid claim ("Class Participants"). This Settlement has a claims-made structure with no reversion, so the full Settlement Fund will be distributed to Class Participants; no money will be returned to the Defendants.

4

**C.    Uncashed Checks Will Be Distributed to a *Cy Pres* Recipient**
        (Ex. 1, Settlement Agreement, § 2.1(h))

Class Participants will have 150 days to cash their settlement payments. Funds from

checks not cashed by the deadline will be distributed to the Northern Illinois Food Bank as the *cy*

*pres* recipient.

**D.    Defendant's Representations of Compliance with BIPA**
        (Ex. 1, Settlement Agreement, § 2.2)

As part of the Settlement, Defendants represent that they are fully compliant with the

BIPA to the extent they utilize finger scanning technology. After Plaintiffs filed this lawsuit, the

Defendants added a "Donor Biometric Data Privacy Policy" that is available online.

https://www.grifolsplasma.com/en/privacy-policy.

**E.    Release of Claims**
        (Ex. 1, Settlement Agreement, §§ 1.20, 1.21, 3.1)

Settlement Class Members who have not excluded themselves will release the Released

Parties from claims relating in any way to or connected with the alleged capture, collection,

storage, possession, transmission, conversion, purchase, receipt through trade, obtaining, sale,

lease,  profiting from, disclosure, redisclosure, dissemination, transmittal, conversion and/or

other use of biometric identifiers and/or biometric information as detailed in the Settlement

Agreement.

**F.    Settlement Administration**
        (Ex. 3, Declaration of Settlement Administrator)

Analytics Consulting, LLC ("Settlement Administrator") has administered the Class

Notice and claims process and will administer the remainder of the Settlement. Their expenses

and costs are estimated at $153,953. (Exhibit 3, Declaration, ¶ 18).

G.    **The Notice Process Was Successful**
      (Ex. 3, Declaration of Settlement Administrator)

The Settlement Agreement required a robust class notice program to ensure that

Settlement Class Members learned of their rights in the Settlement. As a result, the claims rate is

high—more than three times what is typically seen in class action litigation: 32% of Settlement

Class Members on the Class List submitted a timely, valid, or accepted Claim Form (for a total

of 21,392 individuals). The Claim Form deadline was August 4, 2023.

The mailing addresses contained in the Class List were updated through the National

Change of Address Database ("NCOA") maintained by the U.S. Postal Service. On April 6,

2023, Class Members were sent Notice via USPS First Class Mail. The same day, Class

Members were sent a text message with a link to the website to file their claim electronically. On

June 28, 2023, a reminder text message was sent to those Class Members who had not filed a

claim.

The Federal Trade Commission in 2019 issued a report that analyzed claim rates in class

action litigation. *Consumers and Class Actions: A Retrospective and Analysis of Settlement

Campaigns.*[1] The FTC's study demonstrated a median Claims rate of approximately 10%. *Id.* at

21. *See also Gascho v. Global Fitness Holdings, LLC*, 822 F.3d 269, 290 (6th Cir. 2016)

(discussing expert testimony that response rates in claims-made class action settlements

"generally range from 1 to 12 percent, with a median response rate of 5 to 8 percent[.]");

*Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 329 n.60 (3rd Cir. 2011) (*en banc*) (noting that claims

rate in consumer class action settlements "rarely exceed seven percent").

Other Courts approving BIPA settlements have complimented lower claims rates. *See In*

---

[1]Available at https://www.ftc.gov/system/files/documents/reports/consumers-class-actions-retrospective-analysis-settlement-campaigns/class_action_fairness_report_0.pdf (Last Visited July 20, 2022).

*re Facebook Biometric Info. Priv. Litig.,* 522 F. Supp. 3d 617, 620 & 629 (N.D. Cal. 2021) (describing 22% claims rate in BIPA settlement with Facebook as "impressive" and "unprecedented"); *Crumpton v. Octapharma Plasma. Inc.*, 19-cv-08402 (N.D. Ill.) (February 16, 2022) (BIPA final approval granted with a 22% claims rate and describing it as an "excellent claim rate" in the final approval order).

## IV.    The Court Should Grant Final Approval

The Court preliminary approved the Parties' Settlement on March 9, 2023. (Dkt. No. 105). Plaintiffs now request that the Court grant final settlement approval, the final step for approval of a class action settlement.

### A.    Settlement of Class Action Litigation is Favored

Federal courts favor and encourage settlements, particularly in class actions and other complex matters, where the inherent costs, delays, and risks of continued litigation might otherwise overwhelm any potential benefit the class could hope to obtain. *See Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992); *see also* 2 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 11.41 (3d ed. 1992) (collecting cases). The *Manual for Complex Litigation* describes a three-step procedure for approval of class action settlements:

> (1)  Preliminary approval of the proposed settlement at an informal hearing;
>
> (2)  Dissemination of mailed and/or published notice of the settlement to all affected class members; and
>
> (3)  A "formal fairness hearing" or final settlement approval hearing, at which class members may be heard regarding the settlement, and at which evidence and argument concerning the fairness, adequacy, and reasonableness of the settlement may be presented.

*Manual for Complex Lit.*, at § 21.632–34. This procedure, used by courts in this Circuit and endorsed by the leading class action treatise, safeguards the due process rights of absent class

members, and enables the Court to fulfill its role as the guardian of class interests. *See* 2

Newberg & Conte, at § 11.22, *et seq.* With this motion, Plaintiffs request that the Court take the

final step in the process by granting final approval of the proposed Settlement.

**B. Other BIPA Settlements**

The relief in this case of $16,750,000 for 66,808[2] people and approximately $500 per

Class Participant is a very favorable outcome. While there are many BIPA cases pending, there

were only a handful filed against plasma collection centers, and to date, excluding this case, only

three have settled. The settlement here is superior to each of the other BIPA plasma center

settlements as this chart demonstrates:

| BIPA Plasma Center Case | Class Members | Settlement Amount | Final Approval Date | Attorney Fees |
|---|---|---|---|---|
| *Crumpton v. Octapharma Plasma. Inc.*, 19-cv-08402 (N.D. Ill.)(Judge Kendall) | 76,826 | $9,987,380 | February 16, 2022 | 33.3% |
| *Marsh v. CSL Plasma, Inc.*, 2019-CV-07606 (N.D. Ill.)(Judge Chang) | 74,821 | $9,900,000 | December 9, 2022 | 33.3% |
| *Phillips, et al. v. Biolife Plasma, LLC*, 2020 CH 05658 (Cir. Ct. Cook Cty.)(Judge Wilson) | 57,525 | $5,994,233 | June 6, 2022 | 35% |

Indeed, the per-person monetary relief achieved here is among the best in BIPA cases of

this size—*i.e.*, those with at least tens of thousands of class members. *See Prelipceanu v. Jumio*

*Corp.*, 2018 CH 15883 (Cir. Ct. Cook Cnty. July 21, 2020) ($7 million fund for approximately

260,000 class members); *Miracle-Pond v. Shutterfly*, 2019 CH 07050 (Cir. Ct. Cook Cnty. Sept.

9, 2021) ($6.75 million fund for potentially millions of class members); *Thome v. NOVAtime*

*Tech., Inc.*, No. 19-cv-6256, Dkt. No. 90 (N.D. Ill. Mar. 8, 2021) ($4.1 million fund for 62,000

---

[2] The final class size is slightly less than the original estimate of 66,822, but the Settlement Fund remains the same. Ex. 1, ¶ 1.28.

class members, and assignment of insurance policy); *Figueroa v. Kronos*, 2019- CV-01306
(N.D. Ill. Feb. 10, 2020) ($15.2 million for 171,643 class members); *Rosenbach v. Six Flags Ent.
Corp.*, 2016-CH-00013 (Cir. Ct. Lake Cnty. Oct. 29, 2021) (approving $36 million fund for
approximately 1,110,000 class members, and capping class member payments).

By way of comparison, settlements in other statutory privacy class actions frequently do
not come near this amount, either in terms of raw numbers or percentage of available relief. *See
e.g., In re Google LLC Street View Elec. Commc'ns Litig*., 2020 WL 1288377, at *11–14
(approving over objections of class members and state attorney general, a settlement providing
only *cy pres* relief for violations of a federal privacy statute, where $10,000 in statutory damages
were available per claim); *Adkins v. Facebook, Inc.,* 18-cv-05982-WHA, Dkt. Nos. 350, 369
(N.D. Cal. May 6, 2021 and July 13, 2021) (approving settlement for injunctive relief only, in
class action arising out of Facebook data breach, and granting $6.5 million in attorneys' fees and
costs); *Carroll v. Crème de la Crème, Inc.,* 2017 CH 01624 (Cir. Ct. Cook Cnty. June 25, 2018)
(BIPA settlement providing only credit monitoring).

### C. Risks of Litigation

Significantly, here, Defendants had many defenses available:

*First*, Class Members signed a form stating: "*I understand and agree that I will provide
my fingerprint as biometric authentication of my identity as part of the automated screening
process.*" While Plaintiffs argued this disclosure was not BIPA compliant, it represented a risk
(and one that Defendants argued) that the claims were entirely barred, or maybe would have
convinced a fact finder that damages were not warranted. *Second*, this settlement was negotiated
shortly before the Illinois Supreme Court held that a 5-year statute of limitations (as opposed to a
1-year) applies. *Tims v. Black Horse Carriers, Inc.,* 2023 IL 127801 (February 23, 2023). Had the
Court ruled that a one-year statute of limitations applied, most Settlement Class Members would

have been barred from any recovery. *Third*, while the Plaintiffs achieved what they perceived as a favorable ruling on the motion to dismiss, had Defendants ultimately prevailed on any of their defenses (or defeated class certification), the Settlement Class Members could lose their case and collect nothing. For instance, no appellate court has ruled on the unique plasma-center defenses (such as, for example, whether federal regulations preempt the BIPA's requirements). *Fourth*, the Illinois Supreme Court currently has before it the appeal of *Mosby v. Ingalls Memorial Hospital, et al*., 2022 IL App (1st) 200822. At issue in *Mosby* is the scope of the so-called HIPAA and healthcare exceptions to the BIPA that Defendants argued bar Plaintiffs' claims here. (Dkt. 54.) Plaintiffs provided the Appellate Court's *Mosby* decision as Supplemental Authority in the briefing on the Motion to Dismiss (dkt. 64) and this Court cited it in denying the Motion to Dismiss. (Dkt. 88). An adverse decision by the Supreme Court in *Mosby* would impact the outcome of this case. While Plaintiffs felt confident in their responses to these potential defenses, other arguments would inevitably be made by Defendants.

> **D.  Approval Is Appropriate Under Rule 23(e)(2)**
>
> **1.  The Class Representatives and Class Counsel have Adequately Represented the Proposed Settlement Class – Rule 23(e)(2)(A)**

The first Rule 23(e)(2) factor, whether the class representative and class counsel have adequately represented the class, focuses on class counsel's and the class representative's performance as it relates to the "conduct of the litigation and of the negotiations leading up to the proposed settlement." Fed. R. Civ. P. 23(e), Advisory Committee's Note to 2018 Amendment. In considering this factor, courts are to examine whether the plaintiff and class counsel had adequate information to negotiate a class-wide settlement, taking into account the nature and amount of discovery completed, whether formally or informally. *See Snyder v. Ocwen Loan Servicing, LLC,* No. 14 c 8461, 2019 WL 2103379, at *4 (N.D. Ill. May 14, 2019). This inquiry

is coextensive with the Seventh Circuit's direction to consider the "stage of the proceedings and the amount of discovery completed." *Wong v. Accretive Health, Inc.,* 773 F.3d 859, 863 (7th Cir. 2014) (internal quotations omitted). Class Counsel negotiated a settlement that obtains meaningful non-reversionary monetary relief, and with an appropriate release of claims.

### 2. The Settlement Is the Product of Arm's-Length, Non-Collusive Negotiations – Rule 23(e)(2)(B)

The Settlement was the result of arm's-length negotiation between counsel. While professional, the Parties litigated this case at arms-length from the start.

### 3. The Settlement Provides Adequate Relief to the Class – Rule 23(e)(2)(C)

The final and most important factor under Rule 23(e)(2) examines whether the relief provided for the class is adequate. Fed. R. Civ. P. 23(e)(2)(C). The Class Representatives claim that they and potential Class Members are entitled to $1,000 per violation if they are able to prove Defendant's alleged violations of the BIPA were "negligent." 740 ILCS 14/20(1). After reaching this settlement, the Illinois Supreme Court found that damages accrued on a per-scan basis but were "discretionary rather than mandatory." *Cothron v. White Castle Sys., Inc.*, 2023 IL 128004, ¶ 42. *See also Rogers v. BNSF Ry. Co.,* 19 C 3083, 2023 WL 4297654, at *8 (N.D. Ill. June 30, 2023) (granting new trial based on *Cothron*'s finding that damages are discretionary).

The Settlement represents a meaningful recovery when compared against average recoveries in other BIPA cases (as discussed above) and other class action settlements. *See In re Ravisent Techs., Inc. Sec. Litig.,* 2005 WL 906361, at *9 (E.D. Pa. Apr. 18, 2005) (citing a study by Columbia University Law School, which determined that "since 1995, class action settlements have typically recovered between 5.5% and 6.2% of the class members' estimated losses.") (internal citations omitted); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 855 (1999) (where class

members are similarly situated with similar claims, equitable treatment is "assured by straightforward pro rata distribution of the limited fund").

The Court should further evaluate the adequacy of relief based on the sub-factors, Fed. R. Civ. P. 23(e)(2)(C)(i)-(iv), each of which the Settlement satisfies. Rule 23 instructs courts to consider several sub-factors, including (i) the cost, risks, and delay of trial and appeal; (ii) the effectiveness of the proposed method of distributing relief to the class; and (iii) the terms of any proposed award of attorneys' fees, including timing of payment. *Id.*

"As courts recognize, a dollar obtained in settlement today is worth more than a dollar obtained after a trial and appeals years later." *Goldsmith v. Tech. Sols. Co.*, No. 92 C 4374, 1995 WL 17009594, at *4 (N.D. Ill. Oct. 10, 1995). In evaluating the adequacy of the relief provided to the class, courts should first compare the cost, risks, and delay of pursuing a litigated outcome to the settlement's immediate benefits. Fed. R. Civ. P. 23(e)(2), Advisory Committee's Note to 2018 amendment. As discussed in Plaintiffs' Motion for Preliminary Approval, no appellate court has ruled on the unique plasma-center defenses (such as, for example, federal preemption and whether they were collecting for healthcare purposes). The Settlement here meets this requirement because it provides relief to Settlement Class Members now, at a higher rate similar to other BIPA settlements of its size, while avoiding years of protracted litigation.

The "effectiveness of [the]…method of distributing relief to the class" weighs strongly in favor of the adequacy of this Settlement under Rule 23(e)(2)(C)(ii) and the first Seventh Circuit factor. An effective distribution method "get[s] as much of the available damages remedy to class members as possible and in as simple and expedient a manner as possible." William B. Rubenstein, 4 *Newberg on Class Actions* § 13:53. This Settlement provides relief directly to

Class Members who submit a timely and valid claim form. The claims structure negotiated with no reversion, carries substantial benefit to the class and fully satisfies Rule 23(e)(2)(C)(ii).

The final relevant sub-factor considers the adequacy of the relief provided to the class, taking into account "the terms of [the] proposed award of attorney's fees, including timing of payment[.]" Fed. R. Civ. P. 23(e)(2)(C)(iii). The Settlement's contemplated method of calculating attorneys' fees (*i.e.*, the percentage-of-the-fund method) and its limit on attorneys' fees (*i.e.*, one-third of the Gross Settlement Fund) are reasonable and predicated on the outstanding relief provided to the Settlement Class. Accordingly, that the Settlement permits the Court to award one-third of the Gross Settlement Fund in attorneys' fees is more than appropriate.

**D.    The Remaining Considerations Set Forth by the Seventh Circuit Support Approval of the Settlement.**

In addition to the requirements that overlap with those now required by Rule 23(e), the Seventh Circuit requires a few additional considerations: the class's reaction to the settlement, the opinion of competent counsel, and whether the settlement raises any red flags that courts should be wary of. *Wong*, 773 F.3d at 863. Here, the positive reaction of the Settlement Class, the support of counsel, and the lack of red flags all favor approval.

There were no objections or requests for exclusion from the Settlement out of tens of thousands of Class Members. This represents a favorable reaction from the Class. *See McDaniel v. Qwest Commc'ns Corp.*, No. CV 05 C 1008, 2011 WL 13257336, at *4 (N.D. Ill. Aug. 29, 2011) (finally approving settlement with no objections and noting that "[a]n absence of objection is a 'rare phenomenon[]' and 'indicates the appropriateness of the request[]'") (citations omitted); *see also Retsky Family Ltd. P'ship v. Price Waterhouse LLP*, No. 97 C 7694, 2001 WL 1568856, at *3 (N.D. Ill. Dec. 10, 2001) (stating that "[t]he absence of objection to a proposed

class settlement is evidence that the settlement is fair, reasonable and adequate"). Similarly, the high claims rate indicates a strong positive reaction from the Class.

Plaintiffs' counsel recommends this Settlement without hesitation. (Exhibit 4). That recommendation is based on Class Counsel's substantial experience in class litigation, including dozens of similar BIPA class actions. That knowledge and experience were applied in analyzing the possible recovery against the risk, cost and delay explained above. *See Gautreaux v. Pierce*, 690 F.2d 616, 631 (7th Cir. 1982) ("The court also was entitled to 'rely heavily on the opinion of competent counsel' advanced by the proponents") (citation omitted).

Settlement Class Counsel negotiated a claims structure that equally distributes the full amount of the Net Fund to Settlement Class Participants without any money reverting back to the Defendants. (Exhibit 1). The structure that Settlement Class Counsel negotiated here is superior to alternatives approved in other BIPA class action settlements. For example, some settlement structures arbitrarily cap the amount that claimants can receive, regardless of the number of claims submitted. *See, e.g., Zhirovetskiy v. Zayo Group, LLC*, 17-CH-9323 (Cir. Ct. Cook Cnty.) (capping claimants' maximum recovery in BIPA settlement at $400); *Rafidia v. KeyMe, Inc.*, 18-CH-11240 (Cir. Ct. Cook Cnty.) (capping claimants' recovery in BIPA settlement at $515). Other settlement structures only require a defendant to pay for claims submitted and allow a defendant to retain unclaimed funds. *See, e.g., Marshall v. Life Time Fitness, Inc.*, 17-CH-14262 (Cir. Ct. Cook Cty.) (limiting the defendant's funding obligations toward the settlement class to payment of "Approved Claims"). By contrast, this Settlement requires Defendants to fund the full Gross Fund – without any conditional funding or potential reversion – and then requires the full Net Fund to be distributed to claimants. Simply put, Settlement Class Counsel negotiated the most favorable claims structure possible for Settlement Class Members.  And Settlement Class

14

Counsel paired this favorable structure with a robust notice program and claim filing process to maximize the number of Settlement Class Members who submit claims. (Exhibit 3, Declaration).

## III.     Class Counsel are Entitled to Payment of Their Reasonable Attorney Fees

### A.     The Court Should Award Attorney Fees as a Percentage of the Fund

The Court should award attorney fees as a percentage of the settlement fund made available to the class members as, to Plaintiffs' knowledge, every court to approve a BIPA class settlement has done. (Exhibit 2). When counsel's efforts result in the creation of a common fund, counsel is "entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see Primax Recoveries, Inc. v. Sevilla*, 324 F.3d 544, 548 (7th Cir. 2003) (creation of common fund "entitles [counsel] to a share of that benefit as a fee"). This is "based on the equitable notion that those who have benefited from litigation should share in its costs." *Sutton v. Bernard*, 504 F.3d 688, 691-92 (7th Cir. 2007); *Kaplan v. Houlihan Smith & Co.*, No. 12 Civ. 5134, 2014 WL 2808801, at *3 (N.D. Ill. June 20, 2014); *see also Boeing*, 444 U.S. at 478.

Although there are two ways to compensate attorneys for successful prosecution of statutory claims – the lodestar method and the percentage of the fund method, *see Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 565-66 (7th Cir. 1994) – the favored approach in the Seventh Circuit is to use the percentage of the fund method in common fund cases like this one. "Our court of appeals favors the percentage-of-the-fund fee in common fund cases because it provides the best hope of estimating what a willing seller and a willing buyer seeking the largest recovery in the shortest time would have agreed to *ex ante*." *In re FedEx Ground Package System, Inc. Employment Practices Litig.,* 251 F. Supp. 3d 1225, 1236 (N.D. Ind. 2017) (citing *In re Synthoid Mktg. Litig.,* 325 F.3d 974, 979-80 (7th Cir. 2003)); *see also McDaniel v. Qwest Commc'ns Corp.,* No. 05 C 1008, 2011 WL 13257336, at *3 (N.D. Ill. Aug. 29, 2011) ("Many

15

courts have found the percentage-of-recovery method provides a good emulation of the real-world market value of attorneys' services provided on a contingent basis."); *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 974 (7th Cir. 1991) (expressing a preference for the percentage-of-the-fund method and stating that "the lodestar approach certainly has its problems"); *See Hale v. State Farm Mut. Auto. Ins. Co.*, No. 12-0660-DRH, 2018 WL 6606079, at *7 (S.D. Ill. 2018); *see also* Brian T. Fitzpatrick, An Empirical Study of Class Action Settlements and Their Fee Awards, 7 J. Empirical L. Stud. 811, 814 (2010) ("Most federal judges chose to award fees by using the highly discretionary percentage-of-the-settlement method.").

It is appropriate to use a common fund approach in cases based on fee shifting statutes when the "settlement fund is created in exchange for release of the defendant's liability both for damages and for statutory attorneys' fees . . . ." *Skelton*, 860 F.2d at 256; *accord Florin*, 34 F.3d at 564. Here, the Settlement releases Class Members' statutory claims for fees under BIPA.

There are other reasons that courts in the Seventh Circuit favor the percentage of the fund method. First, the percentage of the fund method promotes early resolution and removes the incentive for plaintiffs' lawyers to engage in wasteful churning of the file to increase their billable hours. *See In re Synthroid Mktg. Litig.*, 264 F.3d 712, 789-90 (7th Cir. 2001). Where attorney fees are limited to a percentage of the total, "courts can expect attorneys to make cost-efficient decisions about whether certain expenses are worth the win." *Gaskill v. Gordon*, 942 F. Supp. 382, 386 (N.D. Ill. 1996), *aff'd*, 160 F.3d 361 (7th Cir. 1998); *see also In re Amino Acid Lysine Antitrust Litig.*, No. 95 Civ. 7679, 1996 WL 197671, at *2 (N.D. Ill. Apr. 22, 1996) (explaining "growing recognition that in a common fund situation . . . a fee based on a percentage of recovery . . . tends to strike the best balance in favor of the clients' interests while at the same time preserving the lawyers' self-interest").

16

Second, the percentage method preserves judicial resources because it saves the Court from the cumbersome task of reviewing complicated and lengthy billing documents. *Florin*, 34 F.3d at 566 (noting "advantages" of percentage of the fund method's "relative simplicity of administration"); *Gaskill*, 942 F. Supp. at 386 (citing *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) (fee requests "should not result in a second major litigation")). Courts in this District have noted the advantages of the percentage of the fund approach. *See, e.g.*, *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1040 (N.D. Ill. 2011) (using percentage method because it did "not need to resort to a lodestar calculation, which would be costly to conduct, to reinforce the same conclusion"); *Gaskill*, 942 F. Supp. at 386 (describing advantages of percentage method, including judicial efficiency and an "efficient check on the attorney's judgment" in economic decision-making). As the Second Circuit has explained, the "primary source of dissatisfaction [with the lodestar method] was that it resurrected the ghost of Ebenezer Scrooge, compelling district courts to engage in a gimlet-eyed review of line-item fee audits." *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 48-49 (2d Cir. 2000).

**B.    Analysis of the Market for Legal Services Supports Plaintiffs' Request**

In deciding the fee award in common fund cases, the Seventh Circuit has "consistently directed district courts to 'do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time.'" *Sutton,* 504 F.3d at 692-94). The Seventh Circuit has held that "[a]lthough it is impossible to know *ex post* exactly what terms would have resulted from arm's-length bargaining *ex ante*, courts must do their best to recreate the market by considering factors such as actual fee

contracts that were privately negotiated for similar litigation, information from other cases, and data from class-counsel auctions." *Taubenfeld v. Aon Corp.,* 415 F.3d 597, 599 (7th Cir. 2005).

The percentage method is consistent with, and is intended to mirror, the private marketplace for negotiated contingent fee arrangements. *Kirchoff v. Flynn,* 786 F.2d 320, 324 (7th Cir. 1986) ("[w]hen the 'prevailing' method of compensating lawyers for 'similar services' is the contingent fee, then the contingent fee *is* the 'market rate.'"). In the marketplace, the "contingent fee uses private incentives rather than careful monitoring to align the interests of lawyer and client. The lawyer gains only to the extent his client gains." *Id.* at 325. It is for these reasons that the percentage-of-the-recovery approach makes the most sense for this case and has been used in most BIPA class action settlements. Indeed, Settlement Class Counsel are unaware of any recent BIPA class action settlements where a court awarded fees based on the lodestar method instead of the percentage method. As such, this Court should apply the percentage-of-the-recovery method.

Here, prior to filing the Complaints, Settlement Class Counsel executed a fee agreement with the Settlement Class Representatives that entitled Settlement Class Counsel to attorney fees of forty percent of any recovery, but Settlement Class Counsel has elected to request one-third of the fund. Ex. 4, Fish Decl., ¶ 11. Because the Parties negotiated an attorney fee arrangement at the start of the litigation, the presumption of market-rate reasonableness applies. *See Briggs v. PNC Financial Services Group, Inc.,* No. 1:15-cv-10447, 2016 WL 7018566, at *4 (N.D. Ill. Nov. 29, 2016). This percentage is consistent with standard contingent fee awards in the Northern District of Illinois. *See Dobbs v. DePuy Orthopaedics, Inc.,* 885 F.3d 455, 459 (7th Cir. 2018) ("The typical contingent fee is between 33 and 40 percent") *citing Gaskill v. Gordan,* 160 F.3d at 361, 362 (7th Cir. 1998); *Retsky Family Ltd. P'ship v. Price*

*Waterhouse LLP,* No. 97 C 7694, 2001 WL 1568856, at *4 (N.D. Ill. Dec. 10, 2001) (customary contingency fee ranges from 33 1/3% to 40% of the amount recovered)*; In re Diary Famers of Am., Inc.,* 80 F. Supp. 3d 838, 845 (N.D. Ill. 2015) (the usual range of contingent fees is between 33 and 50 percent); *McDaniel,* 2011 WL 13257336, at *4 ("[T]he real-word market range for contingent fee cases is 33% to 40%."); *see also* 5 William Rubenstein, NEWBERG ON CLASS ACTIONS § 15.83 (5th ed.) (noting that, generally, "50% of the fund is the upper limit on a reasonable fee award from any common fund").

### C. The Risk of Non-Payment Supports the Requested Attorney Fee Award

Settlement Class Counsel's decision to seek the market rate is also reasonable in light of the significant risks of nonpayment that Settlement Class Counsel faced. At the outset of the litigation, Settlement Class Counsel took "on a significant degree of risk of nonpayment" in agreeing to represent Settlement Class Representatives. *Taubenfeld,* 415 F.3d at 600.

Settlement Class Counsel took this case on a contingent fee basis and assumed the risk that they would receive *no* fee for their services. Ex. 4, Fish Decl., ¶ 12; *see Sutton*, 504 F.3d at 693-94 (7th Cir. 2007) ("We recognized [in an earlier case] that there is generally some degree of risk that attorneys will receive no fee (or at least not the fee that reflects their efforts) when representing a class because their fee is linked to the success of the suit.").

Here, Settlement Class Counsel faced risk of no recovery. In particular, Defendants could have defeated liability based on several defenses: (1) that the BIPA's healthcare exemption defeats Plaintiffs' claims, *see* 740 ILCS 14/10 (excluding from the definition of "biometric identifier" any "information captured from a patient in a health care setting"); (2) that Defendants' donor system did not collect biometric data covered by BIPA (a likely subject of future expert testimony); (3) that Defendants' alleged violations of BIPA were not "negligent" or "reckless," a claimed prerequisite to

recovery of monetary damages; and (4) that damages under BIPA are discretionary based on the word "may" in the remedies section of the statute, 740 ILCS 14/20, and that the Court would decline to award damages (or greatly reduce them) because Defendants' biometric technology allegedly posed no risk of harm to Settlement Class Members. And even if Plaintiffs prevailed on these issues, they risked recovering money for a much smaller class if Defendants prevailed in demonstrating that a one- or two-year limitations period, instead of a five-year period, applied to BIPA claims. There is limited authority on any of these issues and so the litigation would have been protracted and expensive. Given these risks, Settlement Class Counsel "could have lost everything" they invested. *Matter of Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 570 (7th Cir. 1992).

And, in the BIPA realm, litigation is not the only risk. Business interests have tried to gut BIPA in the legislature—with many bills recently introduced to amend or repeal BIPA.[3]

### D.      The Benefits Conferred Upon Class Members Justify the Requested Award

The benefit the Settlement provides Settlement Class Members is excellent as the payout is approximately $500 per claimant. This net per Settlement Class Participant recovery provides meaningful relief as many Defendants, and at least one court, have suggested that damages are discretionary. The per-Settlement Class Member amount compares favorably to other large BIPA settlements that have received final approval.

Nor will Class Members be required to provide a general release to participate in the Settlement. The absence of a general release exemplifies the results achieved for Class Members. *See Ramah Navajo Chapter v. Babbitt,* 50 F. Supp. 2d 1091, 1103-04 (D.N.M. 1999) (noting the

---

[3] *See* H.B. 559, 102nd Gen. Assembly (Ill. 2021); H.B. 560, 102nd Gen. Assembly (Ill. 2021); H.B. 1764, 102nd Gen. Assembly (Ill. 2021); H.B. 3112, 102nd Gen. Assembly (Ill. 2021); H.B. 3304, 102nd Gen. Assembly (Ill. 2021); H.B. 3414, 102nd Gen. Assembly (Ill. 2021); S.B. 56, 102nd Gen. Assembly (Ill. 2021); S.B. 300, 102nd Gen. Assembly (Ill. 2021).

limited, rather than general, release as further evidence of an exceptional result in favor of class members).

Settlement Class Counsel's fee request should be approved because it is reasonable based on the market rate. No further showing or analysis is needed. *In re FedEx Ground Package Sys., Inc. Employment Practices Litig.,* 251 F. Supp. 3d at 1243 ("A lodestar cross-check … isn't encouraged in this circuit."); *Wright v. Nationstar Mortgage LLC,* No. 14 C 10457, 2016 WL 4505169, at *17 (N.D. Ill. Aug. 29, 2016) (courts can skip a lodestar check); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 598 n.27 (N.D. Ill. 2011) ("use of a lodestar cross-check in a common fund case is unnecessary, arbitrary, and potentially counterproductive"). This is because the recovery for Settlement Class Members is substantial, the entire Net Settlement Fund will be distributed to Settlement Class Members who submit valid claims, and the settlement does not present indicia that it was the product of collusion between the Parties at the expense of Settlement Class Members. *See Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011) ("consideration of a lodestar check is not an issue of required methodology"); *In re Dairy Farmers of Am.*, 80 F. Supp. 3d 838, 850 (N.D. Ill. 2015) ("For attorneys who are arguing for a percentage-of-the-fund fee award, any delineation of hours is seemingly unnecessary . . . ."); *In re Trans Union Corp. Privacy Litig.*, No. 00 Civ. 4729, 2009 WL 4799954, at *9 (N.D. Ill. Dec. 9, 2009); *Wright,* 2016 WL 4505169, at *17 ("Nor the is the lodestar an accurate representation of the hypothetical market agreement between the plaintiffs and their attorneys"). As explained above, because Settlement Class Counsel's substantial work has "bought" a significant recovery for Settlement Class Members, the Court need not analyze Settlement Class Counsel's lodestar.

## V. The Payment of Class Counsel's Litigation Expenses are Appropriate

Settlement Class Counsel seek reimbursement of actual costs in the amount of $643.51

for litigation related expenses. (Exhibit 4, Fish Decl. ¶ 13). Settlement Class Counsel's request for these costs from the Gross Fund is appropriate, as these costs were necessarily incurred to litigate and settle this case.

## VI.    Payment of the Settlement Administrator's Costs Are Appropriate

Analytics Consulting, LLC ("Settlement Administrator") has administered the Class Notice process and will administer the remainder of the Settlement. Plaintiffs request that the Court award the Settlement Administrator its estimated expenses of $153,953. (Exhibit 3, Declaration, ¶ 12).

## VII.   Payment of the Service Awards is Appropriate

Consistent with the Settlement Agreement and Class Notice, the Settlement Class Representatives request Service Awards of $5,000 each from the Gross Fund. "Because a named plaintiff is an essential ingredient of any class action, an incentive award is appropriate if it is necessary to induce an individual to participate in the suit." *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) (affirming $25,000 incentive award); *Davis v. Heartland Emp. Servs., LLC*, No. 1:19-cv-00680, dkt. 130 (N.D. Ill. Oct. 25, 2021) ($10,000 service award in BIPA case); (Exhibit 2, Chart 4). The Class Representatives pursued this case in their own names and on behalf of the proposed class. In doing so, the Class Representatives accepted a risk of retaliation from future potential employers, or others with whom they want to affiliate, who can easily identify them through a Google or background search as the lead Plaintiffs in this lawsuit.

## VI.    CONCLUSION

Because the Settlement makes significant monetary relief available to Settlement Class Members who might have recovered nothing without the Settlement, the Court should grant final approval and enter the proposed Final Approval Order, which will be submitted to the Court via its proposed order email address and is attached hereto as Exhibit 5.

Dated:  August 10, 2023                      Respectfully submitted,

                                             /s/ David Fish
                                             One of Plaintiffs' Attorneys

David Fish
**FISH POTTER BOLAÑOS, P.C.**
111 East Wacker Drive, Suite 2300
Chicago IL 60601
dfish@fishlawfirm.com
(312) 861-1800

Mara Baltabols
**FISH POTTER BOLAÑOS, P.C.**
200 E. 5th Ave., Suite 115
Naperville, IL 60563
mara@fishlawfirm.com
(630) 264-4061

*Attorneys for Plaintiffs and*
*Others Similarly Situated*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that a true and correct copy of the foregoing was filed with the Court's CM/ECF filing system on August 10, 2023, which will serve a copy on all counsel of record.

<u>/s/ David Fish</u>
*One of the Attorneys for Plaintiffs*